Alexander Prieto (SBN 270864)
Richard Rothschild (SBN 67356)
Antionette D. Dozier (SBN 244437)
Rebecca Miller (SBN 317405)
WESTERN CENTER ON
LAW & POVERTY
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010-2826
Tel: (213) 487-7211
Fax: (213) 487-0242
aprieto@wclp.org
rrothschild@wclp.org
adozier@wclp.org
rmiller@wclp.org

Lindsay Nako (SBN 239090)
Jocelyn D. Larkin (SBN 110817)
David S. Nahmias (SBN 324097)
IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704-1693
Tel: (510) 845-3473
Fax: (510) 845-3654
lnako@impactfund.org
jlarkin@impactfund.org
dnahmias@impactfund.org

*Attorneys for Plaintiffs and the Plaintiff Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBIN HALL** and **STEVEN SUMMERS**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE** and **GEORGE ERVIN "SONNY" PERDUE III**, in his official capacity as United States Secretary of Agriculture,<br><br>Defendants. | Case No. 3:20-cv-03454<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** |

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES ......................................................................................... ii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ................... 1

I.     INTRODUCTION ................................................................................................ 2

II.    BACKGROUND ................................................................................................. 3

   A.   SNAP is a federally funded, state-administered anti-hunger program that provides low-income families monthly allotments to purchase food. ......................................... 3

   B.   Only very poor households qualify for SNAP, and only the poorest receive the maximum regular monthly allotment. ............................................................................. 4

   C.   COVID-19 causes unmet emergency food needs for California SNAP recipients, particularly for the poorest families already receiving the maximum regular SNAP allotment. ................................................................................................................................ 5

   D.   Congress responded to the increased need for food assistance caused by COVID-19 by providing mandatory emergency SNAP allotments in the Families First Act. ......... 8

   E.   USDA's final guidance implementing the Families First Act denies emergency allotments to the neediest families – those receiving the maximum regular allotment. 9

   F.   USDA relied on its guidance to deny California's request to provide Plaintiffs emergency allotments to meet their temporary food needs. ........................................... 10

III.   LEGAL STANDARD ......................................................................................... 12

IV.    ARGUMENT ...................................................................................................... 13

   A.   Plaintiffs will succeed on the merits of their APA claims because denying emergency allotments to the neediest households is inconsistent with the plain meaning of section 2302(a)(1) of the Families First Act. ........................................................................ 13

      1.   The challenged guidance is a final agency action because it is USDA's last word on emergency allotments and has immediate legal consequences. ....... 13

      2.   Section 2302(a)(1) unambiguously provides separate emergency allotments to meet temporary food needs for all SNAP households, including those receiving the maximum regular allotment. ...................................................... 14

      3.   USDA's policy cannot be justified by reference to a different SNAP statute, which does not govern emergency allotments and by its own terms does not deny allotments to recipients receiving the maximum regular benefit. .......... 17

   B.   Denial of emergency allotments to meet increased food needs during an unprecedented public health crisis irreparably harms Plaintiffs. ............................... 18

   C.   The balance of equities and public interest heavily favor a preliminary injunction.... 19

   D.   Plaintiffs should not be required to post a bond. ......................................................... 20

   E.   Plaintiffs, who have suffered harms caused by USDA's illegal actions that this Court can redress, have constitutional and prudential standing to bring this lawsuit. ........... 20

V.     CONCLUSION .................................................................................................... 22

1

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

2

**FEDERAL CASES**

3

*Abreu v. Callahan,*
   971 F. Supp. 799 (S.D.N.Y. 1997) ................................................................ 18

4

*All for the Wild Rockies v. Pena,*
   865 F.3d 1211 (9th Cir. 2017) .................................................................... 12

5

*Appalachian Power Co. v. E.P.A.,*
   208 F.3d 1015 (D.C. Cir. 2000) ................................................................. 14

6

7

*Bennett v. Spear,*
   520 U.S. 154 (1997) .................................................................................. 13

8

*Beno v. Shalala,*
   30 F.3d 1057 (1994) ............................................................................. 19, 21

9

10

*Booth v. McManaman,*
   830 F. Supp. 2d 1037 (D. Haw. 2011) .............................................. 18, 19, 20

11

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ..................................................................... 19

12

13

*Chevron U.S.A., Inc. v. Hammond,*
   726 F.2d 483 (9th Cir. 1984) ..................................................................... 18

14

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council,*
   467 U.S. 837 (1984) .................................................................................. 14

15

16

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) .................................................................................. 13

17

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .............................................................................. 13

18

19

*E. Bay Sanctuary Covenant v. Trump,*
   950 F.3d 1242 (9th Cir. 2020) ................................................................... 22

20

21

*Garnett v. Zeilinger,*
   313 F. Supp. 3d 147 (D.D.C. 2018) ............................................................ 18

22

*Gill v. United States Dep't of Justice,*
   913 F.3d 1179 (9th Cir. 2019) ................................................................... 13

23

24

*Golden Gate Rest. Ass'n v. City and County of San Francisco,*
   512 F.3d 1112 (2008) ............................................................................... 19

25

*Graham v. Fed. Emergency Mgmt. Agency,*
   149 F.3d 997 (9th Cir. 1998) ..................................................................... 22

26

27

*Havasupai Tribe v. Provencio,*
   906 F.3d 1155 (9th Cir. 2018) ................................................................... 13

28

*Heckler v. Lopez,*
    463 U.S. 1328 (1983) ............................................................................................. 20

*I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist.,*
    805 F.3d 1164 (9th Cir. 2015) ............................................................................... 15

*Levin v. Commerce Energy, Inc.,*
    560 U.S. 413 (2010) ............................................................................................... 22

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) ............................................................................... 20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................... 20, 21

*Mendia v. Garcia,*
    768 F.3d 1009 (9th Cir. 2014) ............................................................................... 21

*Miller v. Carlson,*
    768 F.Supp. 1331 (N.D. Cal. 1991) ...................................................................... 20

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ................................................................................. 14

*Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala,*
    65 F.3d 1472 (9th Cir. 1995) ................................................................................. 14

*Skyline Wesleyan Church v. California Dep't of Managed Health
    Care,___F.3d __, No. 18-55451,*
    2020 WL 2464926 (9th Cir. May 13, 2020) .......................................................... 21

*Taproot Admin. Servs., Inc. v. Comm'r,*
    679 F.3d 1109 (9th Cir. 2012) ......................................................................... 16, 17

*Walker v. Pierce,*
    665 F. Supp. 831 (N.D. Cal. 1987) ....................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................... 12

*Withrow v. Concannon,*
    942 F.2d 1385 (1991) ............................................................................................ 19

