Alexander Prieto (SBN 270864)
Richard Rothschild (SBN 67356)
Antionette D. Dozier (SBN 244437)
Rebecca Miller (SBN 317405)
WESTERN CENTER ON
LAW & POVERTY
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010-2826
Tel: (213) 487-7211
Fax: (213) 487-0242
aprieto@wclp.org
rrothschild@wclp.org
adozier@wclp.org
rmiller@wclp.org

Lindsay Nako (SBN 239090)
Jocelyn D. Larkin (SBN 110817)
David S. Nahmias (SBN 324097)
IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704-1693
Tel: (510) 845-3473
Fax: (510) 845-3654
lnako@impactfund.org
jlarkin@impactfund.org
dnahmias@impactfund.org

*Attorneys for Plaintiffs and the Plaintiff Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBIN HALL** and **STEVEN SUMMERS**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE** and **GEORGE ERVIN "SONNY" PERDUE III**, in his official capacity as United States Secretary of Agriculture,<br><br>Defendants. | Case No. 4:20-CV-03454-HSG<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Date:** June 10, 2020<br>**Time:** 11 am |

1

**TABLE OF CONTENTS**

2

**PAGE(S)**

3

INTRODUCTION...................................................................................................................1

ARGUMENT ........................................................................................................................2

   A.   Article III's redressability requirement is satisfied because California's words and actions show that it will very likely request emergency allotments for Plaintiffs if the Court rules in their favor.......................................................................................................2

   B.   Plaintiffs are likely to prevail on their claim that USDA's guidance exceeds its authority under section 2302(a)(1). ..............................................................................5

       1.   USDA's position that section 2302(a)(1)'s cap applies to the sum of a household's regular and emergency allotments is contrary to the plain language of the statute...........................................................................................................5

       2.   USDA's claim that section 2302(a)(1) is solely intended to address loss of income is contrary to the language of the statute, arbitrary, and irrational..........6

       3.   There is no legal basis to conclude that Congress intended to adopt USDA's administrative practice under 7 U.S.C. § 2014 when it enacted section 2302(a)(1). ...................................................................................................8

       4.   USDA's arguments based on appropriations do not justify departure from the plain language of section 2302(a)(1). .....................................................10

   C.   The other preliminary injunction factors weigh in Plaintiffs' favor............................12

       1.   Denial of emergency allotments irreparably harms Plaintiffs and a preliminary injunction will likely redress this injury.........................................................12

       2.   Contrary to USDA's arguments, the balance of equities and public interest favor a preliminary injunction. ..................................................................................13

   D.   Plaintiffs meet the standard for a mandatory injunction because denial of benefits to meet urgent food needs is serious and irreparable harm and the law and facts clearly favor them. ...............................................................................................................13

CONCLUSION....................................................................................................................15

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

PAGE(S)

**FEDERAL CASES**

3

*Agredano v. Mut. of Omaha Cos.*,
    75 F.3d 541 (9th Cir. 1996)..........................................................................................8

4

*All. for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018)....................................................................................15

5

6

*Beno v. Shalala*,
    30 F.3d 1057 (9th Cir. 1994)........................................................................................3

7

*Booth v. McManaman*,
    830 F. Supp. 2d 1037 (D. Haw. 2011)...................................................................12, 14

8

9

*California Department of Social Services v. Thompson*,
    321 F.3d 835, 846 (9th Cir. 2003)................................................................................4

10

*Cazarez-Gutierrez v. Ashcroft*,
    382 F.3d 905, 917 (9th Cir. 2004)................................................................................8

11

12

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010)........................................................................15

13

*District of Columbia v. U.S. Dep't of Agric.*,
    No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) .......................12

14

15

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015)......................................................................................14

16

*Garnett v. Zeilinger*,
    313 F. Supp. 3d 147 (D.D.C. 2018)............................................................................12

17

18

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
    465 F.3d 1123 (9th Cir. 2006)......................................................................................4

19

*Golden Gate Rest. Ass'n v. City and County of San Francisco*,
    512 F.3d 1112 (2008)..................................................................................................13

20

21

*Haskins v. Stanton*,
    794 F.2d 1273 (7th Cir. 1986)....................................................................................14

22

*Hernandez v. Sessions*,
    872 F.3d 976, 999 (9th Cir. 2017 ..........................................................................14, 15

23

24

*Katie A., ex rel. Ludin v. Los Angeles County*,
    481 F.3d 1150 (9th Cir. 2007)....................................................................................14

25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................3

26

27

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009)......................................................................................14

28

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................................................. 15

*Native Vill. of Venetie I.R.A. Council v. Alaska*,
    944 F.2d 548 (9th Cir. 1991) ................................................................................. 12

*Novak v. United States*,
    795 F.3d 1012 (9th Cir. 2015) ................................................................................. 4

