UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN HALL, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, et al.,<br><br>        Defendants. | Case No. 20-cv-03454-HSG<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 5 |

Pending before the Court is the motion for preliminary injunction filed by Plaintiffs Robin Hall and Steven Summers. *See* Dkt. No. 5. The Court heard argument on June 10, 2020. As detailed below, the Court finds that Plaintiffs have not met their heavy burden of establishing that an injunction is warranted at this stage in the litigation and **DENIES** the motion.

**I.  BACKGROUND**

We are currently in the midst of a once-in-a-generation global pandemic resulting from the spread of a disease called COVID-19, which is caused by a novel coronavirus. As of the date of this order, more than 2.1 million people in the United States have tested positive for COVID-19, and more than 116,000 Americans have died.[1] In response to this crisis, Congress passed the Families First Coronavirus Response Act, Pub. L. No. 116-127, § 2302(a)(1), 134 Stat. 178, 188 (Mar. 18, 2020) ("FFCRA"). As part of this omnibus statute, Congress provided, among other things, "emergency allotments" related to the Supplemental Nutrition Assistance Program ("SNAP"). *See id.* at § 2302. It is the meaning of this provision that is at issue in this action. In

---

[1] *Coronavirus Disease 2019 (COVID-19)*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed June 16, 2020).

1    particular, Plaintiffs challenge the interpretation of Section 2302(a)(2) that Defendant United

2    States Department of Agriculture ("USDA"), the agency that administers SNAP, has adopted.

3          The Court understands the breadth and severity of the challenges that COVID-19 has

4    presented—and continues to present—to individuals and governments across the country. Still,

5    the scope of this particular case, and the instant motion, is narrow. The Court is tasked with

6    determining whether the USDA's interpretation of the FFCRA as it relates to SNAP is

7    inconsistent with the statute, and if so, what relief Plaintiffs may be entitled to as a result. This

8    case does not call on the Court to decide what would be the fairest or most effective way to assist

9    SNAP recipients in this era of COVID-19, because that judgment is committed to the political

10   branches. Instead, the only issue for this Court is determining what Congress actually did in

11   passing the FFCRA—not whether its actions were the best possible policy response to current

12   conditions, a matter on which the Court cannot and does not offer any opinion.

13         To guide its analysis and for context, the Court provides a brief overview of SNAP and the

14   FFCRA.

15       **A.**    **The Supplemental Nutrition Assistance Program**

16         Congress enacted SNAP "to promote the general welfare, [and] to safeguard the health and

17   well-being of the Nation's population by raising the levels of nutrition among low-income

18   households." *See* 7 U.S.C. § 2011. Congress explained that "the limited food purchasing power

19   of low-income households contributes to hunger and malnutrition among members of such

20   households," and thus designed SNAP "[t]o alleviate such hunger and malnutrition." *Id.*

21         SNAP is a state-administered Federal program. *See id.* §§ 2013(a), 2020. The Secretary of

22   Agriculture administers the program through the Food and Nutrition Service ("FNS"), an agency

23   of the USDA. *See id.* § 2013(a); *see also* Dkt. No. 26-1 at ¶¶ 1–2. And states that elect to

24   participate in SNAP designate a state agency to carry out the program at the state level. *See id.*

25   §§ 2012(s), 2020. The California Department of Social Services ("CDSS") administers SNAP in

26   California. *See* Cal. Welf. & Inst. Code §§ 18900 *et seq.*

27         Under the program, SNAP provides monthly "allotments" for eligible low-income

28   households to use to purchase food at authorized retailers. *See id.* § 2013(a). The value of the

