Alexander Prieto (SBN 270864)
Richard Rothschild (SBN 67356)
Antionette D. Dozier (SBN 244437)
Rebecca Miller (SBN 317405)
WESTERN CENTER ON
LAW & POVERTY
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010-2826
Tel: (213) 487-7211
Fax: (213) 487-0242
aprieto@wclp.org
rrothschild@wclp.org
adozier@wclp.org
rmiller@wclp.org

Lindsay Nako (SBN 239090)
Jocelyn D. Larkin (SBN 110817)
David S. Nahmias (SBN 324097)
IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704-1693
Tel: (510) 845-3473
Fax: (510) 845-3654
lnako@impactfund.org
jlarkin@impactfund.org
dnahmias@impactfund.org

*Attorneys for Plaintiffs and the Plaintiff Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBIN HALL** and **STEVEN SUMMERS**, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE** and **GEORGE ERVIN "SONNY" PERDUE III**, in his official capacity as United States Secretary of Agriculture,<br><br>        Defendants. | Case No. 4:20-cv-03454-HSG<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Date:** September 10, 2020<br>**Time:** 2:00 pm<br>Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

PAGE(S)

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ..........................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................1

INTRODUCTION ......................................................................1

STATEMENT OF FACTS ...............................................................3

STANDARD OF REVIEW ..............................................................6

ARGUMENT .........................................................................8

I.   If the Court enjoins USDA's conduct, California will act to redress the harm to
     Plaintiffs and the proposed class. .............................................8

II.  USDA's emergency allotments guidance violates the Administrative Procedure
     Act because it is contrary to law ...........................................10

     A.   The plain text of the statute unambiguously permits emergency allotments to
          all participating households. ...........................................10

     B.   The scant legislative history, including post-enactment events, is consistent
          with Plaintiffs' reading of section 2302(a)(1). .........................14

          1.   Contemporaneous legislative history does not demonstrate "clearly
               contrary" congressional intent. .....................................15

          2.   Post-enactment legislative action and inaction provides little insight into
               Congress's intent in passing section 2302(a)(1). ....................16

               a.   The CARES Act appropriation offers no insight into congressional
                    intent. .........................................................16

               b.   The HEROES Act offers no insight into congressional intent. ........17

               c.   Congressional silence on USDA's conduct offers no insight into
                    congressional intent. ...........................................17

               d.   Statements of individual lawmakers offer no insight into
                    congressional intent. ...........................................18

III. USDA's emergency allotments guidance is arbitrary and capricious, and violates
     the Administrative Procedure Act. ...........................................18

     A.   USDA incorporated a benefit limitation from an unrelated provision of the
          Food and Nutrition Act, a factor that Congress did not intend it to consider .....19

     B.   USDA entirely failed to consider an important aspect of the problem. ...........21

IV.  The balance of the equities, public interest, and risk of irreparable harm to
     Plaintiffs warrant injunctive and declaratory relief. ........................23

CONCLUSION .......................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Abreu v. Callahan*,
    971 F. Supp. 799 (S.D.N.Y. 1997) ................................................................................23

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*,
    926 F.3d 1061 (9th Cir. 2019).............................................................................. 19, 21

*Arrington v. Daniels*,
    516 F.3d 1106 (9th Cir. 2008)....................................................................................19

*ASARCO, LLC v. Celanese Chem. Co.*,
    792 F.3d 1203 (9th Cir. 2015)....................................................................................10

*Barber v. Thomas*,
    560 U.S. 474 (2010)...................................................................................................18

*Beno v. Shalala*,
    30 F.3d 1057 (9th Cir. 1994).......................................................................... 9, 22, 24

*Booth v. McManaman*,
    830 F. Supp. 2d 1037 (D. Haw. 2011)................................................................23, 24

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018)......................................................................................24

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
    270 F.3d 863 (9th Cir. 2001)........................................................................ 10, 11, 15

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018)......................................................................................7

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)...................................................................................................10

*District of Columbia v. USDA*,
    No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ........................23

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019).................................................................................7, 23

*Encino Motorcars, LLC v. Navarro*,
    138 S. Ct. 1134 (2018)...............................................................................................17

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)...............................................................................................16

*Furnish v. Bd. of Med. Examiners of Cal.*,
    257 F.2d 520 (9th Cir. 1958) .....................................................................................25

*Gill v. Dep't of Justice,*
    246 F. Supp. 3d 1264 (N.D. Cal. 2017) ..................................................................7

*Golden Gate Rest. Ass'n v. City & County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ..............................................................................24

*Gov't Emps. Ins. Co. v. Dizol,*
    133 F.3d 1220 (9th Cir. 1998) ........................................................................7, 25

*Graham v. FEMA,*
    149 F.3d 997 (9th Cir. 1998) ..................................................................................9

*I.R. v. L.A. Unified Sch. Dist.,*
    805 F.3d 1164 (9th Cir. 2015) ..............................................................................11

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) ..............................................................................25

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................19, 21

*Mt. Diablo Hosp. v. Shalala,*
    3 F.3d 1226 (9th Cir. 2003) ..................................................................................21

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ................................................................................7

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) ................................................................................25

*Resident Councils of Wash. v. Leavitt,*
    500 F.3d 1025 (9th Cir. 2007) ..............................................................................12

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ..............................................................................................14

*Sea-Land Serv., Inc. v. DOT,*
    137 F.3d 640 (D.C. Cir. 1998) ............................................................................21

*Sierra Club v. EPA,*
    671 F.3d 955 (9th Cir. 2012) ..........................................................................18, 22

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*
    959 F.3d 341 (9th Cir. 2020) ..............................................................................8, 9

*State of Cal. Dep't of Soc. Servs. v. Thompson,*
    321 F.3d 835 (9th Cir. 2003) ..................................................................................9

*United States v. Corrales-Vazquez,*
    931 F.3d 944 (9th Cir. 2019) ................................................................................12

*United States v. Lyle,*
    742 F.3d 434 (9th Cir. 2014) ................................................................................11

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES [CASE NO. 4:20-cv-03454-HSG]

iii

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016).................................................................................16

*Univ. Med. Ctr. of S. Nev. v. Thompson*,
    380 F.3d 1197 (9th Cir. 2004).................................................................................16

*W. Watersheds Project v. Interior Bd. of Land Appeals*,
    624 F.3d 983 (9th Cir. 2010)...................................................................................14

*Withrow v. Concannon*,
    942 F.2d 1385 (9th Cir. 1991).................................................................................24

**FEDERAL STATUTES**

5 U.S.C. § 704............................................................................................................7

5 U.S.C. § 706(2)(A)...........................................................................................1, 6, 7

5 U.S.C. § 706(2)(C)...........................................................................................1, 6, 7

7 U.S.C. § 2011.........................................................................................................14

7 U.S.C. § 2012(b).....................................................................................................11

7 U.S.C. § 2012(d).....................................................................................................11

7 U.S.C. § 2012(k).....................................................................................................12

7 U.S.C. § 2014(h)(1)................................................................................................20

7 U.S.C. § 2014(h)(3)(A).....................................................................................19, 20

28 U.S.C. § 2201..................................................................................................1, 25

28 U.S.C. § 2202..................................................................................................1, 25

Coronavirus Aid, Relief, and Economic Security Act (CARES Act),
    Pub. L. No. 116-136 (Mar. 27, 2020)..................................................................3, 16

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020).......................................passim

**FEDERAL LEGISLATION**

Health and Economic Recovery Omnibus Emergency Solutions Act (HEROES Act),
    H.R. 6800, 116th Cong. div. A., tit. I (as passed by House, May 15, 2020) .............17

**FEDERAL REGULATIONS**

7 C.F.R. § 273.10(e)(2)(ii)(A) (2019) ........................................................................4

**FEDERAL RULES**

Fed. R. Civ. P. 56(a)....................................................................................................1

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on September 10, 2020 at 2:00 pm, or as soon thereafter as practicable, this motion will be heard before the Honorable Haywood S. Gilliam, Jr.  Plaintiffs Robin Hall and Steven Summers move for summary judgment on all causes of action in the Complaint (ECF No. 1), pursuant to Federal Rule of Civil Procedure 56(a).  As explained below, Defendants United States Department of Agriculture (USDA) and Secretary Perdue's interpretation of section 2302(a)(1) of the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020) (Families First Act), violates the Administrative Procedure Act, warranting injunctive and declaratory relief. There are no genuine issues of material fact as to Plaintiffs' claims under 5 U.S.C. §§ 706(2)(A), (C), and 28 U.S.C. §§ 2201, 2202, and Plaintiffs are entitled to judgment as a matter of law.