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010) ............................................................................... 20

**FEDERAL STATUTES**

5 U.S.C. § 704 ............................................................................................................ 14

5 U.S.C. § 706(2) ....................................................................................................... 13

7 U.S.C. § 2011 ................................................................................................... 3, 4, 17

7 U.S.C. § 2012(m)(1) .......................................................................................... 4

7 U.S.C. § 2012(s) ................................................................................................. 4

7 U.S.C. § 2013(a) ........................................................................................... 4, 22

7 U.S.C § 2014(c)(1) ............................................................................................. 4

7 U.S.C § 2014(h)(3)(A) ...................................................................................... 18

7 U.S.C. § 2017(a) ............................................................................................... 17

7 U.S.C § 2020 ...................................................................................................... 4

7 U.S.C. § 2025(a) ................................................................................................. 4

Families First Coronavirus Response Act,
   Pub. L. No. 116-127, § 2302(a), 134 Stat. 178 ......................................... passim

**STATE STATUTES**

Cal. Welf. & Inst. Code § 18900 ........................................................................... 4

Cal. Welf. & Inst. Code § 18900.2 ........................................................................ 4

**FEDERAL RULES**

Federal Rule of Civil Procedure 23(a) ................................................................ 12

Federal Rule of Civil Procedure 23(b)(2) ........................................................... 12

Federal Rule of Civil Procedure 65(c) ................................................................ 21

**FEDERAL REGULATIONS**

7 C.F.R. § 273.10(e)(2)(ii)(A) ............................................................................... 4

7 C.F.R. § 273.10(e)(4)(i) ...................................................................................... 4

7 C.F.R. § 277.4 ..................................................................................................... 4

**OTHER AUTHORITIES**

Exec. Order N-33-20 (Cal. Mar. 19, 2020) ........................................................... 6

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that, upon assignment of the case to a district or magistrate judge and as soon thereafter as counsel may be heard by the assigned judge, Plaintiffs Robin Hall and Steven Summers will move the Court, under Rule 65 of the Federal Rules of Civil Procedure and Rules 7-2 and 65-2 of the Local Civil Rules of the Court, for a preliminary injunction.

The Motion seeks a preliminary injunction enjoining Defendants from denying any otherwise appropriate request from California under section 2302(a)(1) of the Families First Coronavirus Response Act because it provides emergency Supplemental Nutrition Assistance Program (SNAP) allotments to households receiving the maximum monthly benefit amount. Plaintiffs seek a preliminary injunction on behalf of themselves and all others similarly situated. The motion will be heard under the terms of the Court's General Order No. 72-2 and is filed concurrently with a Motion for Class Certification that seeks certification of a proposed class of SNAP recipients in California who are eligible to receive, are receiving, or will receive the regular maximum monthly SNAP benefit.

This Motion is made on the grounds that Defendants' interpretation of Section 2302(a)(1) violates the Administrative Procedure Act and will cause irreparable harm, and the equities and public interest weigh in Plaintiffs' favor. The Motion is based on this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the declarations of Plaintiff Robin Hall, Plaintiff Steven Summers, Lauren Bauer, Andrew Cheyne, Meg Davidson, Sarah Palmer DeFrank, Brittany Hodge, Lindsay Nako and Alexander Prieto and any Exhibits attached thereto; and all the records and files in the action.

Dated: May 21, 2020

WESTERN CENTER ON LAW & POVERTY
IMPACT FUND

ALEXANDER PRIETO
Western Center on Law and Poverty

*Attorneys for Plaintiffs and the Plaintiff Class*

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Coronavirus has had devastating public health and economic impacts and transformed nearly all aspects of daily life.  Among its many impacts, this unprecedented crisis creates a need for additional food assistance among low-income families and individuals who depend on the Supplemental Nutrition Assistance Program (SNAP).  Because of disruptions caused by COVID-19, these households must spend more on food and have lost access to food pantries and similar resources they normally rely on.  Congress acted to address their urgent needs in the Families First Coronavirus Response Act.  Section 2302(a)(1) of the Act provides for "emergency allotments … to address temporary food needs" as a supplement to regular SNAP benefits.  The statute places a simple cap on these additional allotments: they cannot exceed the amount SNAP sets as the maximum regular monthly allotment for the household size.  Section 2302(a)(1) makes clear that Congress intended this emergency assistance to benefit *all* SNAP households:  the plain language of the statute makes no distinction among households, and the pandemic-related "temporary food needs" Congress sought to address impact all SNAP recipients.

In defiance of this unambiguous intent, USDA has issued guidance that denies emergency allotments to the most vulnerable SNAP households – those who already receive the maximum non-emergency SNAP allotment because of their extreme poverty.  The agency interprets section 2302(a)(1)'s cap on emergency allotments as applying not just to those allotments, as the plain language of the statute provides, but to the total of a household's regular and emergency allotments.  As a result, households with relatively higher incomes receive the greatest supplemental assistance, while the poorest receive nothing.  This interpretation violates the Administrative Procedure Act (APA) because USDA has no authority to deny urgently needed aid to households Congress intended to benefit.

But for this illegal guidance, California households receiving the maximum regular

allotment would have received emergency allotments.  Following SNAP's federal-state partnership model, California requested emergency allotments for all of the state's SNAP households.  But USDA rejected the request based on its unsupportable interpretation of section 2302(a)(1).  These families have already gone without emergency aid for March and April.  Unless the Court grants a preliminary injunction to stop USDA from violating the Families First Act, they will be denied emergency relief for the duration of the COVID-19 crisis.

Plaintiffs have filed a complaint challenging USDA's binding guidance under the APA and a motion to certify a plaintiff class of California SNAP households who are deemed eligible to receive the maximum regular SNAP allotment.  In this motion, they seek a preliminary injunction enjoining Defendants from denying any otherwise appropriate request from California under section 2302(a)(1) because it provides emergency SNAP allotments to households receiving the maximum monthly benefit amount.  The Court should grant the motion because all relevant factors weigh in their favor.  Plaintiffs will prevail under the APA because USDA's guidance is contrary to the plain language of the Families First Act.  Denial of emergency food assistance during an unprecedented public health crisis is irreparable harm that far outweighs any administrative inconvenience USDA may claim, and providing this critical aid to the most vulnerable households serves the public interest.

## II.    BACKGROUND

### A.  SNAP is a federally funded, state-administered anti-hunger program that provides low-income families monthly allotments to purchase food.