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
    806 F.3d 520 (9th Cir. 2015) ................................................................................. 15

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ................................................................................. 6

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ................................................................................. 12

*United States v. Ray*,
    375 F.3d 980 (9th Cir. 2004) ................................................................................. 10

*Wis. Cent. Ltd. v. United States*,
    138 S. Ct. 2067, 2071 (2018) ................................................................................. 9

**FEDERAL STATUTES**

7 U.S.C. § 2011 ................................................................................. 8, 13

7 U.S.C. § 2014(h) ................................................................................. 9

7 U.S.C. § 2014(h)(3)(a) ................................................................................. 9

7 U.S.C. § 2027(b) ................................................................................. 11

7 U.S.C. § 2027(d) ................................................................................. 12

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, § 2302(a)(1), 134 Stat. 178 (Mar. 18, 2020) .................... passim

Heroes Act,
    H.R. 6800, 116th Congr. div. A, tit. I (as passed by House, May 15, 2020) .............. 11

**FEDERAL REGULATIONS**

7 C.F.R. § 273.10(e)(2)(ii)(A) ................................................................................. 8

7 C.F.R. § 273.12(c)(1)(i) ................................................................................. 7

7 C.F.R. § 273.12(c)(1)(ii) ................................................................................. 7

**OTHER AUTHORITIES**

Food & Nutrition Serv., U.S Dep't of Agric., *Disaster SNAP Guidance* (2014),
    https://fns-prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf ............... 9

**INTRODUCTION**

Under the plain language of the Families First Coronavirus Response Act,[1] which is at the heart of this case, USDA is required to approve state requests for supplemental emergency allotments for *all* households participating in the Supplemental Nutrition Assistance Program (SNAP), including those that receive the maximum benefit amount.  In its opposition, USDA all but ignores the language of the statute, as well as the harm resulting from its illegal restriction of funding, engaging instead in evidence-free speculation about congressional intent.  Its arguments are empty and should be rejected.

USDA does not dispute that COVID-19 has increased the food needs of all SNAP recipients by raising food costs, reducing the availability of essential low-cost staples, and disrupting access to supplemental resources like soup kitchens and food pantries, as Plaintiffs have demonstrated.  Yet it argues that Congress, in enacting section 2302(a)(1) to address "temporary food needs" during the pandemic, was indifferent to these concerns.  Instead, USDA contends that, in the face of an unprecedented economic and public health crisis with broad and complex impacts on food needs, Congress enacted section 2302(a)(1) solely to address the needs of a subset of recipients who have newly lost income due to the pandemic but may be unable to verify the loss.  This narrow view of section 2302(a)(1) is both inconsistent with the plain language of the statute and irrational.

USDA bases its arguments almost entirely on two extraneous factors: its administrative practice under a different disaster-related statute and the amount of the appropriations to fund emergency allotments.  These arguments lack merit and cannot alter the unambiguous language of the statute.  There is no authority for USDA's contention that Congress, in enacting a new statute to address a unique crisis, intended only to adopt USDA's administrative practice under a different statute and did so *sub silencio*.  And USDA's claim that Plaintiffs' interpretation of section 2302(a)(1) will increase the cost of emergency allotments beyond available appropriations is a straw man that rests on a blatant mischaracterization of Plaintiffs' position and a misreading of the statutory language.

[1] Pub. L. No. 116-127, § 2302(a)(1), 134 Stat. 178, 188 (Mar. 18, 2020).

1   Plaintiffs do not contend that all households automatically qualify for an additional

2   emergency allotment equal to the maximum regular allotment; rather, the amount of

3   emergency allotments is expressly limited to the temporary food needs in a state, with the

4   value of the maximum regular allotment as an outer limit.  Moreover, USDA provides no

5   evidence at all about the additional cost of allotments for California's poorest SNAP

6   households and offers no reason to conclude that those benefits will dramatically increase

7   spending.  But even if they do, the Food and Nutrition Act has procedures to address

8   shortfalls in SNAP appropriations.

9       USDA's arguments on the other preliminary injunction factors and standing also fall

10   short.  Remarkably, USDA never addresses the fact that denial of benefits to meet increased

11   food needs—very simply, hunger—during an unprecedented crisis inflicts irreparable harm

12   on Plaintiffs.  A preliminary injunction will prevent this harm because California's words and

13   actions make clear that the state will very likely request emergency allotments for Plaintiffs

14   and the proposed class if the Court rules in their favor.  The balance of the equities and

15   public interest also support a preliminary injunction because the suffering caused by lack of

16   food far outweighs financial concerns.  And an equitable distribution of emergency

17   assistance consistent with congressional intent serves the public interest.  Assuming the

18   preliminary injunction is considered mandatory, plaintiffs meet the heightened standard for a

19   mandatory injunction because the harm inflicted by USDA's guidance—increased hunger

20   among the poorest households—is severe and irreparable, and the facts and law are clearly in

21   their favor.