United States District Court
Northern District of California

monthly allotment is tied to the cost of the "thrifty food plan," which is defined as the amount of money required to feed a family of four adjusted by household size. *See id.* §§ 2012(u), 2017(a). For households that have income, their monthly allotment is reduced by thirty percent of their income. *Id.* § 2017(a). In other words, SNAP requires households to contribute thirty percent of their income to food. *Id.*; *see also* 7 C.F.R. § 273.10(e)(2)(ii)(C). Households with little or no income, however, may receive the "maximum monthly allotment," or the total cost to feed a family of their size for one month. *See* 7 U.S.C. §§ 2012(u), 2017(a). In 2020, the maximum monthly allotment for a family of one is $194, and for a family of eight is $1,164.[2]

The total SNAP allotments issued in each fiscal year are limited "to an amount not in excess of the appropriation for such fiscal year." 7 U.S.C. § 2027(b). If the USDA "finds that the requirements of participating states will exceed the appropriation," it must direct states to reduce SNAP allotments to the extent necessary to stay within the bounds of appropriated funds for that year. *See id.* If such reductions are necessary, the USDA must ensure "to the maximum extent practicable" that the reductions reflect "the ratio of household income" to "the income standards of eligibility." *Id.* § 2027(c).

### B.   Families First Coronavirus Response Act and the CARES Act

Congress enacted the FFCRA on March 18, 2020. *See* 134 Stat. 178. The FFCRA is divided into several divisions, including, as relevant here, "Division B—Nutrition Waivers." *Id.* § 2101, at 184. Within Division B, Title III relates to "SNAP Waivers." *Id.* §§ 2301–2302, at 187. Section 2301 is entitled "SNAP Flexibility for Low-Income Jobless Workers," and Section 2302 is entitled "Additional SNAP Flexibilities in a Public Health Emergency." *Id.* Section 2302, at issue in this case, states:

> In the event of a public health emergency declaration by the Secretary of Health and Human Services under section 319 of the Public Health Service Act based on an outbreak of coronavirus disease 2019 (COVID–19) and the issuance of an emergency or disaster declaration by a State based on an outbreak of COVID–19, the Secretary of Agriculture—

---

[2] *See* U.S. DEPARTMENT OF AGRICULTURE, SNAP Eligibility, How Much Could I Receive in SNAP Benefits?, https://www.fns.usda.gov/snap/recipient/eligibility (last accessed June 16, 2020).

3

> shall provide, at the request of a State agency . . . that provides sufficient data (as determined by the Secretary through guidance) supporting such request, **for emergency allotments to households participating in the supplemental nutrition assistance program under the Food and Nutrition Act of 2008 to address temporary food needs not greater than the applicable maximum monthly allotment for the household size** . . . .

*Id.* § 2302(a)(1) (emphasis added).

Two days after the FFCRA was signed into law, the USDA issued guidance to state agencies regarding these "emergency allotments." *See* Dkt. No. 5-9, Ex. 2 ("March 20 Guidance"). This guidance comprised a sample "Request to Provide Emergency Allotments (Supplements) to SNAP Households." *Id.* The sample request indicated that states could ask "to provide an emergency allotment to address temporary food needs to households to bring all households up to the maximum benefit due to pandemic related economic conditions for up to 2 months." *Id.* The sample also advised that "[c]ontingent upon the availability of funding and ongoing need, USDA may approve additional months of emergency issuance with an extension request from the State." *Id.*

Congress subsequently enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"). The CARES Act appropriated $15,810,000,000 for SNAP "to prevent, prepare for, and respond to coronavirus, domestically or internationally." *See* CARES Act, § 6002. The CARES Act also required that $15,510,000,000 of these appropriations "shall be placed in a contingency reserve to be allocated as the Secretary [of Agriculture] deems necessary to support participation should cost or participation exceed budget estimates to prevent, prepare for, and respond to coronavirus." *Id.*

On April 21, 2020, the USDA issued updated guidance to state agencies regarding the "emergency allotments" under the FFCRA. *See* Dkt. No. 5-9, Ex. 7 ("April 21 Guidance"). The USDA's April 21 Guidance clarified that "[a] household's [emergency allotment] cannot increase the current monthly household SNAP benefit allotment beyond the applicable maximum monthly allotment for the household size." *Id.* Thus, the USDA concluded that "SNAP households that already receive the maximum monthly allotment for their household size are not eligible for [emergency allotments]." *Id.*