The Motion is based on this Notice of Motion; the supporting Memorandum of Points and Authorities; the accompanying declarations of Alexis Carmen Fernández, Lauren Bauer, Andrew Cheyne, Meg Davidson, Holden Bussey, and Brittany Hodge; the accompanying request for judicial notice; oral argument; and all records and files submitted in the action.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Four months ago, Californians were rushing to stockpile groceries ahead of the first statewide mandatory shelter-in-place order.  Grocery shelves were emptying across the country.  In Washington, D.C., Congress was quickly drafting legislation to respond to the looming economic and public health crisis caused by COVID-19.  On March 18, 2020, the date that Congress enacted the Families First Act, there were 7,327 confirmed U.S. cases of the virus; 115 Americans had died from it.[1]

---

[1] Request for Judicial Notice (RJN) Ex. 1 (Yale Medical School report of U.S. cases of COVID-19 on March 18, 2020).

1     The Court is called to interpret a single provision of the Families First Act, enacted in

2  the middle of these extraordinary events.  Section 2302(a)(1) established a new, temporary

3  program for emergency Supplemental Nutrition Assistance Program (SNAP) benefits to

4  strengthen food assistance, necessitated by the pandemic.  It authorized states to compile and

5  submit data to USDA to substantiate requests for "emergency allotments" to meet the

6  "temporary food needs" of their "households participating in" SNAP.  When California did

7  so, USDA denied the State's request because it failed to comply with the arbitrary, fixed

8  formula that the agency adopted.  USDA permits only supplemental benefits sufficient to

9  bring participating households up to the maximum monthly allotment.  It provides no

10  additional benefits to households receiving the maximum allotment—those with the lowest

11  incomes.  As a result, USDA is depriving Plaintiffs Robin Hall and Steven Summers and

12  proposed class members of emergency allotments to meet their increased food needs

13  resulting from the pandemic, contrary to congressional intent.

14     Applying the very high standard for mandatory injunctions, the Court declined to

15  grant Plaintiffs' motion for preliminary injunction on June 17, 2020.  With the present

16  motion, Plaintiffs directly address each of the concerns raised in the June 17 order and

17  establish that they are entitled to judgment in their favor:

18  • Plaintiffs submit a declaration from the Chief of the CalFresh and Nutrition Branch of

19     the California Department of Social Services, in which the State expressly commits

20     to, in the event of a favorable order, promptly request emergency allotments for those

21     households that receive the maximum regular benefit;

22  • Plaintiffs provide a more comprehensive textual examination of section 2302(a)(1),

23     which demonstrates that it authorizes states to request emergency allotments to

24     address the temporary food needs of *all* SNAP households;

25  • Plaintiffs address the inferences that the Court drew, in the absence of legislative

26     history, from post-enactment congressional action and inaction; and

27  • Plaintiffs address for the first time their claim that USDA's interpretation of section

28     2302(a)(1) is arbitrary and capricious.

1    Plaintiffs ask this Court to find that USDA's action violates the Administrative

2   Procedure Act and grant injunctive and declaratory relief.  To do so, the Court need not make

3   policy decisions, only determine what Congress intended in enacting section 2302.

4

5                              **STATEMENT OF FACTS**

6    By mid-March 2020, U.S. cases of COVID-19 were rapidly climbing, financial

7   markets were collapsing, and California was implementing the first statewide shelter-in-place

8   order.[2]  The national media was blanketed with stories of panic shopping, empty shelves in

9   grocery stores, and shortages at food banks, as Congress debated how to act quickly to

10  protect the nation's public health and economy.[3]  On March 11, 2020, the U.S. House of

11  Representatives introduced the Families First Coronavirus Response Act; it was signed it into

12  law just seven days later.[4]  Section 2302(a)(1) of the Families First Act directed, contingent

13  on federal and state emergency declarations, that the Secretary of Agriculture:

14          shall provide, at the request of a State agency . . . that provides sufficient data
            (as determined by the Secretary through guidance) supporting such request,
15          for emergency allotments to households participating in the supplemental
            nutrition assistance program under the Food and Nutrition Act of 2008 to
16          address temporary food needs not greater than the applicable maximum
            monthly allotment for the household size. . . .
17

18  Admin. R. (ECF No. 43-3) at AR25.[5]

19    Shortly thereafter, Congress passed the Coronavirus Aid, Relief, and Economic

20  Security Act, which, *inter alia*, appropriated over $15.5 million to SNAP "to prevent, prepare

21  for, and respond to coronavirus."  Pub. L. No. 116-136, § 6002 (Mar. 27, 2020).

---

22  [2] RJN Ex. 2 ("shelter-in-place" executive order issued by California Governor Gavin
23  Newsom on March 19, 2020).

    [3] *See* RJN Ex. 3 (*Preparing for the Coronavirus: Shoppers Are Finding Empty Shelves, Long
24  Lines at Stores Nationwide*, USA Today, March 13, 2020); *id.* Ex. 4 (*Grocers Fail to Keep
    Up With Demand as Coronavirus Pandemic Spreads*, Wall Street Journal, March 15, 2020);
25  *id.* Ex. 5 (*Food Banks Are Seeing Volunteers Disappear and Supplies Evaporate as
    Coronavirus Fears Mount*, Washington Post, March 16, 2020); *id.* Ex. 6 (*U.S. Virus Plan
26  Anticipates 18-Month Pandemic and Widespread Shortages*, New York Times, March 17,
    2020).

27  [4] RJN Ex. 7 (overview of congressional action on the Families First Act).

28  [5] Citations to the certified administrative record (ECF No. 43-3) and supplement (ECF 44-3)
    are identified as "AR," with page numbers that correspond to the Bates numbering provided.

1

**USDA's Implementation of Section 2302(a)(1)**

2      Two days after Congress enacted the Families First Act, on March 20, 2020, USDA

3 issued guidance to state agencies regarding the emergency allotments authorized by section

4 2302(a)(1). AR111-14. The guidance included a template "Request to Provide Emergency

5 Allotments (Supplements) to SNAP Households." AR112-14. The template limits

6 permissible state requests to those asking "to bring all households up to the maximum benefit

7 due to pandemic related economic conditions for up to 2 months"—i.e., the difference

8 between a household's regular allotment[6] and the standard maximum allotment for its

9 household size. AR112.

10      Less than a month later, on April 11, 2020, USDA distributed the first "Q&A"

11 document to its regional offices. AR115. In response to the question, "What are emergency

12 allotments?," USDA answered:

13
14
15
16
17
> The emergency allotments authorized under Sec. 2302 of the Families First
> Coronavirus Response Act (FFCRA) are supplements to a household's SNAP
> benefits, similar to supplements authorized during disasters under Sec.
> 5(h)(3)(A) of the Food and Nutrition Act of 2008 (FNA). These supplements
> address temporary food needs and are added on to a household's monthly
> benefit so the total household benefit amount may equal the maximum benefit
> amount for their household size. Households that already receive the
> maximum benefit for their household size may not receive an additional
> emergency allotment. AR117-18.