SNAP, part of the Food and Nutrition Act of 2008, is the nation's largest anti-hunger program.  Congress enacted SNAP to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. This core purpose has remained constant since the program, originally known as the Food Stamp Program, was introduced in 1964. Pub. L. No. 88-525, § 2, 78 Stat. 703.  SNAP is intended to fight "hunger and malnutrition" by increasing the "limited food purchasing

power" of low-income households. 7 U.S.C. § 2011.  SNAP accomplishes this purpose by

providing monthly allotments that eligible low-income families use to purchase food at

authorized retailers.  7 U.S.C. § 2013(a).

SNAP is a federal-state partnership.  USDA pays the full cost of monthly allotments,

but they are administered by the states, which must opt into the program.  7 U.S.C.

§§ 2013(a), 2020.  USDA also funds 50 percent of the states' SNAP administrative costs.  7

U.S.C. § 2025(a); 7 C.F.R. § 277.4.  States that elect to participate in SNAP designate a state

agency to carry out the program at the state level.  7 U.S.C. §§ 2012(s), 2020.  California has

chosen to participate in SNAP and designated the California Department of Social Services

as its responsible state agency.  Cal. Welf. & Inst. Code § 18900.  SNAP is known as

CalFresh in California. Cal. Welf. & Inst. Code § 18900.2.

### B.  Only very poor households qualify for SNAP, and only the poorest receive the maximum regular monthly allotment.

To receive SNAP benefits, a household – defined as a group of people who purchase

and prepare food together – generally must have a net income at or below 100 percent of the

federal poverty line after various deductions and exclusions that account for items including

housing, dependent care, and medical expenses.  7 U.S.C. §§ 2012(m)(1), 2014(c)(1); 7

C.F.R. § 273.10(e)(2)(ii)(A).  A household's monthly allotment is calculated by subtracting

30 percent of its net income from the maximum regular allotment for the household size. 7

C.F.R. § 273.10(e)(2)(ii)(A).  Families who receive the non-emergency maximum allotment

are thus extremely poor – their net income after deductions for basic needs other than food is

zero.  This means that, without SNAP, they have no money to buy food unless they sacrifice

other essentials.

The maximum regular SNAP allotment is uniform by household size across the 48

contiguous States and the District of Columbia.  7 C.F.R. § 273.10(e)(4)(i).  The current

maximum regular allotment for a single person is $194 per month.  This equals $6.38 per day

or about $2 per meal.  Maximum SNAP allotments increase as household size increases, as

shown in the table below:

*Federal Fiscal Year 2020 Maximum Allotment by Household Size*[1]

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Each Add'l Person |
|---|---|---|---|---|---|---|---|---|
| $194 | $355 | $509 | $646 | $768 | $921 | $1,018 | $1,164 | +$146 |

Even before COVID-19, California households receiving the maximum regular allotment struggled to afford a nutritious diet.  Because food costs in California are significantly higher than the national average, the purchasing power of the nationally uniform maximum allotment is lower here.  Declaration of Lauren Bauer in Support of Motion for Preliminary Injunction (Bauer Decl.) ¶¶ 25-27.  In 2018, the maximum allotment per meal did not cover the cost of a meal in any county in California.  *Id.* ¶ 27.

To get by on just the maximum SNAP allotment, California households must carefully plan their monthly food budgets and supplement their purchases with food from food pantries and other sources.  *Id.* ¶ 33; Declaration of Robin Hall ¶ 14; Declaration of Steven Summers ¶¶ 12, 18.  Plaintiff Steven Summers, for example, qualifies for the maximum SNAP allotment, but even before the pandemic, he still relied on free groceries from a food assistance program and used money from his dwindling savings to buy additional food.  Summers Decl. ¶¶ 18, 19.  Plaintiff Robin Hall regularly attended a free church breakfast program and soup kitchens to supplement what she could buy with the maximum allotment.  Hall Decl. ¶¶ 13, 14.

### C.  COVID-19 causes unmet emergency food needs for California SNAP recipients, particularly for the poorest families already receiving the maximum regular SNAP allotment.

Since January 2020, COVID-19 has swept across the country, radically altering daily life and causing devastating economic and public health consequences.  As of May 20, 2020, there are over 1.5 million known cases of COVID-19 in the U.S., and over 90 thousand

---

[1] Cal. Dep't of Soc. Servs., All County Info. Notice I-54-19, *CalFresh Cost-of-Living Adjustments Effective October 1, 2019* at 2 (Aug. 21, 2019), https://www.cdss.ca.gov/Portals/9/ACIN/2019/I_54_19_ES.pdf?ver=2019-09-24-104141-480.

1   Americans have died from the virus.[2]  There are 84 thousand known cases of COVID-19 in

2   California.[3]  Over three thousand Californians have died from the virus, and an additional

3   three thousand Californians have been hospitalized with positive COVID-19 tests.[4]

4         On March 4, Governor Gavin Newsom declared a state of emergency in California

5   based on COVID-19.  Governor Gavin Newsom, Proclamation of a State of Emergency

6   (Mar. 4, 2020),  https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-

7   SOE-Proclamation.pdf.  To contain the spread of the virus, the Governor issued a "shelter-in-

8   place" executive order on March 19, 2020, prohibiting residents from leaving their homes

9   except to complete essential activities.  Exec. Order N-33-20 (Cal. Mar. 19, 2020), *available*

10  *at* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.

11        Among numerous other impacts, the pandemic has greatly increased food insecurity

12  in California.  Bauer Decl. ¶¶ 18-20.  A recent study of the impact of the COVID-19

13  pandemic found that 26 percent of households in California were "food insecure," meaning

14  that respondents reported that "the food that we bought didn't last, and we didn't have

15  enough money to get more."  *Id.*  A full third of California households in the study were

16  "worried our food would run out before we got money to buy more."  *Id.*

17        Households receiving the maximum SNAP allotment are especially vulnerable to

18  increased food insecurity during the pandemic.  COVID-19 and the state's shelter-in-place

19  order increase these families' need for food assistance in several key ways.

20        First, increased food prices caused by the pandemic further reduce the inadequate

21  purchasing power of the maximum SNAP allotment in California.  Bauer Decl. ¶¶ 29-31, 34.

22  The cost of purchasing food to eat at home has increased 3.6 percent nationally over the past

23  three months.  *Id.* ¶¶ 30-31.  The April 2020 increase (2.6 percent) was the largest one-month

24  increase since 1974.  *Id.* ¶ 30.  The price of eggs rose 16 percent between March and April,

---

25  [2] Ctrs. For Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in

26  the U.S.* (last updated May 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

27  [3] *California Coronavirus COVID-19 Statewide Update* (last updated May 20, 2020), https://update.covid19.ca.gov.