22

23                                  **ARGUMENT**

24   **A.  Article III's redressability requirement is satisfied because California's words
        and actions show that it will very likely request emergency allotments for
25      Plaintiffs if the Court rules in their favor.**

26       USDA argues that Plaintiffs and the proposed class do not meet Article III's

27   redressability requirement because California must request emergency allotments for them in

28   order for a favorable decision to redress their injuries.  Opp'n at 16 (ECF No. 26).  It

1    contends that there is no way for the Court to predict whether the state will take necessary

2    action. *Id.* at 17. But the state's own words and actions demonstrate that it will very likely

3    make a new request for emergency allotments that includes Plaintiffs and the proposed class

4    if the Court rules in their favor. This evidence satisfies Article III, which only requires a

5    party to show "that a favorable decision is *likely* to redress his injury, not that a favorable

6    decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir.

7    1994) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

8          In its requests to USDA, California staked out a firm and unequivocal position:

9    households receiving the maximum regular allotment are eligible for emergency allotments

10   under section 2302(a)(1) and have the greatest need for those allotments because they "are

11   most likely to have unmet food needs in a time of crisis." Decl. of Lindsay Nako in Supp. of

12   Pls.' Mot. for Prelim. Inj. ("Nako Decl.") (ECF No. 5-9) ¶ 3, Ex. 3. The state is obviously

13   committed to this position. It initially requested emergency allotments for households

14   receiving the maximum regular allotment even though USDA's guidance prohibits

15   emergency allotments for these households. *Id.* And it was adamant about its disagreement

16   with USDA's interpretation: "CDSS finds [USDA's] interpretation to be in conflict with both

17   the plain language of the Act and the circumstances leading to the passage of the Act." *Id.*

18   California only relented when USDA made clear it would not budge from the interpretation

19   in its guidance. *Id.* ¶ 3, Ex. 4.

20         USDA cannot point to a single fact suggesting that California has changed its position

21   on emergency allotments. It does not take a crystal ball to predict that the state will make a

22   second revised request following a favorable decision, satisfying Article III's redressability

23   requirement. USDA's arguments at best raise only the merest possibility that a favorable

24   decision might not redress Plaintiffs' injuries. That is not enough to deprive Plaintiffs of

25   Article III standing. *See Beno*, 30 F.3d at 1064-66 (welfare recipients had standing to

26   challenge federal waivers permitting state-wide benefits cuts even though defendants raised

27   multiple scenarios showing that a favorable decision "might" not ultimately prevent the cuts).

28   //

1    Courts have held that redressability was satisfied in similar cases where additional

2    state action was necessary to secure payments to plaintiffs under federally funded public

3    benefits programs.  In *California Department of Social Services v. Thompson*, 321 F.3d 835,

4    846 (9th Cir. 2003), the Ninth Circuit held that a foster parent had standing to challenge the

5    federal government's disapproval of a California Aid to Families with Dependent Children

6    plan amendment that would have provided her with higher benefits, even though the state

7    would have to take "additional steps" to obtain federal funding after a favorable decision.

8    The Court of Appeals concluded that the state was likely to take these additional steps

9    because it was in the state's economic interest to do so, and expressions of legislative intent

10   in a state statute showed that California wanted to secure federal funding.  *Id.*

11   A similar analysis applies here.  Requesting emergency allotments for Plaintiffs and

12   those similarly situated is in California's interest because the benefits are federally funded

13   and urgently needed to help the state's most vulnerable residents through a temporary

14   economic crisis.  And the state's prior requests manifest its intent to seek federal funding for

15   those allotments.

16   *Thompson* also demonstrates that California's decision not to pursue legal action

17   itself against USDA does not defeat redressability.  The state was a party to the case before

18   the district court but did not appeal the lower court's ruling in favor of the federal

19   government, yet the Ninth Circuit still concluded that California would act to secure foster

20   parent benefits for the plaintiff.  *Id.* at 845-46.