4

**C.    California's Request for SNAP Emergency Allotments under the FFCRA**

The Secretary of Health and Human Services declared a nationwide public health emergency based on the outbreak of COVID–19 on January 31, 2020, satisfying the first condition required by the FFCRA.[3] And Governor Gavin Newsom declared a state of emergency in California based on COVID-19 on March 4, 2020.[4] As part of this state of emergency, the Governor issued a "shelter-in-place" executive order on March 19, 2020, which directed residents to "stay home" except for essential activities and to "at all times practice social distancing."[5]

Accordingly, California's Department of Social Services submitted an initial request for emergency allotments under the FFCRA on March 25, 2020. *See* Dkt. No. 5-9, Ex. 3. In the cover letter submitted along with its request, CDSS highlighted its disagreement with the USDA's interpretation of Section 2302 as limiting eligibility for emergency allotments to those households that do not already receive the maximum monthly allotment provided by statute. *Id.* CDSS stated that it found "this interpretation to be in conflict with both the plain language of the Act and the circumstances leading to the passage of the Act." *Id.* CDSS noted that due to COVID-19, "[m]any non-essential businesses have temporarily closed or reduced staffing, resulting in significant and immediate job loss across the state," and that this has "hit hourly workers and the self-employed especially hard, as working from home is not an option for many" and "[m]any workers will not continue to get paid as demand slows, businesses close, shifts are canceled, and workers are laid off." *Id.* CDSS explained that, despite these challenges, the USDA's "interpretation would leave the most vulnerable households who have the least resources without any increase in SNAP benefits, as many are already receiving the maximum monthly benefit

---

[3] *See* DEP'T OF HEALTH & HUM. SERVS., *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus* (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last accessed June 16, 2020).

[4] *See* OFFICE OF GOVERNOR NEWSOM, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19* (Mar. 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/ (last accessed June 12, 2020); *see also* Proclamation of a State of Emergency (Mar. 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (last accessed June 16, 2020).

[5] *See* Cal. Exec. Order N-33-20 (Cal. Mar. 19, 2020), https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (last accessed June 16, 2020).

5

allotment." *Id.* CDSS thus proposed in the alternative to provide SNAP households with a $60 per person emergency allotment, regardless of whether the household already received the maximum monthly allotment. *Id.* Doing so, CDSS said, would "provide a more equitable issuance" than the USDA's approach and would not constitute "an aggregated benefit issuance in excess of that which would be allowable under the USDA's interpretation." *Id.*

On March 26, 2020, the USDA responded to CDSS by email, informing CDSS that the proposal was "not aligned with the Emergency Allotment guidance." *See* Dkt. No. 5-9, Ex. 4. The USDA directed CDSS to "revise the plan in accordance with the template," as set forth in the USDA's March 20 Guidance. *Id.* The next day, CDSS submitted a "revised emergency allotment request." *See* Dkt. No. 5-9, Ex. 5. In its cover letter, CDSS stated that its "revised request" was made as a result of the USDA's denial of its prior request. *Id.* But CDSS reiterated its belief that the FFCRA "authorizes payments more broadly than as interpreted by [the USDA]" and CDSS "reserve[d] the right to challenge [the USDA's] implementation of the [FFCRA]." *Id.* In conformity with the USDA's guidance, however, CDSS's revised request sought emergency allotments to "raise each household's regular monthly SNAP allotment to the maximum allowable allotment based on household size." *Id.*

The USDA approved CDSS's revised request on March 30, 2020, providing emergency allotments that would increase SNAP households' current monthly allotments for March and April up to the maximum monthly allotment for a household of that size. *See* Dkt. No. 5-9, Ex. 6. And on April 29, 2020, CDSS submitted its request to extend the emergency allotments for the month of May 2020. *See* Dkt. No. 5-9, Ex. 8.