18      On April 21, 2020, USDA issued updated guidance authorizing requests for

19 emergency allotments to continue as long as federal and state emergency declarations

20 remained in place. AR128. The guidance states, "SNAP households that already receive the

21 maximum monthly allotment for their household size are not eligible for [emergency

22 allotments]." AR129.

23

**California's Request for Emergency Allotments of SNAP Benefits**

24      On March 25, 2020, the California Department of Social Services submitted its

25 request for emergency allotments for all SNAP households, including those receiving the

26 maximum regular allotment, for March and April 2020. AR132. Its cover letter documented

27

28 _____

[6] A household's monthly allotment is equal to the maximum SNAP allotment for the
household size reduced by a percentage of its net monthly income. 7 C.F.R.
§ 273.10(e)(2)(ii)(A) (2019). Therefore, as income increases, the SNAP allotment decreases.

1   the Department's disagreement with USDA's interpretation of section 2302(a)(1), as "in

2   conflict with both the plain language of the Act and the circumstances leading to the passage

3   of the Act."  *Id.*  The Department proposed a "more equitable" distribution: "an estimate of

4   the total increase in benefits that would have resulted from the USDA's interpretation . . .

5   divided by the number of participants to achieve an equal per-person emergency allotment

6   amount" to all SNAP households, resulting in flat emergency allotment of $60 per

7   participant.  AR133.  The request included data about the economic impact of COVID-19 in

8   the state, consistent with section 2302's data requirement.  AR135-36.  On March 26, 2020,

9   USDA rejected the Department's request as "not aligned with the Emergency Allotment

10  guidance" and directed it to submit a revised request.  AR138.

11       The next day, the Department submitted a revised request for a nearly identical

12  amount that would raise all SNAP households to the maximum monthly benefit and did not

13  contain any payments for maximum allotment households, along with a cover letter

14  reiterating its disagreement with USDA's interpretation of section 2302(a)(1).  AR139-44.

15  On March 30, 2020, USDA approved California's revised request.  AR145.  The Department

16  has sought and received emergency allotments for May and June 2020, in accordance with

17  USDA's April 21 guidance.  Suppl. Admin. R. (ECF No. 44-3) at AR346-50; AR170-71.

18                     **Plaintiffs' Injuries and Filing of Lawsuit**

19       Plaintiffs Robin Hall and Steven Summers are two of the many California SNAP

20  recipients who receive the maximum regular monthly allotment for their household size and

21  are not receiving emergency allotments.  Decl. of Robin Hall (ECF No. 5-1) ¶¶ 8-10; Decl. of

22  Steven Summers (ECF No. 5-2) ¶¶ 9-11.  COVID-19 has changed where and how they get

23  food, and they now struggle to feed themselves with their regular allotments.  *See, e.g.*, Hall

24  Decl. ¶¶ 14-16, Summers Decl. ¶¶ 13-19.  Ms. Hall can no longer access the soup kitchens

25  that she relies on to supplement her regular SNAP allotments.  Hall Decl. ¶¶ 14-16.  Higher

26  food prices, food shortages, and inadequate distributions from food pantries have forced Mr.

27  Summers to spend more of his savings on meals, leaving him without enough money to pay

28  his rent.  Summers Decl. ¶¶ 13-19.  Ms. Hall's and Mr. Summers's experiences are consistent

1    with data and testimony from service providers showing that food prices in California and

2    nationwide have risen significantly during the pandemic, grocery items are far less

3    accessible, and demand at food banks and pantries has multiplied while food supply has

4    lagged.  *See, e.g.*, Decl. of Andrew Cheyne (ECF No. 5-3) ¶¶ 6-9; Decl. of Meg Davidson

5    (ECF No. 5-4) ¶¶ 5-10; Decl. of Brittany Hodge (ECF. No. 5-5) ¶ 6; Decl. of Sarah Palmer

6    DeFrank (ECF No. 5-6) ¶¶ 5-10; Decl. of Lauren Bauer (ECF No. 5-7) ¶¶ 29-34.

7           These challenges have proliferated as the pandemic surges.  Demand for food

8    supplies continues to increase, while food banks and pantries continue to confront heightened

9    food and operational costs.  *See* Suppl. Decl. of Andrew Cheyne ¶¶ 6-7; Suppl. Decl. of Meg

10   Davidson ¶¶ 6-8; Decl. of Holden Bussey ¶¶ 4-7.  Food prices in California and nationwide

11   continue to rise at a rate faster than normal inflation rates.  Suppl. Decl. of Lauren Bauer

12   ¶¶ 12-13.  And free resources are still far less available than before the pandemic.  *See*

13   Davidson Suppl. Decl. ¶ 6; Bussey Decl. ¶¶ 5-6; Suppl. Decl. of Brittany Hodge ¶¶ 4-5.

14          On May 21, 2020, Plaintiffs Robin Hall and Steven Summers filed this action

15   challenging USDA's interpretation and implementation of the Families First Act as violating

16   the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and requesting injunctive and

17   declaratory relief.  ECF No. 1.  Plaintiffs concurrently moved for a preliminary injunction

18   and class certification.  ECF Nos. 5, 6.[7]  On June 17, 2020, the Court denied the motion for

19   preliminary injunction (ECF No. 32) (Order), which Plaintiffs have appealed, ECF No. 34.

20

21                              **STANDARD OF REVIEW**

22          The Administrative Procedure Act governs the Court's review in this action.  A

23   reviewing court must "set aside agency action, findings, and conclusions found to be . . . in

24   excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C.

25

26   [7] Plaintiffs seek to represent a putative class defined as "SNAP recipients in California who
     have been deemed eligible to receive, are receiving, or will receive the regular maximum
     monthly SNAP allotment for their household size from March 2020 until the Secretary for
27   Health and Human Services rescinds the COVID-19 public health emergency declaration or
     the State-issued emergency or disaster declaration expires."  ECF No. 6 at 1.  The motion for
28   class certification is pending.

1    § 706(2)(C), or "arbitrary, capricious, an abuse of discretion or otherwise not in accordance

2    with law," 5 U.S.C. § 706(2)(A).[8]  With regard to statutory authority, "[i]f the statute is clear,

3    [courts] 'must give effect to the unambiguously expressed intent of Congress' regardless of

4    the agency's view." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1141

5    (9th Cir. 2007) (citation omitted).  Under the arbitrary and capricious standard, the Court

6    must "ensure that the agency considered the relevant factors and articulated a rational

7    connection between the facts found and the choices made." *Ctr. for Biological Diversity v.*

8    *Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted).  "'Summary judgment thus

9    serves as the mechanism for deciding, as a matter of law, whether the agency action is

10   supported by the administrative record and otherwise consistent with the APA standard of

11   review.'" *Gill v. Dep't of Justice*, 246 F. Supp. 3d 1264, 1268 (N.D. Cal. 2017), *aff'd*, 913

12   F.3d 1179 (9th Cir. 2019) (citation omitted).

13          Plaintiffs also seek a permanent injunction and declaratory relief.  "To be entitled to a

14   permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that

15   it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that

16   the balance of hardships justify a remedy in equity; and (5) that the public interest would not

17   be disserved by a permanent injunction." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir.

18   2019) (citation omitted), *petition for cert. filed sub nom. Idaho Dep't of Corr. v. Edmo*, No.

19   19-1280 (U.S. May 6, 2020).  Declaratory relief under the Declaratory Judgment Act is left

20   to the Court's discretion, and is warranted where "the district court [is] satisfied that

21   entertaining the action is appropriate." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223

22   (9th Cir. 1998).

23   //

24   //

25   //

26   //

27

28   [8] USDA does not dispute that its interpretation is a final agency action and reviewable by the
     Court under 5 U.S.C. § 704.