28  [4] *Id.*

1   and prices of other staples like meat and grains have also increased.  *Id.*

2         Second, changes in the availability of groceries caused by COVID-19 make it harder

3   to stretch the maximum allotment to meet nutritional needs, as does the need to shelter in

4   place, which limits trips to grocery stores.  *Id.* ¶¶ 34-35; Summers Decl. ¶¶ 13-17.  Mr.

5   Summers, for example, could not find the $1 cans of tuna fish or discounted ground beef he

6   usually buys during a recent shopping trip.  Summers Decl. ¶ 14.  He has also had to

7   purchase more expensive brands of pasta and rice because they are all that is available on the

8   shelves.  *Id.* ¶ 15.  And while his normal shopping and budgeting process calls for trips to

9   several different stores to find the best deals, he must now balance the need for bargains

10  against the increased risk of exposure to coronavirus from visits to multiple grocers.  *Id.*

11  ¶¶ 14-17.  At age 64, he is among those most vulnerable to severe health consequences if he

12  contracts COVID-19.  *Id.* ¶ 3.

13        Third, the pandemic has made it more difficult for SNAP recipients to obtain food

14  from food pantries, soup kitchens, and other community organizations.  Across California,

15  demand for these organizations' services has skyrocketed in the wake of the pandemic.

16  Declaration of Andrew Cheyne, California Association of Food Banks ¶ 6; Declaration of

17  Meg Davidson, San Francisco-Marin Food Bank ¶¶ 5-7; Declaration of Sarah Palmer

18  DeFrank, Berkeley Food Network ¶ 6; Declaration of Brittany Hodge, St. Anthony's

19  Foundation ¶ 6.  At the same time, COVID-19 creates many new operational challenges for

20  them, including food supply issues, shortage of staff and volunteers, and new pandemic-

21  related expenses like protective equipment.  Cheyne Decl. ¶ 8; Davidson Decl. ¶¶ 4, 5;

22  Hodge Decl. ¶ 6.  These pressures have forced many direct providers of free food to close or

23  drastically reduce their locations, making it harder for SNAP recipients to find food

24  distributors near them.  *See* Davidson Decl. ¶ 4; DeFrank Decl. ¶ 5; Hall Decl. ¶ 16; Hodge

25  Decl. ¶ 8.

26        When SNAP recipients manage to access an open food distribution point, the

27  groceries may run out before they reach the head of the line or they may receive smaller

28  amounts of food and less nutritious items.  *See* Davidson Decl. ¶ 9; DeFrank Decl. ¶ 7;

1   Summers Decl. ¶ 18.  The Berkeley Food Network, for example, "provides households of

2   five people with the same amount of food [it] would normally give to individuals."  DeFrank

3   Decl. ¶¶ 7, 11.  And instead of donating ready-made food, the cafeterias that supply its Hub

4   Kitchen program provide difficult-to-use bulk items like industrial-size cans of tomatoes.

5   DeFrank Decl. ¶ 10.

6         The consequences of increased food insecurity during a pandemic are severe.

7   Children living in food-insecure households tend to have a lower health-related quality of

8   life, higher rates of asthma, less nutritious diets, anemia, and cognitive and behavioral

9   problems that affect well-being and school performance.  Bauer Decl. ¶ 7.  Among adults,

10  food insecurity is predictive of poor nutrition, poor self-reported health, depression and

11  anxiety, diabetes, and chronic disease.  *Id.*

12

13        **D.  Congress responded to the increased need for food assistance caused by**
          **COVID-19 by providing mandatory emergency SNAP allotments in the**
14        **Families First Act.**

15        In response to the unprecedented national crisis created by the COVID-19 pandemic,

16  Congress passed the Families First Coronavirus Response Act on March 18, 2020.  Pub. L.

17  No. 116-127, 134 Stat. 178 (Families First Act).  In section 2302(a)(1) of the Act, Congress

18  addressed the additional food needs resulting from the pandemic by authorizing extra

19  "emergency allotments" to increase SNAP recipients' food purchasing power.

20        Section 2302(a)(1) makes emergency food assistance available when two conditions

21  are met.  There must be (1) "a public health emergency declaration by the Secretary of

22  Health and Human Services under section 319 of the Public Health Service Act based on an

23  outbreak of coronavirus disease 2019 (COVID–19)"—which occurred on January 31, 2020[5]

24  —and (2) "an emergency or disaster declaration by a State based on an outbreak of COVID-

25

26

27  [5] Press Release, Dep't of Health & Hum. Servs., Secretary Azar Declares Public Health
    Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020),
28  https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-
    emergency-us-2019-novel-coronavirus.html.

19"—which occurred in California on March 4, 2020.[6]  Families First Act § 2302(a).  If both are satisfied, USDA "shall provide … for emergency allotments" upon a request from a state agency "that provides sufficient data … supporting such request."  *Id.* § 2302(a)(1).  The statute directs USDA to issue guidance regarding the information necessary to support a state's request.  *Id.*

Section 2302(a)(1) does not set specific amounts for emergency allotments, but sets two parameters for those amounts.  Emergency allotments (1) must be targeted to "temporary food needs" and (2) cannot be "greater than the applicable maximum monthly allotment for the household size."

### E.  USDA's final guidance implementing the Families First Act denies emergency SNAP allotments to the neediest families – those receiving the maximum regular allotment.

USDA set forth its official interpretation of section 2302(a)(1) in two guidance documents issued on March 20, 2020 and April 21, 2020.  In this guidance, the agency interprets section 2302(a)(1) as limiting emergency allotments to the difference between a household's regular allotment and the standard maximum allotment for the household size.  In other words, families receiving less than the maximum regular allotment can be "topped off," but families who already receive the maximum due to their extreme poverty are completely denied emergency assistance to meet their temporary food needs.

On March 20, 2020, USDA issued a memorandum to state agencies with a template "Request to Provide Emergency Allotments (Supplements) to SNAP Households." Declaration of Lindsay Nako ¶ 3, Ex. 2.  The template limits permissible state requests for emergency allotments to requests to "bring all households up to the maximum benefit due to pandemic related economic conditions for up to 2 months."  *Id.*

On April 21, 2020, USDA issued updated guidance regarding emergency allotments

---

[6] Governor Gavin Newsom, Proclamation of a State of Emergency (Mar. 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

for additional months. *Id.* ¶ 3, Ex. 7.  This guidance authorizes states with requests approved

under the March guidance to continue issuing monthly emergency allotments as long as the

conditions in section 2302(a) (a federal public health emergency declaration and a state

emergency declaration) remain in place. *Id.*  The April guidance repeats the agency's

interpretation that "SNAP households that already receive the maximum monthly allotment

for their household size are not eligible for [emergency allotments]." *Id.*  Both guidance

documents also provide simple instructions about the data necessary to support a request for

emergency allotments. *Id.* ¶ 3, Exs. 2, 7.