21   The cases on which USDA relies are not on point.  The plaintiffs in both cases based

22   their redressability arguments on a claim that commercial actors not before the court would

23   charge them less for goods or services if the court ruled in their favor.  *See Novak v. United*

24   *States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (plaintiffs claimed shipping companies would

25   lower prices if the court invalidated statutory provisions prohibiting foreign competition in

26   the domestic shipping market); *Glanton ex rel. ALCOA Prescription Drug Plan v.*

27   *AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (plaintiffs claimed that their drug

28   plans would reduce their co-payments if they succeeded on their claim that the defendant

1    overcharged the plans for drugs).  The Ninth Circuit rejected plaintiffs' redressability

2    arguments in both cases because the prices charged by third party companies depended on

3    complex market factors and there was no requirement that those companies pass any savings

4    on to plaintiffs.  *See Novak*, 795 F.3d at 1020; *Glanton*, 465 F.3d at 1125.  The commercial

5    considerations involved in these cases are inapplicable here.  In contrast to the situation in

6    *Novak* and *Glanton*, California's interest in providing emergency allotments to the state's

7    neediest residents is entirely aligned with Plaintiffs' interest in receiving them.  Plaintiffs

8    have established Article III standing.[2]

9

10       **B.  Plaintiffs are likely to prevail on their claim that USDA's guidance exceeds its**
            **authority under section 2302(a)(1).**

11

12          **1.  USDA's position that section 2302(a)(1)'s cap applies to the sum of a**
                **household's regular and emergency allotments is contrary to the plain**
13              **language of the statute.**

14          USDA argues that the sole purpose of section 2302(a)(1) is to raise all SNAP

15   households to the maximum regular allotment to address loss of income related to the

16   ongoing public health emergency.  Opp'n at 12.  According to the agency, section

17   2302(a)(1)'s statutory cap—"not greater than the applicable maximum monthly allotment for

18   the household size"—applies to the sum of regular and emergency allotments.  *Id.* at 10-11.

19          This interpretation must be rejected because it is contrary to the plain language of the

20   statute.  Section 2302(a)(1) provides that upon a properly supported request from a state

21   agency, USDA "shall provide . . . for emergency allotments to households participating in

22   [SNAP] to address temporary food needs not greater than the applicable maximum monthly

23   allotment for the household size[.]"

24          As a grammatical matter, the words "not greater than the applicable maximum

25   monthly allotment for the household size" modify the phrase "emergency allotments … to

26   address temporary food needs."  It would not make sense for the cap to apply to the

27   "temporary food needs" themselves.  Needs can be addressed by an allotment, but cannot be

28
_____
[2] USDA does not contest that Plaintiffs also have prudential standing under the APA.

1    compared to an allotment, or capped by one.   But even if the cap applies to "temporary food

2    needs," the result does not change.  If the statute is interpreted to provide that the "temporary

3    food needs" to be addressed cannot not exceed the "applicable maximum monthly allotment

4    for the household size," the effect is still the same.

5          Section 2302(a)(1) provides for emergency allotments "to households participating in

6    the supplemental nutrition assistance program."  Nothing in the language of the statute limits

7    eligibility for emergency allotments to households receiving less than the maximum regular

8    allotment.

9          Tellingly, USDA barely addresses the language of the statute in its opposition, despite

10   acknowledging that this is the starting point for statutory interpretation.  The agency's

11   discussion of the statutory language is limited to a single sentence:  it argues that through its

12   guidance, it "is 'provid[ing]' 'emergency allotments' to SNAP households with 'temporary

13   food needs'—for example, temporary loss of income due to stay-at-home orders—that are up

14   to the 'maximum monthly allotment for the household size[.]'" Opp'n at 10-11 (alterations

15   in original).  But it offers no explanation why the language of section 2302(a)(1) should be

16   interpreted to exclude households receiving the maximum allotment, or why the cap should

17   be interpreted to apply to the total of a household's assistance, rather than to its emergency

18   allotment.  Because the plain language of the statute never refers to the total assistance, the

19   cap cannot be read to apply to that amount.[3]

20

21          **2.  USDA's claim that section 2302(a)(1) is solely intended to address loss of**
22          **income is contrary to the language of the statute, arbitrary, and irrational.**

23          USDA's argument also improperly equates "temporary food needs" with "temporary

24   loss of income."  USDA acknowledges that the pandemic creates difficulties accessing and

25

26   [3] While USDA quotes the standard for *Skidmore* deference, Opp'n at 9, it never explains why
     its interpretation of section 2302(a)(1) merits deference or asks that it be applied.  Nor should
27   it.  The agency's guidance wholly lacks the "power to persuade"; it contains no reasoning of
     any kind and is not grounded in the sort of substantive expertise that typically warrants
28   *Skidmore* deference.  *See Sierra Club v. Trump*, 929 F.3d 670, 693-94 (9th Cir. 2019).

1   affording food unrelated to loss of income, and does not contest any of Plaintiffs' evidence of

2   these impacts.  Opp'n at 13.  Yet the agency argues, without evidence or analysis, that it is

3   "much more likely" that Congress solely intended to address loss of income and was

4   indifferent to COVID-19's other effects on food needs.  *Id.* at 14.  But if Congress were

5   focused exclusively on lost income, it could easily have used the words "temporary loss of

6   income."  Instead, the words Congress used, "temporary food needs," reflect a broad focus

7   on SNAP recipients' capacity to obtain food, not a narrow focus on changed income.  This

8   language demonstrates that Congress intended to comprehensively address the various ways

9   in which COVID-19 makes it harder for all SNAP recipients to access and afford nutritious

10  food, by providing emergency benefits to increase their food purchasing power.  In short,

11  "food" means food.