**D.     Procedural History**

Despite California's indication to the USDA that it "reserve[d] the right to challenge [the USDA's] implementation of the [FFCRA]," *see* Dkt. No. 5-9, Ex. 5, as of the date of this order, California has not pursued litigation against the USDA. Rather, Plaintiffs filed this action on May 21, 2020, challenging the USDA's interpretation and implementation of the FFCRA as inconsistent with the plain language of the statute. *See* Dkt. No. 1. Plaintiffs assert two causes of action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, alleging that the

6

USDA's interpretation is "in excess of statutory authority" and "arbitrary and capricious," and also seek declaratory judgment on that basis. *See id.* at ¶¶ 64–82.

In conjunction with their complaint, Plaintiffs also filed a motion for class certification, Dkt. No. 6, and a motion for preliminary injunction, Dkt. No. 5. Plaintiffs seek to represent a class defined as:

> SNAP recipients in California who have been deemed eligible to receive, are receiving, or will receive the regular maximum monthly SNAP allotment for their household size from March 2020 until the Secretary for Health and Human Services rescinds the COVID-19 public health emergency declaration or the State-issued emergency or disaster declaration expires.

*See id.* at ¶ 57; *see also* Dkt. No. 6. And in the instant motion, they seek a preliminary injunction enjoining the USDA and the United States Secretary of Agriculture "from denying any otherwise appropriate request from California under section 2302(a)(1) of the [FFCRA] because it provides emergency [SNAP] allotments to households receiving the maximum monthly benefit amount." *See* Dkt. No. 5-10.

## II.   LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted). Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). The most important *Winter* factor is likelihood of success on the merits. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869

F.3d 848, 856 (9th Cir. 2017).

A preliminary injunction "can take two forms," either a "prohibitory injunction" or a "mandatory injunction." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "Prohibitory injunction[s]" simply "preserve the status quo pending a determination of the action on the merits," while "mandatory injunction[s]" "order[] a responsible party to take action." *Id.* (quotation omitted). Mandatory injunctions are "particularly disfavored" and are only permissible if "*extreme or very serious damage will result*." *Id.* at 879 (emphasis added). Courts do not issue mandatory injunctions "in doubtful cases." *Id.*

## III. DISCUSSION

As a threshold matter, the Court finds that Plaintiffs seek a mandatory rather than prohibitory injunction. Plaintiffs nominally frame their requested injunctive relief in the negative, seeking to enjoin the USDA and the Secretary of Agriculture "from denying any otherwise appropriate request from California" under the FFCRA. But in substance, they are asking the Court to order the USDA to take action: approving "any otherwise appropriate request from California," regardless of whether that request includes emergency allotments for households that already receive the statutory maximum. *See* Dkt. No. 5-10. As such, Plaintiffs are asking the Court to change the status quo, not preserve it. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("[A] mandatory injunction goes well beyond simply maintaining the status quo pendente lite . . . .") (quotations omitted). Plaintiffs thus bear a heavy burden of establishing that such an injunction is warranted, since mandatory injunctions are "particularly disfavored." *Id.* (quotations omitted). Applying this stringent standard, the Court finds that Plaintiffs have not met their burden and are not entitled to a preliminary injunction at this time.

### A. Likelihood of Success on the Merits

Where, as here, Plaintiffs seek a mandatory injunction, they must show a "clear likelihood of success on the merits." *See Stanley v. University of Southern California*, 13 F.3d 1313, 1316 (9th Cir. 1994). The crux of Plaintiffs' case is that Defendant's interpretation of Section 2302 is unlawful. As the Ninth Circuit has directed, "the plain language of a statute should be enforced according to its terms, in light of its context." *See ASARCO, LLC v. Celanese Chem. Co.*, 792

8

1   F.3d 1203, 1210 (9th Cir. 2015).  Section 2302(a)(1) provides that upon a properly supported
2   request from a state agency, USDA "shall provide . . . for emergency allotments to households
3   participating in the supplemental nutrition assistance program under the Food and Nutrition Act of
4   2008 to address temporary food needs *not greater than the applicable maximum monthly allotment*
5   *for the household size*."  *See* § 2302(a)(1), 134 Stat. 178 (emphasis added).