**ARGUMENT**

I.    **If the Court enjoins USDA's conduct, California will act to redress the harm to Plaintiffs and the proposed class.**

Plaintiffs must establish the elements of Article III standing: injury-in-fact, causation, and redressability.  *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 959 F.3d 341, 349 (9th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  There is no dispute that Plaintiffs satisfy the injury-in-fact and causation requirements for Article III standing.[9]  In its June 17 order, however, the Court observed that Plaintiffs' showing of redressability "appeared speculative," finding that "[t]he Court simply has no basis to say what California would do if the Court entered Plaintiffs' requested preliminary injunction."  Order at 13.  With this motion, Plaintiffs provide direct evidence from the State of California regarding its intent, which proves that the requested order would redress Plaintiffs' injuries.

Plaintiffs have submitted the declaration of the Chief of the CalFresh and Nutrition Branch of the California Department of Social Services, Alexis Carmen Fernández, who oversees the administration of SNAP for the State of California.  Decl. of Alexis Carmen Fernández in Supp. of Pls.' Mot. for Summ. J. ¶¶ 2-3.  Chief Fernandez was responsible for the State's March 25 and March 27, 2020 requests for emergency allotments to USDA.  *Id.* ¶¶ 6-7.  She affirms that the Department is aware of the injunction that Plaintiffs are seeking and, if the order is entered, will seek benefits for Plaintiffs and the proposed class:

> If the Court were to issue such an order, the Department would promptly revise and renew its request for emergency allotments for future benefit months.  The new request would be based on an assessment of the temporary food needs of SNAP participants in California and *would include emergency benefits for households receiving the maximum regular monthly benefit allotment for their household size.*

*Id.* ¶ 8 (emphasis added).

---

[9]  Plaintiffs Hall and Summers have both been denied emergency SNAP allotments that would mitigate their temporary food needs related to the COVID-19 pandemic.  They have each suffered an injury that is actual, concrete, particularized, and caused by USDA's interpretation of section 2302(a)(1) to deny emergency allotments to households receiving the maximum monthly allotment for their household size.  Hall Decl. ¶¶ 10, 15; Summers Decl. ¶¶ 11, 13.

1        This unambiguous affirmation of the State's intent more than satisfies the Ninth

2   Circuit's standard for redressability.  Plaintiffs need only show that a favorable decision is

3   "*likely*" to redress their injuries, not that it "*will inevitably*" do so.  *Beno v. Shalala*, 30 F.3d

4   1057, 1065 (9th Cir. 1994) (citing *Lujan*, 504 U.S. at 561); *see also Skyline Wesleyan*, 959

5   F.3d at 351 (9th Cir. 2020) ("It is not necessary to show 'a guarantee that [the plaintiff's]

6   injuries will be redressed.'" (alteration in original) (citation omitted)).

7        Here, California's clear statement of intent makes it highly likely that Plaintiffs and

8   proposed class members will receive emergency allotments following a court order in their

9   favor, easily clearing the redressability hurdle.  This conclusion is further bolstered by the

10  fact that California originally requested emergency allotments for households receiving

11  maximum monthly benefits and stated that USDA's interpretation unduly limited benefits in

12  violation of the statute.  AR132-33.  This past course of conduct is "strong evidence" of the

13  State's likely future action.  *See Skyline Wesleyan*, 959 F.3d at 352.

14       It is not necessary for California to be a party to the lawsuit to satisfy redressability.[10]

15  Where Plaintiffs demonstrate that an independent third party is likely to take action to redress

16  their harm in response to the requested court order, the Ninth Circuit has not required that the

17  third party be named in the action.  *See, e.g., id.* (finding standing satisfied where group

18  health insurers were not parties to lawsuit challenging state regulation preventing purchase of

19  insurance that omitted abortion services); *Graham v. FEMA*, 149 F.3d 997, 1002-03 (9th Cir.

20  1998) (reversing dismissal of claim against FEMA on redressability grounds, where the state

21  entity responsible for disbursing federal disaster funds to plaintiffs was not a party to the

22  lawsuit and beyond the court's jurisdiction), *abrogation on other grounds recognized by*

23  *Novak v. United States*, 795 F.3d 1012 (9th Cir. 2015).  In *State of California Department of*

24  *Social Services v. Thompson*, 321 F.3d 835, 846, 857 (9th Cir. 2003), California sued the

25  Department of Health and Human Services regarding eligibility for the Aid to Families with

26  Dependent Children-Foster Care program but, when the suit was dismissed, chose not to

27

28  [10] In its June 17, 2020 order, the Court noted that "California has not filed its own action, or
    joined in this one."  Order at 13.

1    appeal.  The Ninth Circuit held that an AFDC-FC recipient who intervened satisfied

2    redressability alone: "That some additional steps by the State may be required . . . [was] of no

3    moment."  *Id.* at 846.

4          An injunction directed at USDA will redress the injuries of Plaintiffs and the class.

5

6    **II.    USDA's emergency allotments guidance violates the Administrative Procedure

7           Act because it is contrary to law.**

8          The Court must determine whether USDA acted beyond the authority granted to it by

9    Congress.  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013) ("the question—whether

10   framed as an incorrect application of agency authority or an assertion of authority not

11   conferred—is always whether the agency has gone beyond what Congress has permitted it to

12   do").  To be affirmed, USDA's interpretation of section 2302(a)(1) must be consistent with

13   congressional intent.  To discern congressional intent, the Ninth Circuit has directed:

14         We look first to the plain language of the statute, construing the provisions of
           the entire law, including its object and policy, to ascertain the intent of

15         Congress. We will resort to legislative history, even where the plain language
           is unambiguous, where the legislative history clearly indicates that Congress

16         meant something other than what it said.

17   *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) (quoting *Carson*

18   *Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc)).  The plain

19   language of section 2302(a)(1) requires USDA to approve state requests based on data

20   supporting the temporary food needs of SNAP participants in the state; it does not permit the

21   agency to impose a universal formula.  The scant legislative history of the Families First Act

22   does not indicate otherwise.

23         **A.    The plain text of the statute unambiguously permits emergency
                 allotments to all participating households.**

24

25         Section 2302(a)(1) of the Families First Act directs USDA to approve state requests,

26   supported by data, to provide "emergency allotments to households participating in

27   [SNAP] . . . to address temporary food needs" arising from the COVID-19 pandemic.  AR25.

28   The plain and unambiguous terms of the statute contemplate benefits for all participating

1    households, including those eligible for maximum regular monthly allotments. The

2    subsequent phrase at issue here—"not greater than the applicable maximum monthly

3    allotment for the household size"—limits the amount of the supplemental emergency benefit

4    alone. It does not exclude maximum allotment households from receiving emergency

5    allotments or permit USDA's interpretation to that end.

6         Section 2302(a)(1) must be read by applying the definitions under the Food and

7    Nutrition Act, SNAP's governing statute. Its words should be then considered in their

8    immediate context, the surrounding provisions of the Families First Act, and finally, the Food

9    and Nutrition Act as a whole. *See I.R. v. L.A. Unified Sch. Dist.*, 805 F.3d 1164, 1167 (9th

10   Cir. 2015) (stating that, to determine plain meaning, courts evaluate the language of the

11   statute "in light of the overall purpose and structure of the whole statutory scheme" (citation

12   omitted)). Each level of the textual analysis (i.e. words, phrases, section, statute)

13   demonstrates that USDA's interpretation exceeds its statutory authority and contravenes the

14   intent of Congress.

15        We begin the textual analysis by focusing on the meanings of the words that Congress

16   chose. *See Carson Harbor*, 270 F.3d at 878 ("When a statute includes an explicit

17   definition, . . . we must follow that definition[.]" (quoting *Stenberg v. Carhart*, 530 U.S. 914,

18   942 (2000)). The Food and Nutrition Act defines "allotment" as "the total value of benefits a

19   household is authorized to receive during each month." AR173 (7 U.S.C. § 2012(b)).