### F.  USDA relied on its guidance to deny California's request to provide Plaintiffs emergency allotments to meet their temporary food needs.

The California Department of Social Services submitted a request to provide

emergency allotments to USDA on March 25, 2020.  Nako Decl. ¶ 3, Ex. 3.  This request

sought to provide emergency allotments to all SNAP households, including those receiving

the maximum regular allotment.  It explained that "[t]hese households are the poorest SNAP

households.  The reason households receive the maximum benefit is that they have *no*

income available to purchase food under the SNAP benefit calculation rules." *Id.*  The

request expressed the state's view that USDA's interpretation denying emergency allotments

to these households, who "are most likely to have unmet food needs in a time of crisis,"

"finds no support in the language or purpose of section 2302." *Id.*

California therefore proposed to provide emergency allotments "more equitably,"

without exceeding the aggregate amount permissible under USDA's guidance. *Id.*  Under the

state's proposal, the total amount necessary to raise all households to the regular maximum

monthly allotment would have been divided equally between all SNAP households, resulting

in a flat emergency allotment of $60 per person per household. *Id.*  The request also included

information about the economic impact of COVID-19 in the state, consistent with USDA's

guidance on supporting data. *Id.*

On March 26, USDA denied California's request and directed the state to revise the

request "in accordance with the template."  Nako Decl. ¶ 3, Ex. 4.  The next day, California submitted a revised request consistent with the guidance, accompanied by a cover letter reiterating the state's position regarding USDA's interpretation of section 2302(a)(1).  *Id.* ¶ 3, Ex. 5.  The information about economic impact supporting the revised request was identical in substance to that in the initial request, except for an updated count of COVID-19 cases. *Id.* ¶ 3, Exs. 3, 5.

USDA approved the revised request.  *Id.* ¶ 3, Ex. 6.  Emergency allotments for March and April have been issued to households receiving less than the maximum regular allotment. *Id.*  Under the updated April guidance, California is approved to continue issuing emergency allotments that give the most to households with higher incomes, but prohibited from providing emergency aid to the poorest families.  *See id.* ¶ 3, Ex. 7.  The state expects to issue emergency allotments for May in June.  *Id.* ¶ 3, Ex. 8.

Plaintiffs Robin Hall and Steven Summers are two of the many California SNAP households denied emergency allotments by USDA's guidance.  Hall Decl. ¶¶ 9-12; Summers Decl. ¶ 9-11.  Ms. Hall, who has Type 2 diabetes, has had to skip meals during the pandemic because she lost access to the free food resources she relied on to supplement her maximum SNAP allotment.  Hall Decl. ¶¶ 2, 14, 16, 19.  The church-based free breakfast program she attended every morning shut down, and the homeless day center where she sometimes received free lunches stopped its regular meal services.  *Id.* ¶¶ 13,14, 16.  Ms. Hall must also avoid soup kitchens, which are crowded and have long lines, because her diabetes increases her risk for severe symptoms if she contracts COVID-19.  *Id.* ¶ 16. Because of her condition, skipping meals threatens her health. *Id.* ¶ 19.  Additional SNAP benefits would allow her to eat regularly again.  *Id.*

Since the pandemic, Mr. Summers has had to spend more on food because prices are higher and he cannot always find the inexpensive items and deals he usually relies on. Summers Decl. ¶¶ 14, 15.  He is also less able to supplement his diet with free food resources.  Before the pandemic, Mr. Summers could select the free food items he needed at the Emeryville Citizens Assistance Program, providing him at least a day's worth of meals

each time he went. *Id.* ¶ 18.  Now, the program provides pre-selected food boxes that

sometimes contain non-nutritious foods like candy and items like sour cream that require

additional purchases to make a complete meal, adding to what he must spend purchasing

food during the pandemic. *Id.* ¶ 18.  Because his normal SNAP assistance does not cover

these increased expenses, Mr. Summers has had to spend more of his limited savings on

food, leaving him without enough to pay his rent. *Id.* ¶ 19.

Concurrent with this motion, Plaintiffs have filed a motion under Federal Rule of

Civil Procedure 23(a) and 23(b)(2) for certification of a proposed class of Plaintiffs defined

as:

> SNAP recipients in California who have been deemed eligible to receive, are
> receiving, or will receive the regular maximum monthly SNAP allotment for
> their household size from March 2020 until the Secretary for Health and
> Human Services rescinds the COVID-19 public health emergency declaration
> or the State-issued emergency or disaster declaration expires.

On behalf of themselves and the class, they seek a preliminary injunction enjoining

Defendants from denying any otherwise appropriate request from California under section

2302(a)(1) because it provides emergency allotments to households receiving the maximum

monthly benefit amount.

## III.   LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate that (1) it "is likely to

succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of

preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in

the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the

"sliding scale" variant of the *Winter* standard adopted by the Ninth Circuit, "if a plaintiff can

only show that there are serious questions going to the merits—a lesser showing than

likelihood of success on the merits—then a preliminary injunction may still issue if the

balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are

satisfied."  *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (citations

and internal quotation marks omitted).

1

## IV.   ARGUMENT

2

### A.  Plaintiffs will succeed on the merits of their APA claims because denying emergency allotments to the neediest households is inconsistent with the plain meaning of section 2302(a)(1) of the Families First Act.

3

4   The APA directs reviewing courts to "hold unlawful and set aside agency action"

5   that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"

6   or "in excess of statutory jurisdiction [or] authority."  5 U.S.C. § 706(2); *Dep't of Commerce*

7   *v. New York*, 139 S. Ct. 2551, 2567 (2019).  "[W]hether framed as an incorrect application of

8   agency authority or an assertion of authority not conferred[, the question] is always whether

9   the agency has gone beyond what Congress has permitted it to do . . . ."  *City of Arlington v.*

10   *FCC*, 569 U.S. 290, 297–98 (2013).

11   The USDA guidance challenged in this case is final agency action subject to APA

12   review.  It must be set aside because it is inconsistent with the plain language of section

13   2302(a)(1).  Because the statute unambiguously provides separate emergency allotments for

14   all SNAP households, USDA has no authority to deny them to households receiving the

15   maximum regular SNAP allotment.

16

17   ### 1.  The challenged guidance is a final agency action because it is USDA's last word on emergency allotments and has immediate legal consequences.