12        Statutory context also confirms that emergency allotments under section 2302(a)(1)

13  were not solely or primarily intended to address loss of income.  Under USDA regulations,

14  SNAP recipients already can report loss of income that occurs outside their required

15  reporting periods, and states must quickly process these changes.  7 C.F.R. section

16  273.12(c)(1)(ii) provides that if a household reports a decrease in gross monthly income of

17  $50 or more, a state must provide increased benefits no later than the next month, and often

18  sooner.  *See also* 7 C.F.R. § 273.12(c)(1)(i) (slightly longer timeline for decreases in gross

19  monthly income less than $30).  These provisions already address the needs of SNAP

20  recipients who have experienced loss of income related to COVID-19, undermining USDA's

21  claim that lost income was the sole problem Congress intended to address through section

22  2302(a)(1)'s wholly new program for emergency allotments.

23        USDA argues that some households may have difficulty reporting changes in income

24  during the pandemic.  Opp'n at 12-13.  But Congress provided flexibility to address that

25  possibility in section 2302(a)(2).  That section authorizes USDA to "adjust … issuance

26  methods and application and *reporting requirements* under the Food and Nutrition Act of

27  2008 to be consistent with what is practicable under actual conditions in affected areas."

28  § 2302(a)(2), 134 Stat. at 188 (emphasis added).  Because "terms of the same statute are not

1   to be construed so as to be redundant," *Agredano v. Mut. of Omaha Cos.*, 75 F.3d 541, 544

2   (9th Cir. 1996), USDA's argument that lost income is the exclusive focus of section

3   2302(a)(1) must be rejected.

4        As interpreted by USDA, section 2302(a)(1) is an extremely inefficient remedy for

5   lost income, further undermining the agency's argument.  USDA's guidance raises all

6   households to the maximum regular allotment whether or not they have actually lost income

7   or face difficulty reporting the loss.  Supplementing the food budgets of higher income

8   households who have not lost income, while giving nothing to households with the lowest

9   income, is irrational and contrary to the fundamental principles of SNAP.  The program is

10  intended to provide all eligible households the same level of food purchasing power

11  regardless of income.  7 U.S.C. § 2011.  Households with higher incomes and smaller regular

12  allotments are expected to contribute more of their own funds to their food budgets, but the

13  sum of a household's expected contribution and its regular allotment always equals the

14  maximum regular allotment for the household size.  7 C.F.R. § 273.10(e)(2)(ii)(A).  By

15  providing increased regular allotments to higher income households whose ability to

16  contribute to their food budgets has not changed, USDA's interpretation dramatically and

17  arbitrarily increases the food purchasing power of some households while excluding the

18  neediest.  Congress could not have intended such a capricious result.

19

20        **3.  There is no legal basis to conclude that Congress intended to adopt USDA's**
          **administrative practice under 7 U.S.C. § 2014 when it enacted section**
21        **2302(a)(1).**

22        USDA argues that its interpretation is "buttressed by the presumption that Congress is

23  aware of USDA's interpretation of the [Food and Nutrition Act] in times of disaster."  Opp'n

24  at 13.  But USDA omits the crucial second half of the presumption upon which it relies; in

25  full, the sentence the agency quotes from *Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 917

26  (9th Cir. 2004) reads: "Congress is presumed to be aware of an administrative interpretation

27  of a statute and to adopt that interpretation *when it reenacts a statute without changing the*

28  *interpretation*."  (Emphasis added.)  Because the Families First Act is a new statute, not a

1    reenactment of an existing statute, this presumption does not apply.

2          USDA's argument here turns this principle on its head:  it contends that Congress, in

3    enacting section 2302(a)(1), was aware of and intended to adopt its administrative practice

4    under 7 U.S.C. § 2014(h), even though section 2302(a)(1) uses different language.  There is

5    no authority for this proposition.  It is also contrary to established rules of statutory

6    interpretation.  Courts typically presume that "differences in language" in different statutes

7    "convey differences in meaning," especially when the statutes address similar subjects.  *Wis.*

8    *Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) (citation omitted).

9          7 U.S.C. § 2014(h) establishes a disaster response program known as "Disaster

10   SNAP" or "D-SNAP," which is entirely different from what Congress provided in the

11   Families First Act.  According to USDA's Food and Nutrition Service, "D-SNAP provides

12   temporary food assistance for households affected by a natural disaster. . . . D-SNAP

13   provides one month of benefits to eligible disaster survivors and can facilitate the issuance of

14   supplemental SNAP benefits for ongoing households."[4]  Citing an agency handbook from

15   2014, USDA claims that its focus under § 2014(h) is "on bringing all SNAP households up to

16   the 'maximum monthly allotment'" to "account[ ] for the disaster's disruption to a low-

17   income individual's ability to work or contribute to the cost of feeding their family."  Opp'n

18   at 12.  In addition, 7 U.S.C. § 2014(h)(3)(a) provides emergency allotments that are intended

19   "to replace food destroyed in a disaster."