6   As noted above, Defendant contends that Section 2302(a)(1)'s statutory cap—"not greater
7   than the applicable maximum monthly allotment for the household size"—applies to the sum total
8   of all regular and emergency allotments.  Plaintiffs, on the other hand, urge that this statutory cap
9   only applies to the "emergency allotments," and as such, "households receiving the maximum
10  regular SNAP allotment are eligible for additional emergency allotments to address their increased
11  food needs during the pandemic."  *See* Dkt. No. 5 at 15.  Plaintiffs argue that as a matter of plain
12  meaning and grammar, "not greater than the applicable maximum monthly allotment for the
13  household size" modifies "emergency allotments."  *Id.* at 15.  Because the statute does not
14  explicitly reference a SNAP household's total allotments (which include both regular monthly and
15  emergency allotments), Plaintiffs contend that the cap cannot be read to apply to that aggregate
16  amount, and must instead apply only to the amount of the emergency allotments.  *Id.* at 15–16.  To
17  find otherwise, Plaintiffs note, would imply that Congress passed legislation in the face of
18  COVID-19 that would help all but the neediest SNAP households.  *Id.* at 16–17.

19  The Court acknowledges that Plaintiffs' facial reading of Section 2302 has some
20  persuasive force.  Nonetheless, the Court does not find the statute unambiguous on its face.  The
21  statute references SNAP's statutory "maximum monthly allotment."  *See* 7 U.S.C. §§ 2012(u),
22  2017(a).  But this phrase, and Section 2302 more broadly, may not be considered in isolation.
23  Rather, they must be considered within the broader context of SNAP.  "No statutory provision is
24  written in a vacuum."  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir.
25  2001).  And "[c]omplex regulatory statutes, in particular, often create a web—or . . . perhaps a
26  maze—of sections, subsections, definitions, exceptions, defenses, and administrative provisions."
27  *Id.*

28  Here, Section 2302(a)(1) references SNAP's "maximum monthly allotment," but does not

explicitly raise this maximum. Nor does it alter the "thrifty food plan" on which this statutory maximum is based. *See id.* Yet under SNAP, the thrifty food plan—and the maximum monthly allotment—is assumed by definition to constitute the total cost needed to feed a household for a month. *See id.* Those households that receive the maximum monthly allotment, therefore, already receive what SNAP defines as necessary to feed their household for a month. In contrast, there are households that do not receive the statutory maximum, and must instead contribute thirty percent of their income toward food. *See* 7 U.S.C. § 2017(a); 7 C.F.R. § 273.10(e)(2)(ii)(C). Section 2302 could be read to require "emergency allotments" to these SNAP households to bring them up to the "maximum monthly allotment for the household size," given the unstable employment conditions caused by COVID-19 and stay-at-home orders across the country.

California noted exactly these types of employment difficulties as justification for its emergency allotment requests:

> Many non-essential businesses have temporarily closed or reduced staffing, resulting in significant and immediate job loss across the state. The economic impacts of COVID-19 have hit hourly workers and the self-employed especially hard, as working from home is not an option for many. Many workers will not continue to get paid as demand slows, businesses close, shifts are canceled, and workers are laid off. For instance, employees who are paid hourly, who make up over half of all wage and salary workers, constitute more than two-thirds of the retail trade and leisure and hospitality workforce nationwide, which are among the hardest hit industries in the current economic crisis. Many SNAP recipients have lost essential earned income and many Californians, who were not previously SNAP-eligible, are now turning to SNAP for critical food assistance.