20   "Benefit" is defined as "the value of supplemental nutrition assistance provided to a

21   household." AR174 (7 U.S.C. § 2012(d)). Congress left other critical words, namely

22   "emergency" and "temporary," undefined. Absent a statutory definition, normal usage

23   applies.[11] *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014). "Emergency allotments,"

24   therefore, constitute nutritional assistance provided to households in an urgent situation

25   requiring immediate action.

26

27   ───────────────────
     [11] RJN Ex. 8 (Merriam-Webster Dictionary defines "emergency" as "an unforeseen
28   combination of circumstances or the resulting state that calls for immediate action," and
     "temporary" as "lasting for a limited time.").

1    Section 2302(a)(1) places only two limits on this benefit.  First, the benefit must be

2    determined by a state's assessment of participating households' "temporary food needs."

3    Second, the benefit cannot exceed the amount of a household's maximum monthly benefit.

4    Nothing in section 2302(a)(1) supports USDA's interpretation that "not greater than the

5    applicable maximum monthly allotment for the household size" applies to *the sum of* the

6    emergency allotment *and* a household's regular monthly allotment.  *See* AR25.  USDA's

7    reading requires the Court to restructure and add words to the plain language of section

8    2302(a)(1), which is forbidden.  *See Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025,

9    1031 (9th Cir. 2007) ("Congress expresses its purpose by words. It is for us to ascertain—

10    neither to add nor to subtract, neither to delete nor to distort." (citation omitted)).[12]

11    USDA has justified its untenable reading of the statute by equating "temporary food

12    needs" with "temporary loss of income due to stay-at-home orders," which it argues can be

13    addressed by removing income contributions and raising all households to the monthly

14    maximum.  PI Opp'n at 10-11.  But this reading impermissibly ignores Congress's use of the

15    phrase "temporary food needs."  *See United States v. Corrales-Vazquez*, 931 F.3d 944, 950

16    (9th Cir. 2019) ("[T]he 'cardinal principle' of interpretation [is] that courts 'must give effect,

17    if possible, to every clause and word of a statute.'" (citation omitted)).  The Food and

18    Nutrition Act defines "food," in relevant part, as "any food or food product for home

19    consumption."  AR175 (7 U.S.C. § 2012(k)).  Nowhere in section 2302(a)(1) does Congress

20    equate food needs and lost income.  USDA's reading fails to give effect to every clause and

21    word in the statute.  Focusing still further on the words that Congress chose, it provided

22    benefits to "households participating in [SNAP]" and did not impose any limit on eligibility.

23    USDA's implementation of emergency allotments also does not square with section

24    2302(a)(1)'s specific procedure for states to obtain benefits.  It requires states to assess the

25

26    [12] USDA has argued that Plaintiffs' reading would result in emergency allotments up to twice
the statutory maximum.  Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. and Class Certification

27    (ECF No. 26) at 11 (PI Opp'n).  Section 2302(a)(1) requires, first and foremost, that the
amount of the emergency allotment be defined by the state's assessment of temporary food

28    needs.  Congress permitted USDA to determine what constitutes "sufficient data" to support
state requests, but then required it to approve requests based on such data.

1   "temporary food needs" of their SNAP recipients and submit sufficient data to justify their

2   requests for emergency allotments. USDA's interpretation of the Act reads this procedure out

3   of section 2302(a)(1) entirely, replacing it with an across-the-board "topping off" of

4   households receiving less than the maximum regular allotment.

5        The Act's overall structure again supports Plaintiffs' reading and contradicts USDA's

6   position that Congress intended section 2302 to respond to loss of income. The Families

7   First Act contains only two provisions on SNAP with titles that delineate their *distinct*

8   purposes: section 2301 ("SNAP Flexibility for Low-Income Jobless Workers") and section

9   2302 ("Additional SNAP Flexibilities in a Public Health Emergency"). AR24-25. In section

10  2301 for "Low-Income Jobless Workers," Congress suspended the three-month time limit on

11  SNAP benefits for certain able-bodied adults to address difficulties they were likely to face in

12  meeting work requirements. AR24. Congress did not include emergency allotments in the

13  section specific to low-income jobless workers, which might have suggested that the

14  allotments were intended to address loss of job-related income. Instead, Congress placed

15  emergency allotments in a separate provision entitled "Additional SNAP Flexibilities."

16  AR25. These flexibilities apply to *all* participating SNAP households without limitation. *Id.*

17       Shifting the statutory analysis to the Families First Act itself, section 2302(a)(1) is

18  among a long list of new programs created in response to the COVID-19 pandemic. While

19  Congress did not include an explicit statement of the overall purposes of the Act in the

20  statute, its enormous reach and multifaceted content bespeaks an aggressive federal response

21  to the wide-ranging needs faced by families as a result of the pandemic. In a single piece of

22  legislation, Congress established, among other things:

23       • Additional funding for the Women, Infants, and Children (WIC) program, AR3;

24       • New food assistance benefits for children losing school lunches because of school
25         closures, AR4-7, 16-23;

26       • Paid sick leave and expanded family and medical leave as well as employer tax
           credits, AR27-38, 46-63;

27       • Extended unemployment compensation, AR39-43;

28       • Free coronavirus diagnosis and testing, AR63-87; and

---

- Funding for taxpayer services, AR88-108.

The immense scope of the Act does not suggest narrow fixes or half measures. Rather, it shows that Congress was implementing a comprehensive network of new benefit programs requiring significant new federal funding. Understanding section 2302(a)(1) to authorize supplemental allotments for pandemic-related food needs, in addition to regular SNAP monthly benefits, for all SNAP households is consistent with the Act's scope and ambition.

Plaintiffs' reading of section 2302(a)(1) is also consistent with the overall purpose and structure of the Food and Nutrition Act. Congress authorized SNAP to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation" in order to "alleviate . . . hunger and malnutrition." AR173 (7 U.S.C. § 2011). Congress enacted section 2302(a)(1) to provide participating households with additional purchasing power to address temporary food needs due to the pandemic—including rising food costs, interruptions in food supply, and other difficulties accessing and affording sufficient food through normal channels of trade—that affect all SNAP households. *See, e.g.*, Bauer Decl. ¶¶ 29-32 (rising food costs in February and March 2020); DeFrank Decl. ¶¶ 5-8 (change in food pantry distributions as demand increased, distribution sites closed, and food supply decreased). The plain language of section 2302(a)(1) confirms that Congress intended for USDA to provide all SNAP participants with additional purchasing power to prevent hunger in unprecedented times. Where "the statutory language is unambiguous and the statutory scheme is coherent and consistent," the inquiry "must cease." *W. Watersheds Project v. Interior Bd. of Land Appeals*, 624 F.3d 983, 987 (9th Cir. 2010) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

**B.      The scant legislative history, including post-enactment events, is consistent with Plaintiffs' reading of section 2302(a)(1).**

As the meaning of section 2302(a)(1) is plain and unambiguous, the Court may consider legislative history only "to ensure that there is no clearly contrary congressional

1  intent." *Carson Harbor*, 270 F.3d at 884.  The meager legislative history available provides

2  no evidence of congressional intent clearly contrary to the plain language of the statute.