18   Section 704 of the APA authorizes judicial review of "final agency action."  5 U.S.C.

19   § 704.  The threshold question in a suit under the APA is whether the challenged action is

20   final under this section.  *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018).

21   In *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), the Supreme Court identified two

22   conditions necessary for an agency action to be final under section 704.  First, the action

23   must "mark the consummation of the agency's decisionmaking process – it must not be of a

24   merely tentative or interlocutory nature"; second, the action must "be one by which rights or

25   obligations have been determined, or from which legal consequences will flow."  *Id.*

26   (citations and internal quotation marks omitted); *see also Gill v. U.S. Dep't of Justice*, 913

27   F.3d 1179, 1184 (9th Cir. 2019).  Courts applying this test "focus on the practical and legal

28   effects of the agency action and interpret finality in a pragmatic and flexible manner."  *Gill*,

1  913 F.3d at 1184 (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th

2  Cir. 2006)) (internal quotation marks omitted).

3        Both *Bennett* conditions are satisfied here.  In evaluating *Bennett*'s first condition,

4  courts consider "whether the action amounts to a definitive statement of the agency's

5  position" and whether the agency expects "immediate compliance" with its terms.  *Or. Nat.*

6  *Desert Ass'n*, 465 F.3d at 982.  The guidance is the agency's last word on the permissible

7  scope of emergency allotments:  section 2302(a)(1) is an emergency statute requiring

8  immediate implementation and USDA has already used the guidance to evaluate states'

9  requests under it.  *See, e.g.*, Nako Decl. ¶ 3, Exs. 4, 6.  USDA also requires strict and

10 immediate compliance with the guidance; the agency rejected California's initial request for

11 failure to conform with it and required the state to submit a revised, compliant request.  There

12 is thus no question that the agency's decisionmaking process on emergency allotments is at

13 an end, satisfying *Bennett*'s first condition for final agency action.

14       *Bennett*'s second condition is also satisfied.  The guidance has immediate and

15 concrete legal consequences, as it determines the outcome of states' requests.  *See*

16 *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (*Bennett*'s second

17 condition is satisfied where a guidance document "give[s] the States their 'marching

18 orders'").  The guidance impacts SNAP recipients' access to emergency allotments by

19 denying state requests that include supplemental benefits for households at the maximum

20 regular allotment.  In doing so, it denies Plaintiffs crucial food assistance.  These legal

21 consequences more than satisfy *Bennett*'s second condition.  Because both conditions are

22 met, the guidance is final agency action.

23

24       **2.  Section 2302(a)(1) unambiguously provides separate emergency allotments to**
           **meet temporary food needs for all SNAP households, including those**
25           **receiving the maximum regular allotment.**

26       "If the plain meaning of the statute is clear, this Court and the agency 'must give

27 effect to the unambiguously expressed intent of Congress.'"  *Queen of Angels/Hollywood*

28 *Presbyterian Med. Ctr. v. Shalala*, 65 F.3d 1472, 1477 (9th Cir. 1995) (quoting *Chevron,*

1   *U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984)).  To determine plain

2   meaning, courts evaluate the language of the statute "in light of the overall purpose and

3   structure of the whole statutory scheme." *I.R. ex rel. E.N. v. Los Angeles Unified Sch. Dist.*,

4   805 F.3d 1164, 1167 (9th Cir. 2015).

5       Applying these principles here, the meaning of section 2302(a)(1) is unambiguous.

6   Under the plain language of the statute, reinforced by its structure and purpose, households

7   receiving the maximum regular SNAP allotment are eligible for additional emergency

8   allotments to address their increased food needs during the pandemic.

9       Section 2302(a)(1) of the Families First Act provides that upon a properly supported

10  request from a state agency, USDA "shall provide . . . for emergency allotments to

11  households participating in the supplemental nutrition assistance program under the Food and

12  Nutrition Act of 2008 to address temporary food needs not greater than the applicable

13  maximum monthly allotment for the household size[.]"

14      This statutory language clearly identifies the families and individuals Congress

15  intended to aid: "households participating in the supplemental nutrition assistance program."

16  This unambiguous and unqualified phrase includes all households that receive a regular

17  SNAP allotment, making clear that households receiving the maximum regular allotment are

18  among those Congress intended to benefit.

19      The words Congress used to describe the problem it sought to address – "temporary

20  food needs" – also demonstrate that households receiving the maximum allotment are

21  intended beneficiaries under section 2302(a)(1).  Read in context, this phrase plainly refers to

22  increased needs for food assistance caused by COVID-19.  The pandemic temporarily

23  increases SNAP households' need for food assistance in several ways.  Among other things,

24  it raises the price of food, makes it harder to find low-cost staples on grocery shelves, and

25  reduces access to free food from food pantries and similar sources.  All SNAP recipients are

26  experiencing the conditions that have created the "temporary food needs" that Congress

27  intended to address.  Because of their dire economic circumstances, households receiving the

28  maximum allotment are the most likely to have increased needs.  There is no reason to

1   conclude that Congress intended to benefit all SNAP recipients *except* these households.

2        To address pandemic-related food needs, Congress authorized "emergency allotments

3   . . . not greater than the applicable maximum monthly allotment for the household size."

4   This language too confirms that Congress intended to aid households receiving the maximum

5   regular allotment.  Interpreting the words Congress used in context and "in their ordinary,

6   everyday senses" (*Taproot Admin. Servs., Inc. v. Comm'r*, 679 F.3d 1109, 1116 (9th Cir.

7   2012)), "emergency allotment[ ]" plainly refers to something provided *in addition to* the

8   regular monthly allotment a household receives under non-emergency conditions.  The

9   phrase "not greater than the applicable maximum monthly allotment for the household size"

10   then places a simple cap on the amount of these separate emergency allotments.  The

11   permissible amount of emergency allotments is defined by this cap and the scope of the

12   temporary needs caused by the pandemic.

13        Nothing in the text of section 2302(a)(1) supports a reading in which a household's

14   emergency allotment is limited by the amount of its regular allotment – that amount is not

15   mentioned anywhere in the statute.  And nothing in the statutory language indicates an intent

16   to distinguish between different groups of SNAP households, or to exclude those with the

17   greatest need.  If Congress had intended for the statute to operate the way USDA has

18   implemented it, it could easily have said so, for example by providing, "The total monthly

19   assistance received by a household, including its emergency allotment, shall not exceed the

20   applicable maximum monthly allotment for the household size."  But that is not what the

21   statute says.  The phrase "not greater than the applicable maximum monthly allotment for the

22   household size" modifies "emergency allotments … to address temporary food needs."  It

23   must therefore be read as a limit on the amount of those separate allotments, not a limit on

24   the combined total of a household's regular and emergency allotments.