20         The current pandemic presents a wholly different challenge from a natural disaster

21   and does not cause the physical destruction of a recipient's food supply.  In section

22   2302(a)(1), Congress authorized emergency allotments "to address temporary food needs."

23   Those words demonstrate that Congress intended to address a new problem—the barriers to

24   accessing food created by an unprecedented global pandemic—not to adopt the narrow focus

25   on lost income that USDA claims is its prevailing administrative response to natural disasters

26   under § 2014(h).

27

28   [4] Food & Nutrition Serv., U.S Dep't of Agric., *Disaster SNAP Guidance* 1 (2014), https://fns-prod.azureedge.net/sites/default/files/D-SNAP_handbook_0.pdf.

1    There is no evidence that Congress was aware of administrative practices contained in

2    an agency handbook, and courts are not required "to assume Congress's awareness of an

3    administrative interpretation that does not result from notice and comment rulemaking."

4    *United States v. Ray*, 375 F.3d 980, 991 n.14 (9th Cir. 2004) (citation and internal quotation

5    marks omitted).  But even accepting USDA's claim that Congress knew of its administrative

6    practices under § 2014(h), there was an easy way for Congress to adopt those practices if that

7    was its goal.  Congress could simply have made section 2014(h) applicable "[i]n the event of

8    a public health emergency declaration by the Secretary of Health and Human Services …

9    based on an outbreak of coronavirus disease 2019 (COVID–19) and the issuance of an

10   emergency or disaster declaration by a State based on an outbreak of COVID–19," the

11   triggering conditions under section 2302(a).  But Congress took a different approach

12   appropriate to a unique crisis with unambiguous language in a separate section of the Food

13   and Nutrition Act.[5]  USDA has no authority to substitute its preferred approach for

14   Congress's clearly expressed intent.

15

16   **4.  USDA's arguments based on appropriations do not justify departure from**
     **the plain language of section 2302(a)(1).**

17

18   USDA argues that Plaintiffs' interpretation of section 2302(a)(1) "would require the

19   Secretary to provide an emergency allotment equal to the maximum benefit for each

20   household in addition to its current[] monthly allotment."  Opp'n at 14.  It asserts that

21   payments in this amount would exceed the amount Congress appropriated to fund emergency

22   allotments, creating an "absurd result."  Opp'n at 13.  This argument lacks merit, for two

23   reasons.

24   First, there is no evidence that Plaintiffs' interpretation of section 2302(a)(1) would

25   require payments above the appropriations available to fund emergency allotments.

26   California's initial request would have provided emergency allotments to all SNAP

27   households, including those receiving the maximum regular allotment, without exceeding the

28   ---
[5] Section 2302 as enacted amends 7 U.S.C. § 2011 (note).  134 Stat. at 188.

1  amount USDA ultimately approved for California SNAP households.  Nako Decl. ¶ 3, Ex. 3.

2  Moreover, USDA has failed to provide evidence regarding what could be required for

3  California, the only subject of this litigation.  But even if future requests from California

4  result in emergency allotments higher in the aggregate than those approved under USDA's

5  interpretation, the declaration of USDA Food and Nutrition Service Chief Financial Officer

6  David Burr shows that the agency has ample funds to meet an increase in costs.  According

7  to Mr. Burr, USDA determined that it had $4 billion in contingency funds available to pay

8  for emergency allotments and then received an additional $15.5 billion under the CARES

9  Act, which it is also using for emergency allotments, a total of $19.5 billion.  Decl. of David

10  Burr in Supp. of Defs.' Opp'n (ECF No. 26-1) ¶¶ 8, 10, 13, 16.  USDA estimates that the

11  cost of emergency allotments under its interpretation is $12 billion over six months, leaving

12  an additional unspent $7.5 billion.  *See id.* ¶¶ 15-16.  On top of this, Congress is already

13  considering further pandemic-related legislation that could provide additional appropriations

14  for SNAP.  *See, e.g.*, Heroes Act, H.R. 6800, 116th Congr. div. A, tit. I (as passed by House,

15  May 15, 2020) (appropriating an additional $10 billion to SNAP).

16       USDA's claim that Plaintiffs' interpretation would dramatically exceed

17  appropriations rests on a misreading of section 2302(a)(1) and a mischaracterization of

18  Plaintiffs' position.  Plaintiffs do not argue that section 2302(a)(1) automatically authorizes

19  emergency allotments in the full amount of the maximum regular allotment for all SNAP

20  households.  The statutory cap places an outer limit on emergency allotments, but emergency

21  allotments are also subject to the constraint that they must address "temporary food needs" as

22  established by data submitted by the states.  Those needs vary depending on the impact of

23  COVID-19 in a state and do not necessarily warrant an emergency payment in the amount of

24  the maximum allotment for every household nationwide.