*See* Dkt. No. 5-9, Ex. 3. Clearly, loss of income is not the only challenge facing SNAP households during the pandemic: as Plaintiffs note, "COVID-19 has greatly increased food insecurity in California" by increasing food prices and food unavailability. *See* Dkt. No. 15 at 5–8. However, unexpected job loss is a challenge Congress reasonably could have chosen to focus on in the FFCRA. And Plaintiffs have not demonstrated that their interpretation, which would substantially raise the maximum monthly allotment cap, is clearly what Congress intended.

During oral argument, the parties acknowledged that there is no legislative history that elucidates Congress' intention in enacting Section 2302. However, subsequent legislation and

legislative actions are suggestive.

*First*, Congress did not appropriate funds for any SNAP emergency allotments in the FFCRA. But the total SNAP allotments provided in each fiscal year are limited "to an amount not in excess of the appropriation for such fiscal year." 7 U.S.C. § 2027(b). And if the USDA "finds that the requirements of participating states will exceed the appropriation," it must reduce SNAP allotments. *See id.* The Chief Financial Officer of FNS, who has served in that role since 2011, estimates that providing emergency allotments to raise all SNAP households to the maximum monthly allotment will cost an additional $2 billion per month. *See* Dkt. No. 26-1 at ¶¶ 5, 12, 15. The USDA conveyed these cost estimates to congressional staff in response to requests from the House and Senate appropriations committees to the Office of Management and Budget ( "OMB"). *Id.* at ¶ 12.

A few weeks after passing the FFCRA, Congress then appropriated approximately $15.8 billion for SNAP as part of the CARES Act "to prevent, prepare for, and respond to coronavirus, domestically or internationally." *See* CARES Act, § 6002. FNS's Chief Financial Officer has estimated that these appropriations will allow SNAP to provide emergency allotments to bring all SNAP households up to the maximum monthly allotments for a period of six months. *See* Dkt. No. 26-1 at ¶¶ 12, 16. By contrast, providing emergency allotments equivalent to the maximum monthly allotment for all SNAP households, as Plaintiffs contend is possible under their interpretation, would cost an additional $6.7 to $7 billion per month, and would quickly outpace SNAP's appropriated funds. *Id.* at ¶ 17.

Plaintiffs point out that their interpretation does not *require* all SNAP households to receive 200% of the maximum monthly allotments in emergency allotments, but that this instead is just a cap on such allotments. *See, e.g.*, Dkt. No. 27 at 10–12. The Court understands that the parties do not know precisely how much the hypothetical emergency allotments under Plaintiffs' interpretation would cost and that, as such, the parties do not know precisely how far SNAP's appropriations would stretch. Nevertheless, the Court thinks it important to consider the practical import of the parties' two interpretations, even in rough estimates.

*Second*, Congress has not suggested that the USDA's guidance or its implementation of the

11

FFCRA is inconsistent with its intention in passing the FFCRA. To the contrary, some members of Congress have publicly lamented that the FFCRA did not go far enough in assisting SNAP participants,[6] and advocated for increasing the maximum monthly allotment in light of COVID-19.[7] And on May 15, 2020, the House passed the HEROES Act, which, among other things, seeks to increase "the value of [SNAP] benefits" to "115 percent of the June 2019 value of the thrifty food plan" and to appropriate an additional $10 billion for SNAP. *See* Heroes Act, H.R. 6800, 116th Congr. div. F, tit. W, § 60606; *id.* at div. A, tit. I. Increasing the maximum monthly allotment by 15% in light of COVID-19 would seem unnecessary if the FFCRA already increased this maximum by 100% in the form of emergency allotments. The Court finds that these facts cast further doubt on Plaintiffs' interpretation of Section 2302(a)(1).