3              **1.  Contemporaneous legislative history does not demonstrate "clearly
                   contrary" congressional intent.**

4

5          There is very little legislative history specific to section 2302, perhaps understandably

6  given the rapid passage of the Families First Act.  Congress's actions reflected the changing

7  circumstances of the day.  During the narrow one-week window between the Act's

8  introduction in the House on March 11 and Senate passage and presidential signing on March

9  18, the full-blown economic crisis had not yet hit.  Interruptions in the food supply and

10  hoarding left grocery shelves empty.[13]  Statewide orders were not yet in place and the crisis

11  had not yet fully hit the labor market.[14]  While the House was considering the bill, claims for

12  unemployment benefits declined.[15]

13          No congressional committees issued reports or held hearings on the Families First

14  Act; the minimal legislative history is limited to statements by lawmakers.  The day the

15  House introduced the bill, March 11, 2020, committee chairs stated that it would "bolster the

16  federal government's response to the coronavirus outbreak and address the severe impacts of

17  the coronavirus on Americans' personal safety and financial security."[16]  During the floor

18  debate, lawmakers declared that the bill would "strengthen[]" food assistance programs.[17]

19  The House expedited passage of the bill, and the Senate passed it without substantive

20  changes.[18]  None of this history is "clearly contrary" to the language of section 2302; the

21  Court's review should stop there.

22  _____

[13] *See supra* note 3.

23  [14] RJN Ex. 2 (California's shelter-in-place order, the first statewide order in the country, was

24  issued on March 19).

[15] RJN Ex. 9 (*Claims for Jobless Benefits Drop By 4,000*, The Hill, March 12, 2020)

25  [16] RJN Ex. 10 (March 11, 2020 press release issued by House Appropriations Committee
    titled *House Democrats Introduce Families First Act*).

26  [17] *See, e.g.*, RJN Ex. 11 (statements on the House floor from Representatives Eddie Bernice
    Johnson of Texas and Barbara Lee of California in support of the Families First Act as

27  entered into the Congressional Record, 166 Cong. Rec. H1688-89 (daily ed. Mar. 13, 2020)).

28  [18] RJN Ex. 12 (*Senate Passes House's Coronavirus Aid Bill, Sending It To Trump*, The Hill,
    March 18, 2020 (reporting that the Senate passed the bill without amendments)).

**2. Post-enactment legislative action and inaction provides little insight into Congress's intent in passing section 2302(a)(1).**

In its order, the Court continued beyond contemporaneous legislative history and looked to later legislation and actions to discern Congress's intention in enacting section 2302. *See* Order at 11-12. However, subsequent events cannot elucidate congressional intent at the time legislation is passed. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("'It is the business of Congress to sum up its own debates in its legislation,' and once it enacts a statute, '[w]e do not inquire what the legislature meant; we ask only what the statute means.'" (alteration in original) (citation omitted)); *see also Univ. Med. Ctr. of S. Nev. v. Thompson*, 380 F.3d 1197, 1202 (9th Cir. 2004) ("[S]ubsequent legislative history is 'an unreliable guide to legislative intent.'" (citation omitted)). Thus, "post-enactment legislative history" should not guide the Court's analysis. We address the matters the Court raised.

**a. The CARES Act appropriation offers no insight into congressional intent.**

The passage of the CARES Act does not elucidate congressional intent behind section 2302(a)(1). The Act made a broad, lump-sum supplemental appropriation to SNAP through September 30, 2021, placing $15.51 billion in a contingency reserve to be "allocated as the Secretary deems necessary to support participation should cost or participation exceed budget estimates to prevent, prepare for, and respond to coronavirus." CARES Act § 6002. The CARES Act is of limited relevance because it is a broad supplemental SNAP appropriation; the text of the appropriation offers no insight into Congress's intended implementation of the Families First Act. *See United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016) ("Our focus . . . must be upon the text of the appropriation." (quoting *Int'l Union, UAW v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.)))

The appropriation does confirm, however, that there are funds available for additional emergency allotments that would not exceed USDA's funding. USDA estimated that it had $19.5 billion ($9 billion in contingency fees less $5 billion held for non-coronavirus emergencies plus $15.5 billion CARES Act appropriation) to fund six months of emergency

1   allotments.  Decl. of David Burr (ECF No. 26-1) ¶¶ 8, 10, 13.  It also estimated that its

2   interpretation of section 2302(a)(1) would cost $2 billion each month for six months, for a

3   total of $12 billion, leaving $7.5 billion remaining to fund additional emergency allotments.

4   *See id*. ¶¶ 15-16.  Notably, California's initial request (with emergency allotments for all

5   households) cost the same as its revised request.  *See* AR132-38.  Approving that initial

6   request today would not require any additional funding.  *See* AR135-37, 142-43.

7               **b.  The HEROES Act offers no insight into congressional intent.**

8           This Court also pointed to the HEROES Act passed by the House in May as H.R.

9   6800, which would increase the maximum regular SNAP allotment by fifteen percent,

10  reasoning that representatives who supported the HEROES Act would not have done so if

11  they believed section 2302(a)(1) already provided assistance above the maximum regular

12  allotment.  Order at 12.  Plaintiffs are aware of no evidence that House members were so

13  motivated, and myriad other explanations are equally plausible.  Some representatives may

14  have believed that the current crisis warrants emergency benefits *and* an increase to the

15  regular benefit baseline.  Some may have supported the fifteen-percent increase

16  because USDA failed to properly implement section 2302(a)(1).  Others may have had no

17  opinion at all on the matter and voted for the HEROES Act based on other provisions

18  contained in its 1,815 pages.  The Senate has not yet voted on the HEROES Act, and it may

19  never.[19]  The bill does not help explain congressional intent in passing section 2302(a)(1).

20               **c.  Congressional silence on USDA's conduct offers no insight into
21                       congressional intent.**

22          The Court noted that "Congress has not suggested that the USDA's guidance or its

23  implementation of the FFCRA is inconsistent with its intention in passing the FFCRA."

24  Order at 11-12.  Congress's silence on a topic does not signal its approval, particularly

25  regarding an agency interpretation that runs against the plain text of the authorizing

26  legislation.  *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018)

27

28  [19] RJN Ex. 13 (*McConnell, Senate GOP declare House Democrats' $3T Coronavirus Bill
    'Dead On Arrival,'* The Hill, May 12, 2020.)

("[S]ilence in the legislative history, 'no matter how "clanging,"' cannot defeat the better reading of the text and statutory context." (citation omitted)).

### d. Statements of individual lawmakers offer no insight into congressional intent.

Finally, statements made by individual lawmakers made after the bill is enacted are not entitled to weight.  The Court's order cited comments from House Speaker Nancy Pelosi "lamenting that the FFCRA did not go far enough in assisting SNAP participants" and advocating for changes to the maximum monthly allotment, reading them as an endorsement of USDA's implementation of section 2302.  Order at 12.  But those comments could just as easily be read as recognizing a need exceeding what temporary emergency allotments could provide, or acknowledging USDA's flawed implementation of section 2302 and pivoting to a new legislative strategy to protect the lowest-income households.  For this reason, post-enactment statements cannot confirm congressional intent at the time section 2302 was passed. *See, e.g.*, *Barber v. Thomas*, 560 U.S. 474, 486 (2010) ("[T]he Court normally gives little weight to statements, such as those of the individual legislators, made after the bill in question has become law.").

The legislative history does not alter the plain meaning of the statute in this instance.

## III.   USDA's emergency allotments guidance is arbitrary and capricious, and violates the Administrative Procedure Act.

USDA must implement the emergency allotments program in accordance with Congress's explicit directions in section 2302(a)(1).  For the reasons set forth above, USDA acted arbitrarily and capriciously by disregarding a congressional mandate. *See supra* Section II.A; *Sierra Club v. EPA*, 671 F.3d 955, 961 (9th Cir. 2012) ("[Courts] may not rubberstamp . . . administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute[.]'" (alterations in original) (citation omitted)).  Section 2302(a)(1) provides USDA with discretion *only* to determine the

1   data state agencies may provide in support of their requests.  USDA does not have the

2   discretion to alter the benefit eligibility requirements established by Congress.

3       Next, in interpreting section 2302(a)(1), USDA was expected to "examine the

4   relevant data and articulate a satisfactory explanation for its action including a 'rational

5   connection between the facts found and the choice made.'"  *Altera Corp. & Subsidiaries v.*

6   *Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle*

7   *Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The

8   "touchstone" is "reasoned decisionmaking."  *Id.* (quoting *State Farm*, 463 U.S. at 52).  An

9   agency decision is arbitrary and capricious if the agency has "relied on factors which

10  Congress has not intended it to consider" or "entirely failed to consider an important aspect

11  of the problem."  *State Farm*, 463 U.S. at 43.  USDA's decisionmaking process contains both

12  of these fatal flaws, and is arbitrary and capricious.

13       **A.    USDA incorporated a benefit limitation from an unrelated provision of
             the Food and Nutrition Act, a factor that Congress did not intend it to**
14           **consider.**

15       USDA's explanation for its action must be limited to that contained in the

16  administrative record.  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) ("In

17  conducting our review, we may look only to the administrative record to determine whether

18  the agency has articulated a rational basis for its decision.").  On multiple occasions, USDA

19  justified its actions by reference to section 5(h)(3)(A) of the Food and Nutrition Act, codified

20  at 7 U.S.C. § 2014(h)(3)(A).  For example:

21       The emergency allotments authorized under Sec. 2302 of the Families First
         Coronavirus Response Act (FFCRA) are supplements to a household's SNAP
22       benefits, *similar to supplements authorized during disasters under Sec.*
         *5(h)(3)(A) of the Food and Nutrition Act of 2008 (FNA)*. These supplements
23       address temporary food needs and are added on to a household's monthly
         benefit so the total household benefit amount may equal the maximum benefit
24       amount for their household size. Households that already receive the
         maximum benefit for their household size may not receive an additional
25       emergency allotment.

26  AR117-18 (emphasis added) (USDA's April 11, 2020 set of questions and answers).

27       USDA improperly incorporated section 2014(h)(3)(A), a provision that Congress did

28  not include in section 2302 of the Families First Act or reference during congressional

1   debate.  *See* AR196.  The agency justifies its action solely by referencing the "similar[ity]" of

2   the two sections.  But, according to USDA's own guidance, "D-SNAP is an entirely different

3   program from the regular Supplemental Nutrition Assistance Program."  RJN Ex. 14 at 3

4   (Disaster SNAP Guidance, July 2014).  Building error upon error, USDA then improperly

5   applied section 2014(h)(3)(A) to eliminate emergency allotments for maximum allotment

6   households.

7            To explain, USDA provides three types of disaster benefit payments:

8   (1) Disaster SNAP (D-SNAP) for non-participating households under section 2014(h)(1);

9   (2) supplemental SNAP benefits for participating households under section 2014(h)(1); and

10   (3) emergency allotments for participating households to replace destroyed food under

11   section 2014(h)(3)(A).  RJN Ex. 14 at 8-10, 35-38; *see also* PI Opp'n at 2-3.

12            Section 2014(h)(3)(A) provides:

13            The Secretary shall provide, by regulation, for emergency allotments to
         eligible households to replace food destroyed in a disaster. The regulations
14            shall provide for replacement of the value of food actually lost up to a limit
         approved by the Secretary not greater than the applicable maximum monthly
15            allotment for the household size.

16   AR196.  Section 2014(h)(3)(A) provides "replacement benefits" on an individual or broader

17   basis.  RJN 14 at 37.  USDA guidance authorizes "automatic/mass replacements" by the state

18   agency.  *Id.*  The amount of the mass replacement is "not fixed."  *Id.*  "The State needs to

19   assess the extent of the losses to make a determination as to the percentage of benefits to be

20   replaced."  *Id.* at 38.  The only cap on replacement benefits is in the statute: "not greater than

21   the applicable maximum monthly allotment for the household size."  AR196 (7 U.S.C.

22   § 2014(h)(3)(A)).  Thus, when warranted, emergency allotments under section 2014(h)(3)(A)

23   can equal a household's maximum allotment to replace a month's worth of food.

24            The benefit calculation that USDA is applying to emergency allotments under section

25   2302 of the Families First Act does not come from section 2014(h)(3)(A).  It comes from the

26   *other* benefit available to participating households: *supplemental benefits* under section

27   2014(h)(1).  RJN 14 at 35.  Supplemental benefits exist to "provide parity" between non-

28   participating households that automatically qualify for the maximum benefit under D-SNAP

1   and participating households that are not eligible for D-SNAP benefits.  *Id.*  In other words,

2   after a disaster, current SNAP recipients are raised to the maximum allotment to ensure that

3   they do not receive less than households that are not normally eligible for SNAP.  In drafting

4   section 2302(a)(1), however, Congress was not expediting food support to non-SNAP

5   households and therefore did not share the parity concerns that drive D-SNAP's

6   supplemental benefit calculation.

7        Emergency allotments under section 2302(a)(1) and disaster benefits under section

8   2014(h) are distinct programs.  By importing its natural disaster response program under

9   2014(h), USDA produced an "artificial narrowing of options."  *See Mt. Diablo Hosp. v.*

10  *Shalala*, 3 F.3d 1226, 1232 (9th Cir. 2003) ("[A]n agency has ignored relevant factors where

11  its action amounts to an '"artificial narrowing of options" [which] is antithetical to reasoned

12  decisionmaking . . . .' Agency actions cannot be sustained where the agency has failed to

13  consider significant alternatives." (alterations in original) (citations omitted)).  But, even if

14  the Court determines that it was reasonable for USDA to adopt provisions of its natural

15  disaster program, USDA must then properly administer them, and it did not. USDA ignored

16  its own guidance and impermissibly incorporated the supplemental benefit calculation into

17  the replacement benefit provision, which has no such limit.  It then improperly used that

18  calculation to limit benefits under section 2302(a)(1), divorcing the calculation from its

19  purpose, which is arbitrary and capricious.  *See Sea-Land Serv., Inc. v. DOT*, 137 F.3d 640,

20  646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion,

21  cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous

22  view of the law.'" (citation omitted)).

23        **B.     USDA entirely failed to consider an important aspect of the problem.**

24        By relying entirely on its supplemental disaster benefit calculation, USDA failed to

25  consider other important aspects of the problem Congress addressed in section 2302(a)(1).

26  *See Altera*, 926 F.3d at 1080 (quoting *State Farm*, 463 U.S. at 43).  The Families First Act

27  describes a state-driven request and approval process, grounded in data assessing heightened

28  food needs among SNAP households in a public health emergency.  USDA ignored

1    Congress's direction, delivered in the context of an omnibus bill providing wide-ranging

2    support for vulnerable families.

3          The administrative record contains a "stunning lack of evidence" that USDA

4    conducted any analysis *at all* before it issued its guidance.  *See Beno*, 30 F.3d at 1074 (9th

5    Cir. 1994) ("[T]he record contains a rather stunning lack of evidence that the Secretary gave

6    plaintiffs' objections any such consideration.").  Then, USDA failed to consider California's

7    data-driven initial request and provide an explanation "rooted in the data presented."  *See*

8    *Sierra Club*, 671 F.3d at 968 ("EPA's failure to even consider the new data and to provide an

9    explanation for its choice rooted in the data presented was arbitrary and capricious.").

10          The agency's standardized approach disregards language from section 2302(a)(1)

11    requiring states to make individualized assessments of the temporary food needs of their

12    residents and to submit supporting data for agency review and approval.  It also ignores the

13    myriad challenges SNAP participants were facing in March, which Congress expected states

14    to assess and document.  Loss of income was certainly one challenge, but far from the only

15    one.  The pandemic increased food prices and reduced the purchasing power of the maximum

16    SNAP allotment in California.[20]  It interrupted food supply chains and initially encouraged

17    panic buying, emptying grocery shelves and making it harder for SNAP participants to find

18    the low-cost staples on which they depend.[21]  The pandemic also made it more difficult for

19    SNAP recipients to obtain nutritional support from food pantries, soup kitchens, and other

20    community organizations.[22]

21          USDA failed to consider that *all* SNAP participants are vulnerable to pandemic-

22    related changes and *all* face additional temporary food needs as a result.  Maximum

23

24    [20] Bauer Decl. ¶¶ 29-32, 34; RJN Ex. 15 (*Rising Food Costs Lift U.S. Consumer Prices; Coronavirus to Weigh on Inflation*, Reuters, March 11, 2020).

25    [21] *See* Bauer Decl. ¶¶ 34-35; Summers Decl. ¶¶ 13-17; RJN Ex. 16 (*Panic Buying at L.A. Supermarkets amid Coronavirus Leaves Shelves Empty, Many Anxious*, Los Angeles Times, March 13, 2020); *id.* Ex. 17 (*Coronavirus: Bay Area Shoppers Clear Grocery Store Shelves as Anxiety Ratchets Up*, Mercury News, March 14, 2020).

26

27    [22] Hall Decl. ¶¶ 13-16; Cheyne Decl. ¶¶ 6, 8; Davidson Decl. ¶¶ 4-7; Hodge Decl. ¶ 6; DeFrank Decl. ¶¶ 5-7; RJN Ex. 18 (*Food Banks Face Shortages of Volunteers; Many Bay Area Pantries Close as Coronavirus Spreads*, CalMatters, March 13, 2020).

28

1    allotment households share these same threats to their food security, but they lack one

2    resource that other SNAP households have: income to address their food needs.  Congress

3    provided emergency allotments to address the temporary food needs of all SNAP households.

4    It did not leave maximum allotment households out in the cold, nor did it authorize USDA to

5    do so.  USDA's interpretation of section 2302(a)(1) is arbitrary and capricious.

6

7    **IV.    The balance of the equities, public interest, and risk of irreparable harm to
         Plaintiffs warrant injunctive and declaratory relief.**

8

9           Plaintiffs seek a permanent injunction prohibiting USDA from denying any otherwise

10   appropriate request from California for emergency allotments that would include those

11   households receiving the maximum regularly monthly allotment.  Should Plaintiffs prevail on

12   the merits, they are entitled to a permanent injunction if they also establish (1) irreparable

13   injury; (2) that remedies available at law are inadequate; (3) that the balance of hardships

14   justify an equitable remedy; and (4) that the public interest is not disserved by a permanent

15   injunction.  *Edmo*, 935 F.2d at 784.  There are no remedies available at law to Plaintiffs.  The

16   remaining three factors are addressed below.

17          Without an injunction, Plaintiffs will experience irreparable injury through the denial

18   of emergency SNAP allotments necessary to obtain vital nutrition during an unprecedented

19   public health crisis.  The hurdles to obtaining adequate nutrition caused by COVID-19

20   continue today.  *See, e.g.*, Bauer Suppl. Decl. ¶¶ 2, 4-8; Cheyne Suppl. Decl. ¶¶ 6-7;

21   Davidson Suppl. Decl. ¶ 6; Hodge Suppl. Decl. ¶ 5.  Denial of subsistence benefits "almost

22   universally has been regarded as irreparable injury because welfare recipients depend upon

23   them . . . to sustain life."  *Abreu v. Callahan*, 971 F. Supp. 799, 821 (S.D.N.Y. 1997) (citing

24   cases finding irreparable harm).  Previous courts have held that deprivation of food from

25   denial of SNAP benefits is irreparable harm.  *See, e.g.*, *District of Columbia v. USDA*, No.

26   CV 20-119 (BAH), 2020 WL 1236657 at *30 (D.D.C. Mar. 13, 2020), *appeal docketed*, No.

27   20-1536 (D.C. Cir. May 14, 2020); *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043-44

28   (D. Haw. 2011).

1    That Plaintiffs are receiving their normal monthly SNAP allotment does not change

2    the conclusion that denial of emergency allotments inflicts irreparable harm.  The regular

3    maximum monthly allotment (totaling $194 per month for an individual) is, at best, just

4    enough to meet minimum needs under normal economic conditions, Bauer Decl. ¶¶ 26-27,

5    and does not address the temporary increase in need recognized by Congress. Reductions in

6    public benefits "of a relatively small magnitude" can "impose irreparable harm" for those on

7    the economic margins.  *Beno*, 30 F.3d at 1063 n.10.  Denial of emergency SNAP allotments

8    during a crisis that makes food both more expensive and more difficult to obtain is

9    irreparable injury.

10    The balance of equities and public interest factors merge when the government is a

11    party.  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018), *cert. denied sub nom. Little*

12    *Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).  These

13    factors weigh heavily in Plaintiffs' favor.  Absent an injunction, Plaintiffs will continue to go

14    without emergency allotments necessary to avoid hunger.  And an injunction will serve the

15    public's interest in "ensuring that eligible low-income households receive needed assistance

16    to provide food for themselves and their families."  *Booth*, 830 F. Supp. 2d at 1045.

17    An injunction to comply with the Families First Act should not be considered a

18    burden when balancing the equities, because "[t]he Act itself imposes the burden; th[e]

19    injunction merely seeks to prevent the defendants from shirking their responsibilities under

20    it."  *Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991) (citation omitted).  And

21    when the conflict is one "between financial concerns and preventable human suffering," the

22    balance of equities "tips sharply in favor of" preventing human suffering.  *Golden Gate Rest.*

23    *Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (citation

24    omitted).  Applying these two principles, the court in *Booth* issued an injunction requiring

25    timely processing of SNAP applications, finding that the public interest and SNAP

26    recipients' need for food "clearly outweighed" any "additional expenses or . . . administrative

27    difficulties" the defendants might experience.  830 F. Supp. 2d at 1044.  The public interest

28    further favors an injunction because "[o]ur society as a whole suffers when we neglect the

1     poor, the hungry, the disabled . . . ." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983),

2     *rev'd in part on other grounds*, 463 U.S. 1328 (1983).

3          Finally, Plaintiffs seek declaratory relief stating that USDA's interpretation of section

4     2302(a)(1) violates the Families First Act and the Administrative Procedure Act.  Declaratory

5     relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, is left to the Court's

6     discretion, and is warranted where "the district court [is] satisfied that entertaining the action

7     is appropriate."  *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222-23 (9th Cir. 1998).  "It

8     was the primary purpose of the act to have a declaration of rights not theretofore

9     determined[.]"  *Furnish v. Bd. of Med. Examiners of Cal.*, 257 F.2d 520, 522 (9th Cir. 1958).

10     For all the foregoing reasons, declaratory relief is warranted in this case.

11          No other adequate equitable remedies exist.  Vacatur is a far broader remedy than

12     Plaintiffs request and could have disruptive consequences.  *See Pollinator Stewardship*

13     *Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (noting the decision whether to vacate on

14     remand requires "weigh[ing] the seriousness of the agency's errors against the 'disruptive

15     consequences of an interim change that may itself be changed'" (citation omitted)).  Section

16     2302(a)(1) obligates USDA to approve California's request for emergency allotments to

17     address the temporary food needs of all of its SNAP households.

18

19                         **CONCLUSION**

20          For the reasons stated above, Plaintiffs are entitled to summary judgment on their

21     claims that Defendants' guidance implementing section 2302(a)(1) of the Families First

22     Coronavirus Response Act is contrary to law and arbitrary and capricious in violation of the

23     Administrative Procedure Act, warranting injunctive and declaratory relief.

24

25     Dated: July 16, 2020               Respectfully submitted,

26

27                         LINDSAY NAKO

28                         Impact Fund
                                  *Attorneys for Plaintiffs and the Plaintiff Class*