25        The purpose and structure of the Families First Act reinforce this plain language

26   reading of the statute.  Nothing in section 2302(a)(1) or elsewhere in the Act suspends the

27   issuance of regular SNAP allotments, demonstrating that Congress intended to provide two

28   parallel streams of assistance: separate emergency allotments alongside ongoing regular

1   allotments.

2   And because emergency allotments are intended to address additional pandemic-

3   related needs above and beyond the needs addressed by regular allotments, subtracting those

4   allotments from the value of emergency allotments thwarts the purpose of the statute.

5   Congress intended to help households experiencing temporary food needs because of

6   COVID-19 and could not have intended to exclude the households most vulnerable to those

7   needs.  Denying emergency allotments to households receiving the maximum regular

8   allotment would also violate the Food and Nutrition Act's express purpose of "safeguard[ing]

9   the health and well-being of the Nation's population by raising levels of nutrition among

10  low-income households."  7 U.S.C. § 2011.  Consistent with this purpose, the Food and

11  Nutrition Act is structured to provide the most assistance to the households who are least able

12  to afford food.  7 U.S.C. § 2017(a).  Denying those households emergency allotments, while

13  providing greater emergency assistance to households with higher incomes, would turn this

14  longstanding principle on its head.  There is no fathomable reason why Congress would

15  choose to distribute emergency allotments in such an arbitrary and inequitable way.

16

17   **3.   USDA's policy cannot be justified by reference to a different SNAP statute,
         which does not govern emergency allotments and by its own terms does not
18       deny allotments to recipients receiving the maximum regular benefit.**

19   Instead of applying section 2302(a)(1) as Congress wrote it, USDA states that it

20  derives its limit on emergency allotments from 7 U.S.C. § 2014(h)(3)(A).  Declaration of

21  Alexander Prieto ¶ 3, Ex. 2 (letter from USDA to Plaintiffs' counsel).  According to the

22  agency, this statute "prohibits SNAP participants from receiving more than the maximum

23  SNAP allotment for their household size."  *Id.*  But section 2014(h)(3)(A), which provides

24  emergency SNAP allotments to replace food destroyed in a disaster, contains no such

25  prohibition.  It is also entirely consistent with an interpretation of section 2302(a)(1) that

26  provides emergency allotment for all SNAP households.

27   Section 2014(h)(3)(A) states:

28   The Secretary shall provide, by regulation, for emergency allotments to

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;               17
MEMORANDUM OF POINTS AND AUTHORITIES [CASE NO. 3:20-cv-03454]

1
2
eligible households to replace food destroyed in a disaster. The regulations shall provide for replacement of the value of food actually lost up to a limit approved by the Secretary not greater than the applicable maximum monthly allotment for the household size.

3   Like section 2302(a)(1), this provision does not limit the combined total of a household's

4   regular and emergency allotments.  It simply says that an emergency allotment to replace

5   food destroyed in a disaster cannot exceed the maximum monthly allotment – the same limit

6   section 2302(a)(1) places on emergency allotments to address pandemic-related food needs.

7           Because there are no references to section 2014(h)(3)(A) in section 2302(a)(1) or

8   elsewhere in the Families First Act, there is also no reason to conclude that Congress

9   intended section 2014(h)(3)(A) to govern emergency allotments under the Act.  The two

10  statutes address two different kinds of emergencies, and section 2014(h)(3)(A) does not

11  define "emergency allotment" or place any generally applicable limits on emergency

12  allotments.  Even if it did, section 2302(a)(1), the more recent and more specific statute,

13  would control if there were an irreconcilable conflict between them.  *Chevron U.S.A., Inc. v.*

14  *Hammond*, 726 F.2d 483, 490 n.8 (9th Cir. 1984).

15          By denying emergency allotments to families and individuals receiving the maximum

16  regular SNAP allotment, USDA has failed to act in accordance with law and exceeded its

17  authority under section 2302(a)(1).

18
19
**B. Denial of emergency allotments to meet increased food needs during an unprecedented public health crisis irreparably harms Plaintiffs.**

20          Without a preliminary injunction, Plaintiffs will be denied access to emergency

21  SNAP allotments necessary to obtain vital nutrition during an unprecedented public health

22  crisis.  That denial unquestionably constitutes irreparable harm and warrants issuance of a

23  preliminary injunction.  Denial of subsistence benefits "almost universally has been regarded

24  as irreparable injury because welfare recipients depend upon them . . . to sustain life." *Abreu*

25  *v. Callahan*, 971 F. Supp. 799, 821 (S.D.N.Y. 1997).  Numerous courts have held that

26  deprivation of food from denial of SNAP benefits is irreparable harm. *See, e.g., D.C. v. U.S.*

27  *Dep't of Agric.*, __ F. Supp. 3d. __, No. CV 20-119 (BAH), 2020 WL 1236657 at *30

28  (D.D.C. Mar. 13, 2020); *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157 (D.D.C. 2018); *Booth*

1  *v. McManaman*, 830 F. Supp. 2d 1037, 1043 (D. Haw. 2011).

2          The fact that Plaintiffs are receiving their normal monthly SNAP assistance does not

3  change the conclusion that denial of emergency allotments inflicts irreparable harm.  While

4  Plaintiffs continue to receive the regular maximum monthly allotment, that amount is at best

5  just enough to meet minimum needs under normal economic conditions.  And as the Ninth

6  Circuit recognized in in *Beno v. Shalala*, 30 F.3d 1057, 1063–64, n.10 (1994), reductions in

7  public benefits "of a relatively small magnitude" can "impose irreparable harm" for those on

8  the economic margin of existence.  Denial of emergency SNAP allotments during a crisis

9  that makes food both more expensive and more difficult to obtain is irreparable injury for

10  households that receive the maximum regular allotment because of their extreme poverty.

11

12          **C.  The balance of equities and public interest heavily favor a preliminary injunction.**

13          The last two preliminary injunction factors, the balance of equities and the public

14  interest, merge when the government is a party.  *California v. Azar*, 911 F.3d 558, 575 (9th

15  Cir. 2018).  These factor tip sharply in Plaintiffs' favor here.  Without a preliminary

16  injunction, Plaintiffs will go without emergency assistance to meet urgent food needs.  And

17  an injunction will serve the public's interest in "ensuring that eligible low-income households

18  receive needed assistance to provide food for themselves and their families."  *Booth*, 830 F.

19  Supp. 2d at 1045.  These considerations far outweigh any administrative or economic

20  hardship USDA may claim to suffer.

21          A preliminary injunction requiring an agency to comply with the Food and Nutrition

22  Act should not be considered a burden when balancing the equities, because "[t]he Act itself

23  imposes the burden; th[e] injunction merely seeks to prevent the defendants from shirking

24  their responsibilities under it."  *Withrow v. Concannon*, 942 F.2d 1385, 1388 (1991) (citation

25  and internal quotation marks omitted).  And when the conflict is one "between financial

26  concerns and preventable human suffering," the balance of equities strongly favors a

27  preliminary injunction.  *Golden Gate Rest. Ass'n v. City and County of San Francisco,* 512

28  F.3d 1112, 1126 (2008).  Applying these two principles, the court in *Booth* issued an

1   injunction requiring timely processing of SNAP applications, finding that the public interest

2   and SNAP recipients' need for food "clearly outweighed" any "additional expenses or . . .

3   administrative difficulties" the defendants might experience.  830 F. Supp. 2d at 1044.  The

4   public interest further favors a preliminary injunction because "[o]ur society as a whole

5   suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their

6   rights or privileges."  *Lopez v. Heckler,* 713 F.2d 1432, 1437 (9th Cir. 1983), *rev'd in part on*

7   *other grounds*, 463 U.S. 1328 (1983).

8        The balance of the equities, the public interest, and all relevant factors favor

9   preliminary relief in this case.

10

11              **D.  Plaintiffs should not be required to post a bond.**

12        "Although Federal Rule of Civil Procedure 65(c) generally provides that a

13   preliminary injunction will not issue except upon the giving of security, it is not required

14   where plaintiffs are indigent or where considerations of public policy make waiver of a bond

15   appropriate."  *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991).  Exercise of that

16   discretion is particularly appropriate in an action brought by a class of indigent plaintiffs.

17   *See, e.g., Walker v. Pierce*, 665 F. Supp. 831, 844 (N.D. Cal. 1987).  The Court should waive

18   the posting of any bond in this case.

19

20              **E.  Plaintiffs, who have suffered harms caused by USDA's illegal actions that**
21              **this Court can redress, have constitutional and prudential standing to**
              **bring this lawsuit.**

22        Article III's  "case or controversy" requirement "consists of three elements: "(1) an

23   injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation;

24   and (3) a likelihood that a favorable decision will redress the injury."  *Wolfson v. Brammer*,

25   616 F.3d 1045, 1056 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

26   560-61 (1992)).  This case meets all those requirements.

27        First, there cannot be a dispute that the named Plaintiffs and every class member have

28   suffered concrete injury:  denial of emergency allotments to feed themselves and their

families.  The harm is actual and ongoing; each day that USDA's illegal guidance remains in effect, it takes food off of Plaintiffs' tables.

Second, the agency's misinterpretation of section 2302(a)(1) has directly caused the harm.  Based on its interpretation, USDA rejected California's request to provide a $60 per person emergency allotment to all SNAP recipients, including those receiving the maximum regular allotment.  Nako Decl. ¶¶ 3, Ex. 4.  *See Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014) ("Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury . . . .").  USDA's erroneous guidance has harmed Plaintiffs and the class.

Third, success in this litigation is more than likely to redress that harm.  To "have standing, a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno*, 30 F.3d at 1065 (citing *Lujan*, 504 U.S. at 561); *see also Skyline Wesleyan Church v. California Dep't of Managed Health Care,*___F.3d __, No. 18-55451, 2020 WL 2464926 at *8 (9th Cir. May 13, 2020) ("It is not necessary to show 'a guarantee that [the plaintiff's]  injuries will be redressed.'") (citation omitted).

 Plaintiffs meet this standard.  For them to secure emergency allotments after a favorable decision, only two events must occur: (1) California must renew its request for emergency allotments for households receiving the maximum regular allotment; and (2) USDA must approve the request.  Both are highly likely.

California will very likely take the necessary action after a favorable ruling.  The state has every incentive to seek allotments for the poorest SNAP recipients, as allotments are entirely federally funded.  7 U.S.C. § 2013(a).  And California previously requested approval to provide emergency allotments to all SNAP recipients and expressed disagreement with USDA's interpretation of section 2032(a)(1).  Nako Decl. ¶¶ 3, Ex. 3.

It is also more than likely that USDA will approve California's request after a favorable decision.  Under section 2302(a)(1), USDA "*shall* provide" emergency allotments "at the request of a State agency . . . that provides sufficient data (as determined by the

1   Secretary through guidance) supporting such request." (Emphasis added.) USDA, in

2   approving California's current request, has already determined that the state provided

3   sufficient data (Nako Decl. ¶ 3, Ex. 6), so a request based on a proper interpretation of

4   section 2302(a)(1) must be approved. Plaintiffs have met the redressability test and have

5   constitutional standing. *See Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003-

6   04 (9th Cir. 1998) (plaintiffs with approved applications for disaster assistance grants under

7   program funded primarily by FEMA but administered by Federated States of Micronesia

8   (FSM) had standing to sue FEMA over termination of program, because incentives made it

9   likely FSM, although not a party, would give grants to plaintiffs if FEMA was ordered to

10  provide its share of funding), *abrogated on other grounds, Levin v. Commerce Energy, Inc.*,

11  560 U.S. 413 (2010).

12          Plaintiffs also have prudential standing. In an APA suit, as a prudential requirement,

13  plaintiffs "must show that they fall within the 'zone of interests' to be protected or regulated

14  by the underlying statute in question." *Id.* at 1001. "The zone-of-interests analysis

15  forecloses suit 'only when a plaintiff's interests are so marginally related to or inconsistent

16  with the purposes implicit in the statute that it cannot reasonably be assumed that Congress

17  authorized that plaintiff to sue.'" *E. Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242, 1270

18  (9th Cir. 2020) (citation omitted). Here, the interests of low-income individuals and families

19  in need of food security are at the heart of both section 2302(a)(1) and the Food and Nutrition

20  Act. Plaintiffs have prudential as well as constitutional standing to bring this suit.

21

22  **V.      CONCLUSION**

23          For the foregoing reasons, Plaintiffs respectfully request that the Court issue a

24  preliminary injunction prohibiting Defendants from denying any otherwise appropriate

25  request from California under section 2302(a)(1) of the Families First Coronavirus Response

26  Act because it provides emergency SNAP allotments to households receiving the maximum

27  monthly benefit amount.

28

1
Dated:   May 21, 2020                                    WESTERN CENTER ON LAW & POVERTY

2
                                                        IMPACT FUND

3

4
                                                        _____

5
                                                        ALEXANDER PRIETO

6
                                                        Western Center on Law and Poverty

7
                                                        *Attorneys for Plaintiffs and the Plaintiff Class*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28