25       Second, even if the cost of applying section 2302(a) as Congress wrote it could

26  conceivably exceed the current appropriations at some point, that is no reason to depart from

27  the plain language of the statute, because SNAP has procedures in place to address situations

28  where costs outrun appropriations.  As USDA notes, 7 U.S.C. § 2027(b) requires USDA to

1  proportionally reduce allotments if it "finds that the requirements of participating States will

2  exceed the appropriation."  Under 7 U.S.C. § 2027(d), USDA must report to Congress *within*

3  *seven days* if it determines that reductions in allotments are necessary and takes such action,

4  giving Congress the opportunity to respond by providing additional appropriations.  The

5  availability of this well-established statutory mechanism further undercuts USDA's

6  contention.  *See Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 554 (9th Cir.

7  1991) ("Congress is presumed to be knowledgeable about existing law pertinent to any new

8  legislation it enacts.").

9

10      **C.  The other preliminary injunction factors weigh in Plaintiffs' favor.**

11          **1.  Denial of emergency allotments irreparably harms Plaintiffs and a**
                 **preliminary injunction will likely redress this injury.**

12

13          USDA's argument on irreparable harm rests entirely on its claim that a preliminary

14  injunction would not redress Plaintiffs' injury; the agency does not deny that the injury is

15  irreparable.  *See* Opp'n at 15-17.  Denial of benefits necessary to avoid hunger is

16  unquestionably irreparable harm, and USDA could not credibly argue otherwise.  *See, e.g.*,

17  *District of Columbia v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657, at

18  *30 (D.D.C. Mar. 13, 2020), *appeal filed*, No. 20-5136 (D.C. Cir. filed May 14, 2020);

19  *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157 (D.D.C. 2018); *Booth v. McManaman*, 830 F.

20  Supp. 2d 1037, 1043-44 (D. Haw. 2011).

21          The injunction requested by Plaintiffs is likely to prevent this harm.  As already

22  discussed, it is more than likely that California will request emergency allotments for

23  Plaintiffs and the proposed class if the Court enjoins USDA from denying allotments to

24  households receiving the maximum regular benefit.  This satisfies Plaintiffs' burden:  a

25  plaintiff seeking a preliminary injunction need only show that irreparable harm is "likely"

26  without an injunction, and "need not prove that irreparable harm is certain or even nearly

27  certain."  *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011).

28  //

1

2
### 2.   Contrary to USDA's arguments, the balance of equities and public interest favor a preliminary injunction.

3      USDA's arguments on the public interest and balance of equities also lack merit.  The

4  agency argues that an injunction would thwart "the public's 'interest in assuring that public

5  funds are appropriately expended[.]'"  Opp'n at 18.  But payment of emergency allotments to

6  households receiving the maximum regular allotment is an appropriate expenditure under the

7  plain language of section 2302(a)(1).  And "preventable human suffering" easily outweighs

8  financial concerns when balancing the equities.  *Golden Gate Rest. Ass'n v. City and County*

9  *of San Francisco,* 512 F.3d 1112, 1126 (2008).  Moreover, spending on emergency

10  allotments would not be a drain on the "public fisc."  Rather, additional expenditures would

11  advance SNAP's purpose of stimulating the economy, an important aspect of the program in

12  the current economic crisis.  *See* 7 U.S.C. § 2011.  Data from the Great Recession shows that

13  additional SNAP spending had the greatest economic benefit of any policy adopted during

14  that time; in the first quarter of 2009, "[e]very $1.00 in new SNAP benefits spurred $1.74 in

15  economic activity[.]"  Decl. of Lauren Bauer in Supp. of Pls.' Mot. For Prelim. Inj. (Bauer

16  Decl.") (ECF No. 5-7) ¶ 12.

17      USDA also argues that some California SNAP households – those with relatively

18  higher incomes – may receive lower emergency allotments in the future if the Court grants an

19  injunction.  Opp'n at 18-19.  But in section 2302(a)(1), Congress expressly gave states the

20  discretion to determine how to meet the needs of their SNAP households during this

21  crisis.  California is in the best position to make that determination. USDA's blanket formula

22  ignores actual data regarding "temporary food needs" and mandates an arbitrary set of

23  winners and losers among needy households.

24

25

26
### D.  Plaintiffs meet the standard for a mandatory injunction because denial of benefits to meet urgent food needs is serious and irreparable harm and the law and facts clearly favor them.

27      Assuming for the sake of argument that the heightened standard for mandatory

28  injunctions applies here, as USDA contends, Opp'n at 8-9, Plaintiffs meet that standard.

1   Plaintiffs seeking a mandatory injunction must show that "'extreme or very serious damage

2   will result' that is not 'capable of compensation in damages,'" *Hernandez v. Sessions*, 872

3   F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*

4   *& Co.*, 571 F.3d 873, 879 (9th Cir. 2009)), and that "the law and facts clearly favor" their

5   position, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  While this is a

6   heightened standard, it is not an unattainable one.  Courts often grant mandatory preliminary

7   injunctions in appropriate cases, including cases involving SNAP benefits.  *See, e.g.*,

8   *Hernandez*, 872 F.3d at 999 (affirming preliminary injunction requiring government to

9   conduct new bail hearings for detainees after assuming it was mandatory); *Booth*, 830 F.

10  Supp. 2d at 1041, 1045 (granting preliminary injunction requiring state to take affirmative

11  steps to process SNAP applications and issue benefits within statutory timeframes).

12  Mandatory injunctions "are most likely to be appropriate when the status quo ... is exactly

13  what will inflict the irreparable injury upon [the] complainant."  *Hernandez*, 872 F.3d at 999

14  (citation and internal quotation marks omitted).

15        Denial of emergency allotments inflicts very serious harm on Plaintiffs and the

16  proposed class that is not capable of compensation in damages.  Plaintiffs need emergency

17  allotments to meet urgent food needs during an unprecedented economic and public health

18  emergency.  "[D]eprivation of food is extremely serious and is quite likely to impose

19  lingering, if not irreversible, hardships[.]" *Haskins v. Stanton*, 794 F.2d 1273, 1276–77 (7th

20  Cir. 1986) (citation and internal quotation marks omitted); *see* Bauer Decl. ¶ 7.  Low-income

21  individuals and families in California should not have to choose between going hungry or

22  meeting other subsistence needs, such as paying rent.  *See* Decl. of Steven Summers in Supp.

23  of Pls.' Mot. for Prelim. Inj. (ECF No. 5-2) ¶ 19.  Plaintiffs have also established that the law

24  and facts "clearly favor" them, as USDA's guidance violates an unambiguous statute.  *See*

25  *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1157 (9th Cir. 2007)

26  (requirement is satisfied where court concludes that plaintiffs have a "strong likelihood" of

27  success on the merits).  If USDA's illegal denial of emergency allotments to the poorest

28  SNAP households is regarded as the status quo, then mandatory relief altering that status quo

1    is warranted, as it is exactly what inflicts extreme harm on Plaintiffs.  *See Hernandez*, 872

2    F.3d at 999.

3         Finally, contrary to USDA's argument, Opp'n at 17, the Court may appropriately

4    remedy violations of the APA through equitable remedies including "'the decision to grant or

5    deny injunctive or declaratory relief[.]'"  *All. for the Wild Rockies v. U.S. Forest Serv.*, 907

6    F.3d 1105, 1121 (9th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343

7    (9th Cir. 1995)).  Should the Court rule favorably for Plaintiffs, USDA proposes vacatur and

8    remand, a far broader and more severe remedy than Plaintiffs' requested injunction narrowly

9    tailored to California only.  *See Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,

10   806 F.3d 520, 532 (9th Cir. 2015) (a court's decision whether or not to vacate on remand

11   requires "weigh[ing] the seriousness of the agency's errors against the disruptive

12   consequences of an interim change that may itself be changed.") (internal quotations

13   omitted).  Moreover, vacatur does not obviate the need to issue an injunction where Plaintiffs

14   will likely face irreparable harm in its absence.  Unlike in *Center for Food Safety v. Vilsack*,

15   734 F. Supp. 2d 948, 954-55 (N.D. Cal. 2010), cited by USDA, Plaintiffs and the proposed

16   class face severe harm that is not "purely speculative and dependent on future conduct."  An

17   injunction allows the Court to retain jurisdiction and ensure that the agency promptly acts to

18   allow and approve California's second revised request for emergency allotments, thereby

19   bringing immediate relief to Plaintiffs and the proposed class.

20

21                                        **CONCLUSION**

22        Plaintiffs request that the Court issue a preliminary injunction prohibiting Defendants

23   from denying any otherwise appropriate request from California under section 2302(a)(1) of

24   the Families First Coronavirus Response Act because it provides emergency SNAP

25   allotments to households receiving the maximum monthly benefit amount.

26   Dated:   June 8, 2020                    WESTERN CENTER ON LAW & POVERTY

27                                            ALEXANDER PRIETO

28                                            *Attorneys for Plaintiffs and the Plaintiff Class*