The Court acknowledges that Plaintiffs' argument that all SNAP households need support in the midst of the pandemic is compelling as an equitable matter. However, Congress, not the Court, is charged with determining how best to weigh and triage the needs of all Americans during this time of crisis, taking into account the budgetary costs and benefits of various policy choices. The Court does not minimize the challenges facing SNAP households, and fully understands that participation in SNAP is already "limited to those households whose incomes and other financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet." *See* 7 U.S.C. § 2014(a). But the Court cannot say that Plaintiffs' interpretation of Section 2302 is the only reasonable interpretation of the statute. Congress may have been concerned with the likelihood of lost or unpredictable income for SNAP households, warranting the need for flexibility for states to quickly raise all households' allotments to the statutory maximum without necessarily providing benefits in excess of that maximum.[8] As a result, the

---

[6] *See* C-SPAN, *House Speaker Nancy Pelosi (D-Calif.) Weekly Briefing* (Apr. 2, 2020), (https://www.c-span.org/video/?470905-1/speaker-pelosi-create-house-select-committee-coronavirus-audio-only (last accessed June 16, 2020) ("We had good language in the bill, but we need more. We wanted a 15% increase in SNAP benefits, because that is what we saw as the need . . . . [W]e need to do much more for SNAP.").

[7] *See* Letter to Speaker Pelosi, Minority Leader McCarthy, Majority Leader McConnell, and Minority Leader Schumer (Apr. 6, 2020), https://pressley.house.gov/sites/pressley.house.gov/files/2020-04-06_snap_during_covid_19_housewide_with_signatures_final.pdf (last accessed June 16, 2020).

[8] The Court notes that nothing in the Supreme Court's recent opinion in *Bostock v. Clayton Cty.,*

12

Court finds that Plaintiffs have not shown a "clear likelihood of success on the merits" as they must to obtain a mandatory injunction.  *See Stanley*, 13 F.3d at 1316.

### B.  Likelihood of Irreparable Injury, Balance of Equities, and Public Interest

Plaintiffs' inability to establish a clear likelihood of success on the merits is dispositive for purposes of this motion for preliminary injunction.  The Court also notes that it has considerable reservations about the nature of Plaintiffs' request for injunctive relief and Plaintiffs' ability to establish redressability.  To establish redressability, Plaintiffs must allege clear and specific facts showing that it is likely that the relief sought will remedy their injury.  *See Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  But as Plaintiffs acknowledge, even if the USDA were to adopt their interpretation of the FFCRA, Plaintiffs do not have the ability to request emergency allotments under SNAP from the USDA directly.  *See* Dkt. No. 5 at 21–22.  Rather, California, an independent sovereign, must renew its request for emergency allotments and decide to provide such allotments to Plaintiffs.  *Id.*

Plaintiffs contend that "California's words and actions make clear that the state will very likely request emergency allotments for Plaintiffs and the proposed class if the Court rules in their favor," Dkt. No. 27 at 2, and that "[t]he state is obviously committed to this position," *see id.* at 3. However, California is conspicuously absent from this case, for whatever reason.  Despite reserving the right to pursue action against the USDA for denying its initial request for emergency allotments, California has not filed its own action, or joined in this one.  The Court simply has no basis to say what California would do if the Court entered Plaintiffs' requested preliminary injunction.  Under these circumstances, redressability appears speculative.  *Cf. Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) ("There is no redressability . . . where (as is the case here) any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or to predict.'").  Ultimately, however, the Court need not conclusively decide this issue at this stage.

---

*Georgia*, No. 17-1618, 2020 WL 3146686, at *3 (U.S. June 15, 2020), alters this analysis.

13

\*          \*          \*

Plaintiffs have not established a clear likelihood of success on the merits, and thus have not met their high burden of showing that an injunction is appropriate under the circumstances.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for a preliminary injunction. The Court further **ADVANCES** the case management conference to June 30, 2020, at 2:00 p.m. All counsel shall use the following dial-in information to access the call:

**Dial-In:** 888-808-6929

**Passcode:** 6064255

At the case management conference, the parties should be prepared to discuss a plan for expeditiously resolving this matter on the merits, including, as necessary, the pending motion for class certification. The parties must submit a joint case management statement by June 23, 2020.

**IT IS SO ORDERED.**

Dated: 6/17/2020

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge