**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBIN HALL; STEVEN SUMMERS, Individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, | No. 20-16232 D.C. No. 4:20-cv-03454-HSG |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE; GEORGE PERDUE, In his official capacity as United States Secretary of Agriculture, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted October 20, 2020
San Francisco, California

Filed December 31, 2020

Before: Sidney R. Thomas, Chief Judge, and Paul J. Kelly, Jr.[*] and Eric D. Miller, Circuit Judges.

_____

[*] The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

Opinion by Judge Miller;
Dissent by Chief Judge Thomas

**SUMMARY**[**]

**Supplemental Nutrition Assistance Program**

The panel affirmed the district court's order denying a
motion for a preliminary injunction brought by a putative
class of Californians, who normally receive the maximum
monthly allotment of Supplemental Nutrition Assistance
Program ("SNAP") benefits, seeking to bar the U.S.
Department of Agriculture ("USDA") from denying
California's request under section 2302(a)(1) of the Families
First Coronavirus Response Act to issue emergency
allotments to households already receiving maximum SNAP
benefits.

In response to the COVID-19 pandemic, Congress
enacted the Families First Act, which provided for
supplemental SNAP benefits.    The USDA, which
administers SNAP, concluded that the statute allowed
households receiving less than the maximum monthly
allotment of SNAP benefits to be brought up to the
maximum but did not permit those already receiving the
maximum to be given any additional benefits.    USDA
rejected, as contrary to its guideline, California's request that
all SNAP households in the State receive an extra $60 per
person, per month.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

The panel held that plaintiffs had Article III standing. The panel held that plaintiffs satisfied the redressability requirement by submitting a declaration from a California official stating that if the court entered a favorable injunction, California would renew its request for emergency benefits for households receiving the maximum regular monthly benefit.

The panel rejected plaintiffs' contention that the plain language of section 2302(a)(1) foreclosed USDA's position that SNAP households that already receive the maximum monthly allotment were not eligible for emergency allotments. The panel held that USDA's interpretation of section 2302(a)(1) was not subject to deferential review under *Chevron*. The panel further held that the agency had the better reading of the statute without regard to any principles of deference, and the panel need not consider whether the deference prescribed in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), applied here. The panel proceeded to construe the statute de novo.

Examining the Families First Act as a whole, as well as other statutes addressing emergency SNAP benefits, the panel held that three considerations led it to conclude that the government's reading of section 2302(a)(1) was more consistent with the overall statutory scheme. First, the government's reading found support in section 2302(a)(2), the provision immediately following the one at issue. Second, topping off SNAP benefits at the maximum monthly allotment for all participants was consistent with the statute governing USDA's response to other crises. Third, if Congress wished to provide across-the-board relief to households based on increased food costs, it would have most naturally modified the metric designed to measure

those costs – the thrifty food plan.  *See* 7 U.S.C. §§ 2012(u), 2017(a).

The panel concluded that because plaintiffs were unlikely to succeed on the merits of their claims, the district court did not abuse its discretion in denying a preliminary injunction.

Chief Judge Thomas dissented because he would hold that plaintiffs established a clear likelihood of success on their claims that the agency's interpretation of section 2302(a)(1) of the Families First Act could not stand under 5 U.S.C. § 706(2).  The plain language of section 2302(a)(1) compelled the conclusion that Congress did not intend to limit the emergency assistance available under that provision to the maximum amount that SNAP households may receive under non-emergency conditions.   Chief Judge Thomas would reverse the denial of the preliminary injunction and remand to the district court for consideration of the remaining factors under *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## COUNSEL

Alexander Prieto (argued), Richard Rothschild, and Antionette D. Dozier, Western Center on Law & Poverty, Los Angeles, California; Lindsay Nako, Jocelyn D. Larkin, and David S. Nahmias, Impact Fund, Berkeley, California; for Plaintiffs-Appellants.

Joshua K. Handell (argued) and Michael S. Raab, Appellate Staff; Ethan P. Davis, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Ryan M. Majerus, Senior Counsel;

Stephen A. Vaden, General Counsel; Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

## OPINION

MILLER, Circuit Judge:

As part of its response to the COVID-19 pandemic, Congress enacted the Families First Coronavirus Response Act (Families First Act), Pub. L. No. 116-127, 134 Stat. 178 (2020), which provides for emergency assistance to households participating in the Supplemental Nutrition Assistance Program (SNAP). Section 2302(a)(1) of the Families First Act authorizes "emergency allotments to households participating in [SNAP] . . . to address temporary food needs not greater than the applicable maximum monthly allotment for the household size." *Id.* § 2302(a)(1), 134 Stat. at 188. The United States Department of Agriculture (USDA), which administers SNAP, concluded that the statute allows households receiving less than the maximum monthly allotment of SNAP benefits to be brought up to the maximum but does not permit those already receiving the maximum to be given any additional benefits. We are asked to decide whether USDA has correctly interpreted the statute. We conclude that it has.

I

Congress created SNAP—formerly known as the food stamp program—to

>"alleviate . . . hunger and malnutrition" by "increasing [the] food purchasing power" of low-income households. 7 U.S.C. § 2011; *see*

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 4001(b), 122 Stat. 1651, 1853–82. SNAP is a federally funded, state-administered program that distributes monthly benefits, or "allotments," to eligible households. 7 U.S.C. §§ 2013(a), 2020. Households can use those allotments "to purchase food from retail food stores." *Id.* § 2013(a).

A household's monthly allotment is calculated by reference to the "thrifty food plan," which is "the diet required to feed a family of four," as determined by the Secretary of Agriculture. 7 U.S.C. §§ 2012(u), 2017(a). The value of each household's allotment is equal to the cost of the thrifty food plan, adjusted for household size, minus 30 percent of the household's income. *Id.* § 2017(a). Households with no income receive the maximum monthly allotment, which is equal to the entire cost of the thrifty food plan, adjusted for household size. *Id.* §§ 2012(u), 2017(a).

On March 18, 2020, Congress enacted the Families First Act, which provides for supplemental SNAP benefits in response to the COVID-19 pandemic. *See* Families First Act, § 2302, 134 Stat. at 188. "In the event of a public health emergency declaration by the Secretary of Health and Human Services . . . based on an outbreak of [COVID-19] and the issuance of an emergency or disaster declaration by a State based on an outbreak of COVID-19," section 2302(a)(1) of the Families First Act directs the Secretary of Agriculture to provide "for emergency allotments to households participating in [SNAP] under the Food and Nutrition Act of 2008 to address temporary food needs not greater than the applicable maximum monthly allotment for the household size." *Id.* § 2302(a)(1), 134 Stat. at 188.

Section 2302(a)(2) further permits the Secretary to "adjust, at the request of State agencies or by guidance in consultation with one or more State agencies, issuance methods and application and reporting requirements under the Food and Nutrition Act of 2008 to be consistent with what is practicable under actual conditions in affected areas." *Id.* § 2302(a)(2), 134 Stat. at 188.

When Congress enacted the Families First Act, the Secretary of Health and Human Services had already issued the emergency declaration required to invoke section 2302(a)(1). *See* Press Release, United States Department of Health and Human Services, Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020). Individual States, including California, had followed suit with their own disaster declarations. *See* Press Release, Gavin Newsom, Governor of California, Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19 (Mar. 4, 2020).

USDA immediately began to implement the Families First Act. On March 20, the agency issued a sample request form for States entitled "Request to Provide Emergency Allotments (Supplements) to SNAP Households." The form suggested that a requesting State frame its request so as "to bring all households up to the maximum benefit due to pandemic related economic conditions for up to 2 months." The form also asked the State to certify that COVID-19 had affected the medical and economic wellbeing of its residents, as measured by criteria such as whether "[r]esidents of the State are confirmed to have contracted Covid-19" and whether "[b]usinesses have closed or significantly reduced their hours."

The California Department of Social Services submitted to USDA a request for emergency allotments. But California's request did not seek to top off the SNAP benefits of participating households at "the maximum benefit," as contemplated by USDA's guidance. Instead, to ensure that those households already receiving the maximum benefit would still receive an emergency allotment, California proposed that all SNAP households in the State receive an extra $60 per person, per month.

USDA rejected California's request as contrary to the guidance in the sample request form. Reserving its objections, California then revised its request "in accordance" with USDA's guidance. USDA approved the revised request, reiterating the agency's position that "SNAP households that already receive the maximum monthly allotment for their household size are not eligible for [emergency allotments]."

On April 21, USDA restated that view in an updated guidance. Later that month, California asked to extend the distribution of emergency allotments to eligible households in line with its revised request. USDA approved the request.

Although the State of California continues to disagree with USDA's interpretation of the statute, it has not challenged that interpretation in court. The plaintiffs in this case, Robin Hall and Steven Summers (collectively, "Hall"), are Californians who normally receive the maximum monthly allotment of SNAP benefits and therefore are not eligible for emergency allotments under USDA's interpretation of the Families First Act. Hall brought this putative class action against USDA and the Secretary of Agriculture challenging the agency's interpretation of section 2302(a)(1) as arbitrary and capricious and in excess of statutory authority. *See* 5 U.S.C. § 706(2). Hall also

sought a preliminarily injunction barring USDA "from denying any otherwise appropriate request from California under section 2302(a)(1) . . . because it provides emergency [SNAP] allotments to households receiving the maximum monthly benefit amount."

The district court denied a preliminary injunction. *Hall v. USDA*, 467 F. Supp. 3d 838 (N.D. Cal. 2020). The court began by explaining that to obtain a preliminary injunction, a plaintiff must establish that (1) she "is likely to succeed on the merits," (2) she "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [her] favor," and (4) "an injunction is in the public interest." *Id.* at 844 (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). Mandatory injunctions requiring a deviation from the status quo, the court noted, are "particularly disfavored." *Id.* (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)).

Turning to section 2302(a)(1), the district court "acknowledge[d] that [Hall's] facial reading of Section 2302 has some persuasive force," but it determined that the statute is not "unambiguous on its face." 467 F. Supp. 3d at 845. The court noted that USDA had estimated "that providing emergency allotments to raise all SNAP households to the maximum monthly allotment will cost an additional $2 billion per month," and that Congress had appropriated six months' worth of such funding shortly after it enacted the Families First Act. *Id.* at 846; *see* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 6002, 134 Stat. 281, 508 (Mar. 27, 2020). Hall's interpretation, by contrast, "would cost an additional $6.7 to $7 billion per month, and would quickly outpace SNAP's appropriated funds." 467 F. Supp. 3d at 847. The court also observed that "Congress has not suggested that the USDA's guidance or

its implementation of the [Families First Act] is inconsistent with its intention," and that, "[t]o the contrary, some members of Congress have publicly lamented that the [Families First Act] did not go far enough in assisting SNAP participants, and advocated for increasing the maximum monthly allotment." *Id.* (footnote omitted). The court concluded that because section 2302(a)(1) is ambiguous, and USDA's interpretation is reasonable, Hall did not show "a 'clear likelihood of success on the merits,' as [a plaintiff] must to obtain a mandatory injunction." *Id.* at 848 (quoting *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1316 (9th Cir. 1994)).

Finally, although the district court declined to reach the remaining preliminary-injunction factors, it noted "considerable reservations" about Hall's "ability to establish redressability" because even after a favorable ruling, "California, an independent sovereign, must renew its request for emergency allotments" before applicants can receive them. 467 F. Supp. 3d at 848.

After the district court denied a preliminary injunction, Hall asked this court for an emergency injunction pending appeal. A motions panel denied an injunction but ordered that the appeal be expedited.

## II

Before we turn to the merits of the appeal, we consider whether we have jurisdiction. Article III defines the jurisdiction of the federal courts in terms of "cases" and "controversies," and the requirement that a plaintiff have standing "is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992); *see* U.S. Const. art. III, § 2. To satisfy "the irreducible constitutional minimum of

standing," a plaintiff must establish three elements: (1) that the plaintiff has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) that there is "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks and citations omitted).

In this case, Hall's injury comes from not receiving emergency allotments, but Hall cannot receive allotments unless the State of California, which is not a party to this litigation, first requests them. And because the statute gives States discretion in framing their requests, any future request from California would not necessarily cover Hall. Indeed, although California initially proposed that emergency allotments be distributed to all SNAP households, including those already receiving the maximum monthly allotment, it then revised its request to comport with USDA's guidance. So even if Hall secured a ruling that she is eligible to receive emergency allotments under section 2302(a)(1), California would have to submit a new request along the lines of its initial request before Hall could obtain any concrete relief.

Although the government raises this issue, it does not expressly argue that Hall lacks standing. Nevertheless, even when "the parties have not raised the issue of . . . standing, we recognize a duty to examine this issue *sua sponte*" because it affects our subject-matter jurisdiction. *Safari Club Int'l v. Rudolph*, 862 F.3d 1113, 1117 n.1 (9th Cir. 2017).

The requirement of standing means that a federal court may "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not

before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). As we have explained, however, "[r]edressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Northwest Requirements Utils. v. FERC*, 798 F.3d 796, 806 (9th Cir. 2015) (quoting *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013)); *accord Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012). That requirement does not categorically "exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Thus, even if an independent actor retains discretion to deny relief to the plaintiff following a favorable ruling, the plaintiff can "adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562.

We conclude that Hall has satisfied that requirement. To address the redressability concerns identified by the district court, Hall attached to her motion for an injunction pending appeal a declaration from Alexis Carmen Fernández, Chief of the CalFresh and Nutrition Services Branch of the California Department of Social Services. The declaration states that if the court were to enter an injunction requiring USDA to authorize emergency allotments for SNAP households receiving the maximum monthly allotment, California "would promptly revise and renew its request for emergency allotments for future benefit months," and its new request "would include emergency benefits for households receiving the maximum regular monthly benefit amount." That is sufficient to demonstrate a "significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Renee*, 686 F.3d at 1013 (quoting *Utah v. Evans*, 536 U.S. 452, 464

(2002)); *see also Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 891 n.9 (9th Cir. 2018) (plaintiff had standing to challenge prohibition on third parties' contributions to plaintiff based on declarations demonstrating third parties' "concrete intentions to resume contributions" upon a favorable ruling).

To be sure, the declaration does not establish exactly what kind of request the State would submit in response to a favorable decision. In particular, it does not say that California would submit a request identical to the State's initial request, nor does it say that whatever request it did submit would necessarily cover Hall. The government argues that the requested injunction would "order USDA to approve a hypothetical application that may or may not be anticipated by a non-party State agency that has not committed to including Plaintiffs within the scope of its emergency-allotment request and has offered no information about how much, if any at all, Plaintiffs stand to gain from such a request." Even though Hall has established a "significant increase in the likelihood" of relief sufficient to establish standing, the uncertainty about what the State will do remains relevant to the question of irreparable harm in the preliminary-injunction analysis. *Renee*, 686 F.3d at 1013 (quoting *Evans*, 536 U.S. at 464). We need not explore that issue further, however, because we conclude that Hall has not shown a likelihood of success on the merits.

III

As the district court correctly recognized, the decision whether to grant a preliminary injunction is governed by the four factors the Supreme Court articulated in *Winter*. *See* 555 U.S. at 20. Here, we conclude that likelihood of success on the merits is determinative, so we confine our analysis to that factor. "We review the denial of a preliminary injunction

for abuse of discretion and the underlying legal principles de novo." *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015).

Hall contends that she is likely to succeed on the merits because the plain language of section 2302(a)(1) forecloses USDA's position that SNAP households that already receive the maximum monthly allotment are not eligible for emergency allotments. We disagree.

## A

We begin by considering what, if any, deference we owe to USDA's interpretation of section 2302(a)(1). Often, when construing a statute that is administered by a federal agency, we review the agency's interpretation under the framework prescribed in *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). Here, the parties dispute whether USDA's interpretation is subject to review under *Chevron*. We conclude that it is not.

Although the Court in *Chevron* described a mode of analysis to be applied "[w]hen a court reviews an agency's construction of the statute which it administers," 467 U.S. at 842, later Supreme Court decisions have clarified that the *Chevron* analysis does not apply to all agency interpretations, *see, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 231–34 (2001). Instead, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226–27; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–25 (2016); *Pacific Choice Seafood Co. v. Ross*, 976 F.3d 932, 940 (9th Cir. 2020). By

contrast, informal "interpretations contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the *Chevron* pale." *Mead*, 533 U.S. at 234 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

USDA's interpretation of section 2302(a)(1), as reflected in the March 20 sample request form and April 21 update, was not promulgated through notice-and-comment rulemaking or formal adjudication, and it expressly purports not to carry the force of law. *See Mead*, 533 U.S. at 230. Both guidance documents include the following disclaimer: "The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies." Under *Mead*, such documents are not entitled to *Chevron* deference. *See Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 487 (2004); *Northern Cal. River Watch v. Wilcox*, 633 F.3d 766, 779 (9th Cir. 2011).

The government contends that the agency's interpretation was not expressed only in the guidance; it also was applied in an informal adjudication—specifically, USDA's denial of California's first request for emergency allotments. In some circumstances, an interpretation developed in an informal adjudication may be entitled to *Chevron* deference. *See Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018). But USDA's interpretation "did not originally arise through an . . . adjudication"; instead, the agency "expressed its position in guidance documents," upon which it later relied in denying California's request. *Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018). Indeed, USDA's rejection of California's first request merely referenced the

guidance contained in the sample request form, without any further elaboration.

In any event, even if we agreed that USDA developed its interpretation through informal adjudication, *Chevron* would apply only to the extent we determined that the interpretation was "intended to have general applicability and the force of law." *Kaufman*, 896 F.3d at 484 (quoting *Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012)). In making that determination, we would apply the factors set out in *Barnhart v. Walton*, 535 U.S. 212 (2002), which "are 'the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time.'" *Kaufman*, 896 F.3d at 484 (quoting *Barnhart*, 535 U.S. at 222).

Those factors do not support applying *Chevron* here. USDA's interpretation involves a significant legal question, not an "interstitial" one, and there is no indication that USDA gave "careful consideration" to "the question over a long period of time." *Barnhart*, 535 U.S. at 222. USDA's first guidance document—the sample request form—was issued just two days after Congress enacted the Families First Act, with updated guidance following one month later. The contents of the guidance documents also do not evince "careful consideration." The sample request form contains no reasoning explaining why households already receiving the maximum monthly allotment are not eligible for emergency allotments, and the subsequent update merely quotes the statute and reaches the same conclusion without explanation. For these reasons, USDA's guidance does not satisfy the *Barnhart* factors, and we conclude that it is not subject to deferential review under *Chevron*.

The government suggests that USDA's interpretation is at least entitled to the narrower form of deference prescribed in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Deference to an agency's interpretation under *Skidmore* is limited to the interpretation's "power to persuade." *Id.* at 140; *see Christensen*, 529 U.S. at 587. Because we conclude that the agency has the better reading of the statute without regard to any principles of deference, we need not consider whether *Skidmore* applies here, and we proceed to construe the statute de novo. *See Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 733 (9th Cir. 2017).

B

We begin with the statutory text. *See United States v. Herrera*, 974 F.3d 1040, 1047 (9th Cir. 2020). Section 2302(a)(1) states in relevant part:

> [T]he Secretary of Agriculture . . . shall provide, at the request of a State agency (as defined in section 3 of the Food and Nutrition Act of 2008) that provides sufficient data (as determined by the Secretary through guidance) supporting such request, for emergency allotments to households participating in the supplemental nutrition assistance program under the Food and Nutrition Act of 2008 to address temporary food needs not greater than the applicable maximum monthly allotment for the household size.

Families First Act, § 2302(a)(1), 134 Stat. at 188.

Hall argues that the phrase "not greater than the applicable maximum monthly allotment for the household

size" modifies "emergency allotments." On that reading, all
SNAP households may receive an emergency allotment up
to the size of the maximum monthly allotment, which means
that SNAP households already receiving the maximum
monthly allotment are eligible to receive benefits totaling up
to twice the maximum. By contrast, the government argues
that the limiting phrase instead modifies "temporary food
needs." On the government's reading, the statute leaves
untouched the maximum total benefits a household may
receive, and only households that normally receive less than
the maximum monthly allotment are eligible for emergency
allotments.

It is grammatically possible to read the limiting phrase to
modify either "emergency allotments" or "temporary food
needs." Hall argues that the statute resolves the ambiguity by
directing that emergency allotments be provided to
"households participating in [SNAP]," which in her view
means *all* such households. Families First Act, § 2302(a)(1),
134 Stat. at 188; *see Gilliam v. USDA*, ___ F. Supp. 3d ___,
2020 WL 5501220, at *12 (E.D. Pa. Sept. 11, 2020). But
while section 2302(a)(1) provides that all recipients of
emergency allotments must be "households participating in
[SNAP]," nothing in the statute suggests that the converse is
true—that all participating households must receive
emergency allotments. It is entirely possible to read the
limiting phrase as narrowing the pool of eligible recipients.

Where the language is ambiguous, canons of
construction can "provide guidance . . . by providing a
compendium of well-established inferences" about the
statutory meaning. *In re Pangang Grp. Co.*, 901 F.3d 1046,
1055–56 (9th Cir. 2018). The government invokes the rule
of the last antecedent, under which "a limiting clause or
phrase . . . should ordinarily be read as modifying only the

noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Strictly speaking, the applicable rule in this case is not the rule of the last antecedent but the nearest-reasonable-referent canon—while pronouns have "antecedents," phrases such as "not greater than the applicable maximum monthly allotment for the household size" do not. But the substance of the rule is the same: "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012); *see Grecian Magnesite Mining, Indus. & Shipping Co. v. Commissioner*, 926 F.3d 819, 824 (D.C. Cir. 2019); *Travelers Indem. Co. v. Mitchell*, 925 F.3d 236, 243 (5th Cir. 2019).

Of course, the canon can be "'overcome by other indicia of meaning,'" as, for example, in a provision where a modifier follows a series of "items that readers are used to seeing listed together," or where a "concluding modifier" is one "that readers are accustomed to applying to each of" the words preceding it. *Lockhart v. United States*, 136 S. Ct. 958, 963 (2016) (quoting *Barnhart*, 540 U.S. at 26). But section 2302(a) is not such a provision. To the contrary, in section 2302(a), "it takes more than a little mental energy to process" the words preceding the limiting phrase, "making it a heavy lift to carry the modifier across them all." *Id.* Applying the nearest-reasonable-referent canon, we conclude that the limiting phrase is best read to modify the immediately preceding phrase, "temporary food needs." That reading avoids jumping backward over multiple prepositional phrases to reach the intended referent, in favor of a more natural reading.

But that conclusion does not end the analysis. Even assuming that it is "temporary food needs" that must not be "greater than the applicable monthly allotment for the household size," the phrase "temporary food needs" is susceptible to multiple readings. It could refer to (1) the *total* monthly benefits a household requires, temporarily, during the pandemic, or (2) the temporary *increase* in monthly benefits a household requires during the pandemic. Capping total monthly benefits at the monthly maximum would deny emergency allotments to households already receiving the monthly maximum. But capping the increase in monthly benefits at the monthly maximum would permit those households to receive up to twice the monthly maximum. The question remains: Did Congress cap total SNAP benefits at the maximum monthly allotment, or did it create a separate, additional benefit also tied to SNAP's maximum monthly allotment?

Viewed in isolation, the text of section 2302(a)(1) does not answer the question. "Statutory construction, however, is a holistic endeavor," and "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *accord Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989); *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 879 F.3d 1000, 1006 (9th Cir. 2018). In addition, "[t]he meaning of one statute may be affected by other Acts." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Thus, "[w]here a statutory term presented to us for the first time is ambiguous, we construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law." *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991). When we examine the

Families First Act as a whole, as well as other statutes addressing emergency SNAP benefits, three considerations lead us to conclude that the government's reading of section 2302(a)(1) is more consistent with the overall statutory scheme.

First, the government's reading finds support in section 2302(a)(2), the provision immediately following the one at issue. Section 2302(a)(2) permits the Secretary of Agriculture to "adjust, at the request of State agencies or by guidance in consultation with one or more State agencies, issuance methods and application and reporting requirements under the Food and Nutrition Act of 2008 to be consistent with what is practicable under actual conditions in affected areas." Families First Act, § 2302(a)(2), 134 Stat. at 188. In making that adjustment, the Secretary must "consider the availability of offices and personnel in State agencies, any conditions that make reliance on electronic benefit transfer systems . . . impracticable, [and] any disruptions of transportation and communication facilities." *Id.* That new flexibility makes sense as a way of addressing the concern that USDA might not have access to key information affecting households' eligibility for SNAP benefits, including changes in income. Congress relaxed "application and reporting requirements" so that USDA could quickly top-off benefits to offset sudden disruptions in income. *Id.*; *compare* 7 C.F.R. § 273.2(f) (requiring State verification of income and other eligibility requirements). On the government's reading, paragraphs (a)(1) and (a)(2) work together to address the economic disruptions caused by the pandemic, which might lead households to lose income but not have immediate access to documentation of their reduced income. That reading "produce[s] an understanding of the statute as a symmetrical and coherent regulatory scheme." *Hernandez v. Williams, Zinman & Parham PC,*

829 F.3d 1068, 1073 (9th Cir. 2016) (internal quotation marks omitted).

We acknowledge that under the government's reading, households that have not suffered income loss might receive a windfall of emergency aid. But that is also true under Hall's reading. Indeed, Hall emphasizes that her interpretation, unlike the government's, would allow households that had no income before the pandemic—and thus have suffered no income loss—to receive emergency allotments. Either way, Congress could reasonably have deemed that collateral cost justified so as to avoid having to reassess the incomes of all SNAP families during the pandemic. That result is hardly so "absurd and unjust" that "Congress could not have intended" it. *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)).

By contrast, nothing in either paragraph (a)(1) or paragraph (a)(2) suggests a concern that the pandemic would increase the cost of the thrifty food plan, thereby requiring an increase in benefits above the maximum monthly allotment. Nor does any provision of the statute provide guidance comparable to that in section 2302(a)(2) on how the Secretary would assess increased food costs or decide by how much to increase benefits above the maximum.

Hall suggests that section 2302(c) shows that Congress was concerned about disruptions to the food supply and not simply the loss of income, but that provision does not support her interpretation. Section 2302(c) requires the Secretary to submit a report to Congress after the pandemic is over describing "the measures taken to address the food security needs of affected populations during the emergency, any information or data supporting State agency requests, any additional measures that States requested that were not

approved, and recommendations" for the future. Families First Act, § 2302(c), 134 Stat. at 188–89. The subject matter of that report—including "additional measures that States requested"—necessarily extends beyond the distribution of the emergency allotments discussed in section 2302(a)(1). And while it is true that the concept of "food security needs" encompasses a broad range of issues, that does not mean that "temporary food needs," as used in section 2302(a)(1), must be read to account for pandemic-related disruptions to the food supply.

Second, topping-off SNAP benefits at the maximum monthly allotment for all participants is consistent with the statute governing USDA's response to other crises. To meet "temporary food needs" arising from natural disasters, Congress has authorized the Secretary to "establish temporary emergency standards of eligibility . . . for households who are victims of a disaster which disrupts commercial channels of food distribution." 7 U.S.C. § 2014(h)(1). Under that authority, USDA has created the Disaster Supplemental Nutrition Assistance Program (D-SNAP), which "provides a full month's allotment"—"the maximum allotment for the household size provided under regular SNAP"—"to households who may not normally qualify for or participate in SNAP." USDA, *Disaster SNAP Guidance* 8 (July 2014). USDA also "supplement[s] the regular SNAP benefits of ongoing households affected by the disaster to bring them up to the maximum allotment." *Id.* That supplemental assistance offsets "the impact of additional disaster-related expenses" likely to "weigh heavily" on SNAP households and ensures "parity between new D-SNAP households and ongoing clients." *Id.* at 35. It helps to offset "[l]ost or inaccessible income," "[i]naccessible liquid resources," and "[o]ut-of-pocket disaster-related expenses paid . . . by the household" (such

as "damage to or destruction of the household's home or self-employment business"). *Id.* at 12. But it does not provide supplemental assistance to SNAP households already receiving the maximum monthly allotment. *Id.* at 8.

Congress is presumed to be aware of an agency's interpretation of a statute. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). We most commonly apply that presumption when an agency's interpretation of a statute "has been officially published and consistently followed." *Autolog Corp. v. Regan*, 731 F.2d 25, 32 (D.C. Cir. 1984). If Congress thereafter reenacts the same language, we conclude that it has adopted the agency's interpretation. *Id.*; *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982). Here, the agency's interpretation of D-SNAP was not reflected in published regulations, which weakens the inference that Congress had USDA's disaster guidance in mind when it imported the term "temporary food needs" into the Families First Act. *See Rabin v. Wilson-Coker*, 362 F.3d 190, 197 (2d Cir. 2004) (questioning whether "we should assume Congress's awareness of an administrative interpretation that does not result from notice and comment rulemaking"); *United States v. Ray*, 375 F.3d 980, 991 n.14 (9th Cir. 2004). Still, we find the history suggestive. Until the Families First Act, the provision authorizing D-SNAP was the only place in Title 7 where the term "temporary food needs" appeared. 7 U.S.C. § 2014(h)(1). In construing a statute that applies to a "public health emergency," Families First Act, § 2302(a)(2), 134 Stat. at 188, it is natural to give the term "temporary food needs" the same meaning that the agency has consistently given it in the context of other kinds of "temporary emergenc[ies]," 7 U.S.C. § 2014(h)(1).

Third, if Congress wished to provide across-the-board relief to households based on increased food costs, it would most naturally have modified the metric designed to measure those costs—the thrifty food plan. *See* 7 U.S.C. §§ 2012(u), 2017(a). The statute already provides for periodic readjustment of the cost of the thrifty food plan. *Id.* § 2012(u). And in another recent national emergency, Congress directly adjusted the thrifty food plan. In response to the 2008 financial crisis, Congress expressly modified the maximum monthly allotment, directing USDA to calculate that figure "using 113.6 percent of the . . . value of the thrifty food plan." American Recovery and Reinvestment Act of 2009 (Recovery Act), Pub. L. No. 111-5, § 101(1), 123 Stat. 115, 120. That modification resulted in precisely the result advocated by Hall in this case: increased SNAP benefits for all households, including those already receiving the maximum monthly allotment. We have held that "Congress does not use different language in different provisions to accomplish the same result," and while that presumption is strongest when the two provisions are enacted at the same time, it is nonetheless relevant that Congress had before it a recent example of language that would have accomplished the result Hall claims that it intended, yet it chose not to use that language. *United States v. Fiorillo*, 186 F.3d 1136, 1148 (9th Cir. 1999) (per curiam).

Hall questions the comparison to the Recovery Act because that statute, she says, involved "a uniform nationwide increase in SNAP benefits" in response to a recession, whereas the Families First Act was enacted as "COVID-19's impacts were just beginning, and their severity varied greatly" throughout the country. So, Hall argues, rather than modify the thrifty food plan, Congress adopted an approach that would account for variation in food costs and availability among States. We see no basis for that

assumption. The Families First Act nowhere directs the Secretary to calculate emergency allotments based on a State-by-State analysis of fluctuating food costs and availability. Nor does the act specify a mechanism by which the Secretary would develop such regionally varying food plans. The more natural understanding of the difference between the two statutes is that one increased the maximum monthly benefit and the other did not.

Significantly, when Congress increased the maximum monthly benefit in the Recovery Act, it clearly identified the relevant provision under the section heading "Temporary Increase in Benefits Under the Supplemental Nutrition Assistance Program," and subheading "Maximum Benefit Increase." Recovery Act, § 101(1), 123 Stat. at 120. By contrast, Congress enacted section 2302 of the Families First Act under the nondescript heading "Additional SNAP Flexibilities in a Public Health Emergency," Families First Act, § 2302, 134 Stat. at 188, in a title designated "SNAP Waivers," *id.* div. B, tit. III, 134 Stat. at 187. On Hall's interpretation, the Families First Act yielded a much greater increase in the maximum monthly allotment—doubling it, rather than simply increasing it by 13.6 percent, and not only for the poorest households, but potentially for every household receiving SNAP benefits. We think it implausible that Congress would so fundamentally alter the scheme using such vague and inconspicuous terms. *Cf. Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 909–10 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.").

Finally, Hall urges us to reject USDA's interpretation of the statute because it would result in the denial of emergency allotments to some of the neediest households—namely, "those who already receive the maximum regular monthly

SNAP allotment because they have no income available to dedicate to purchasing food." That is a serious concern, but it does not give us permission to depart from what we have determined to be the best reading of the statutory text. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019). Instead, as the district court explained, "[t]his case does not call on [us] to decide what would be the fairest or most effective way to assist SNAP recipients in this era of COVID-19, because that judgment is committed to the political branches." 467 F. Supp. 3d at 840. And as discussed above, it appears more likely that Congress had a different policy objective in mind, consistent with USDA's responses to previous crises: to quickly top-off household benefits at the maximum monthly allotment in light of difficult-to-document disruptions in income.

Because Hall is unlikely to succeed on the merits of her claims, the district court did not abuse its discretion in denying a preliminary injunction.

**AFFIRMED.**

THOMAS, Chief Judge, dissenting:

The USDA's interpretation of section 2302(a)(1) of the Families First Coronavirus Response Act ("Families First Act"), Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020), cannot be squared with the text of that provision or the structure of the statute. Accordingly, Plaintiffs have established a clear likelihood of success on their claim that the agency's interpretation cannot stand under 5 U.S.C. § 706(2). *See also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (setting forth preliminary injunction factors); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir.

2015) (explaining that a mandatory injunction may not issue unless the "law and facts clearly favor" the movant's position). Because I would reverse the denial of the preliminary injunction and remand to the district court for consideration of the remaining factors under *Winter*, I respectfully dissent.

I

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (C). The threshold question for "a court reviewing an administrative interpretation of a statute" is "whether Congress has spoken clearly on the issue." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1141 (9th Cir. 2007). If it has, the Court "must give effect to the unambiguously expressed intent of Congress regardless of the agency's view." *Id.* at 1141 (quotation marks omitted); *see also Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031 (9th Cir. 2007) ("If Congress has spoken directly to the question at hand, we may not defer to a contrary agency interpretation."). Only where the statute is ambiguous may a court "turn to extrinsic evidence such as legislative history" to determine its meaning. *J.B. v. United States*, 916 F.3d 1161, 1167 (9th Cir. 2019). Statutory language is "ambiguous only if it is susceptible to more than one reasonable interpretation." *Id.* (quotation marks omitted).

A

Section 2302(a)(1) states, in pertinent part, that the USDA must "provide . . . for emergency allotments to

households participating in [SNAP] to address temporary food needs not greater than the applicable maximum monthly allotment for the household size." In my view, the most grammatical and logical construction of "not greater than the applicable maximum monthly *allotment*" (the "limiting clause") is as a cap on the value of "emergency *allotments*." Congress did not qualify the phrase "households participating in [SNAP]." Therefore, the statute, by its plain terms, makes *all* SNAP households eligible for emergency aid, not just those that had enough income to afford some of their pre-COVID food needs.

B

The USDA counters that the limiting clause applies to the sum total of regular and emergency allotments, thus barring households that already receive the maximum monthly allotment in non-pandemic conditions (i.e., the neediest SNAP households) from receiving emergency aid. But that is not what the statute says. An agency action may neither amend a statute, *Koshland v. Helvering*, 298 U.S. 441, 447 (1936), nor add to a statute "something which is not there," *United States v. Calamaro*, 354 U.S. 351, 359 (1957). Section 2302(a)(1) does not refer to the *sum* of emergency and regular allotments; it refers to emergency allotments alone. It would be incongruous to construe the statute as imposing a statutory cap on something not mentioned in the statute.

C

The majority and the USDA invoke related canons of construction to construe the limiting clause as a cap on "temporary food needs," rather than "emergency allotments." The agency argues that the "last-antecedent rule," under which "a limiting clause or phase . . . should

ordinarily be read as modifying only the noun or phrase that it immediately follows," *Lockhart v. United States*, 136 S. Ct. 958, 963 (2016), requires construing "temporary food needs" as the last antecedent to which section 2302(a)(1)'s limiting clause applies.  The majority invokes instead the "nearest-reasonable-referent canon," but concedes that the "substance of the rule is the same": "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent." *See also United States v. Davis*, 961 F.3d 181, 188 (2d Cir. 2020) ("[T]he 'nearest reasonable referent' rule . . . seems to be a close cousin of the well-established 'rule of the last antecedent.'").  Neither canon supports the agency's interpretation.

Courts typically apply the last-antecedent rule to statutes that "include a *list* of terms or phrases followed by a limiting clause." *Lockhart*, 136 S. Ct. at 962 (emphasis added); *see, e.g., id.* (applying the rule where a statute listed the following predicate crimes: "aggravated sexual abuse, sexual abuse, or *abusive sexual conduct involving a minor or ward*" (citing 18 U.S.C. § 2252(b)(2)) (emphasis added)); *see also Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 999 n.2 (9th Cir. 2017) ("Under the last-antecedent rule, the series 'A or B with respect to C' contains two items: (1) 'A' and (2) 'B with respect to C.'" (quotation marks omitted)), *abrogated on other grounds by GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020).  Section 2302(a)(1) is not such a statute.

Even assuming the canon can be applied in this context, it favors Plaintiffs' interpretation over the agency's. "[E]mergency allotments . . . to address temporary food needs" is best read as a unified phrase that immediately

precedes the limiting clause. *See Lockhart*, 136 S. Ct. at 963 ("[A] limiting clause or phase . . . should ordinarily be read as modifying only the noun *or phrase* that it immediately follows." (emphasis added)). Indeed, this phrase "hangs together as a unified whole, referring to a single thing," *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018): emergency allotments with the purpose of addressing temporary food needs. Accordingly, the "most natural way to view the modifier"—"not greater than the applicable maximum monthly allotment"—"is as applying to the entire preceding clause." *Id.* at 1077 (applying the limiting phrase "as set forth in subsection (b)" to "any covered class action" where the statute at issue referred to "*[a]ny covered class action* brought in any State court involving a covered security, *as set forth in subsection (b)*" (citing 15 U.S.C. § 77p(c)) (emphasis added)); *see also id.* (rejecting the government's position that, under the last-antecedent rule, the limiting phrase modified "involving a covered security").

Finally, even if "emergency allotments" and "temporary food needs" are separate antecedents or referents, both the last-antecedent and nearest-reasonable-referent canons "must yield to the most logical meaning of a statute." *James v. City of Costa Mesa*, 700 F.3d 394, 399 n.7 (9th Cir. 2012) (citation omitted); *see also Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of Internal Revenue Serv.*, 926 F.3d 819, 824 (D.C. Cir. 2019) ("The nearest-reasonable-referent canon—like its cousin, the last-antecedent rule—'is not an absolute and can assuredly be overcome by other indicia of meaning.'" (quoting *Lockhart*, 136 S. Ct. at 963)). For the reasons stated herein, the agency's interpretation is neither the most logical nor reasonable reading of section 2302(a)(1).

### D

The majority concedes that applying the statute's limiting clause to "temporary food needs" under the nearest-reasonable-referent canon "does not end the analysis" because "temporary food needs," which lacks a statutory definition, "is susceptible to multiple readings." Nevertheless, "three considerations" lead the majority to conclude that the agency's "reading of section 2302(a)(1) is more consistent with the overall statutory scheme." I respectfully disagree.

### 1

First, section 2302(a)(2), an adjacent provision, does not favor the USDA's interpretation. To the extent that provision permitted the USDA to "relax[] 'application and reporting requirements'" in recognition that the USDA "might not have access to key information affecting households' eligibility for SNAP benefits, including changes in income," that does not mean section 2302(a)(1)'s exclusive purpose is to "top-off benefits to offset sudden disruptions in income," To impute that purpose to section 2302(a)(1) is to read "temporary food needs" as "temporary loss of income due to stay-at-home orders" or "temporary food needs as a result of pandemic-related income loss." If Congress had intended that meaning, it could easily have said so. Instead, it used the phrase "temporary food needs," which must logically be construed to mean "temporary food needs" irrespective of their source.

If anything, section 2302(a)(2) favors Plaintiffs' interpretation. Because the Families First Act does not provide a mechanism for verifying income loss on a household-by-household basis, and enables the USDA to waive income reporting requirements, *see* Families First

Act, § 2302(a)(2), 134 Stat. at 188, the USDA's reading would mean that households that have suffered no actual income loss may receive emergency aid, while the poorest households cannot. Because the USDA's income-focused conception of section 2302(a) would lead to this "absurd and unjust result which Congress could not have intended," *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000), it cannot be the "best reading of the statutory text." *See Gilliam v. U.S. Dep't of Agric.*, No. 20-cv-3504-JMY, 2020 WL 5501220, at *13 (E.D. Penn. Sept. 11, 2020) (noting this "illogical result").

Additionally, Plaintiffs' reading finds support in another nearby provision, section 2302(c), which reflects "a concern that the pandemic would increase the cost of the thrifty food plan." Section 2302(c) instructs the USDA to submit a report to Congress, within 18 months of the public health emergency declaration being lifted, about "the measures taken to address the *food security needs* of affected populations during the emergency." (emphasis added). "Food security means *access* by all people at all times to enough food for an active, healthy life." USDA, Food Security in the U.S., Overview (last updated November 13, 2020), https://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us/ (emphasis added). Because a household's access to food depends on food costs and supply, in addition to income, section 2302(c) belies the conclusion that Congress did not intend to provide emergency aid under section 2302(a)(1) to households that can no longer afford to purchase adequate food with their non-emergency SNAP benefit because of pandemic-related food supply disruptions and inflation. Accordingly, the statute, read as a whole, demonstrates a Congressional desire "to address the pandemic's impact on low-income households' access to food."

2

Next, there is no textual basis for concluding that Congress intended the USDA to implement section 2302(a)(1)'s emergency allotments in the same way that the agency has implemented disaster-response benefits under 7 U.S.C. § 2014(h)(1) of the Food and Nutrition Act of 2008 ("FNA")[1]—by taking a "topping-off" approach that provides "supplemental allotments" to bring SNAP households affected by a natural disaster up to the maximum monthly allotment. *See Disaster Snap Guidance* 8, 35 (July 2014).

As a preliminary matter, and as the majority recognizes, the agency's D-SNAP guidance does not appear in published regulations. Accordingly, there is no reason to "assume Congress's awareness" of that interpretation. *United States v. Ray*, 375 F.3d 980, 991 n.14 (9th Cir. 2004). Even if Congress was aware of supplemental D-SNAP assistance, there is no evidence in the text or legislative history of section 2302(a)(1) that Congress sought to replicate those "*supplements*" when it provided for "*emergency allotments*." *See Gilliam*, 2020 WL 5501220, at *15 ("If Congress had intended to provide COVID-19 relief under the auspices of D-SNAP, it could have simply enacted a provision stating that the COVID-19 public health

---

[1] Section 2014(h)(1) directs the Secretary of Agriculture to "establish temporary emergency standards of eligibility for the duration of the emergency for households who are victims of a disaster which disrupts commercial channels of food distribution, if such households are in need of temporary food assistance and if commercial channels of food distribution have again become available to meet the *temporary food needs* of such households." (emphasis added). Pursuant to this statutory authority, the USDA established the Disaster Supplemental Nutrition Assistance Program ("D-SNAP").

emergency is deemed a 'disaster' within the meaning of [7 U.S.C.] § 2014(h)(1)."). Because section 2302(a)(1) provides for "emergency allotments" instead of "supplements" and does not refer to the USDA's D-SNAP procedures or 7 U.S.C. § 2014(h)(1), I am unpersuaded that the appearance of the undefined term "temporary food needs" in both 7 U.S.C. § 2014(h)(1) and section 2302(a)(1) supports the USDA's interpretation.

3

Finally, I disagree that Congress could not have intended to make emergency allotments available to all SNAP households, including the neediest, where it did not directly increase the maximum monthly allotment, as it did in the American Recovery and Reinvestment Act of 2009 ("Recovery Act"), Pub. L. No. 111-5, § 101(a)(1), 123 Stat. 115, 120 (Feb. 17, 2009) (providing for temporary calculation of SNAP benefits at 113.6% of the thrifty food plan).

This contention disregards key contextual differences between the Recovery Act and the Families First Act: "When Congress adopted a uniform, nationwide increase in SNAP benefits in the Recovery Act, the country was months into a national recession. When it enacted the Families First Act, COVID-19's impacts were just beginning, and their severity varied greatly among states." The latter context led Congress to adopt a more flexible approach: "emergency allotments to address state-specific needs, determined through data on a state-by-state basis." Because Congress used different language the two statutes to accomplish different results in response to different emergencies, the rule that "Congress does not use different language in different provisions to accomplish the *same* result" should have no bearing on our interpretation of section 2302(a)(1).

*United States v. Fiorillo*, 186 F.3d 1136, 1148 (9th Cir. 1999) (per curiam) (emphasis added).

To be sure, the Families First Act does not expressly "direct[] the Secretary to calculate emergency allotments based on a State-by-State analysis of fluctuating food costs and availability" or "specify a mechanism by which the Secretary would develop such regionally varying food plans." But, as previously noted, the USDA's income-focused conception of section 2302(a)(1) suffers from the same flaw: The Families First Act does not specify a mechanism for verifying income loss. Instead, the statute simply directs states to support their requests for emergency allotments with "sufficient data." Families First Act, § 2302(a)(2), 134 Stat. at 188. There is no textual basis for concluding that "sufficient data" excludes data regarding "temporary food needs" resulting from sources other than income loss, such as food supply disruptions. Indeed, California's initial request for emergency allotments for all California SNAP households reflected the common-sense understanding that "temporary food needs" may arise from *both* the loss of "essential earned income" *and* a shortfall in affordable food, which places "pressure on the emergency food network."

The majority further concludes that Plaintiffs' interpretation runs afoul of the principle that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." In other words, Congress "does not, one might say, hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). This conclusion has two premises: (i) Plaintiffs' interpretation has the "dramatic impact" of increasing monthly SNAP benefits by 200%, and (ii) Congress would not hide such an "elephant" under the

"vague," "inconspicuous," and "nondescript heading 'Additional SNAP Flexibilities in a Public Health Emergency.'" *Compare* Families First Act, § 2302, 134 Stat. at 188 *with* Recovery Act, § 101(a), 123 Stat. at 120 (enacting increase to thrifty food plan under heading "Maximum Benefit Increase").

Both premises are flawed. First, Plaintiffs' interpretation would only permit the poorest households to double their SNAP benefits if (i) a state agency requested that increase; and (ii) a state agency supported that request with "sufficient data (as determined by the Secretary through guidance)." Families First Act, § 2302(a)(1), 134 Stat. at 188. That is hardly a "dramatic" overhaul of the SNAP regulatory scheme, but rather a measured, reality-driven response to an "unprecedented pandemic of varying geographic severity and unknown duration." *Gilliam*, 2020 WL 5501220, at *15.[2]

Second, even if section 2302(a)(1) amounts to an "elephant," it does not hide in a "mousehole." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020) (explaining that a litigant "cannot hide behind the no-elephants-in-mouseholes canon" without answering "[w]here's the mousehole?"). Along with section 2301, section 2302 falls under Title III, "SNAP Waivers." Far from being a "mousehole," "SNAP Waivers" announces Congress's intent to suspend enumerated aspects of the SNAP scheme during a public health crisis. *See* Families First Act,

---

[2] Notably, California's denied request did not seek an aggregate benefit issuance exceeding the amount allowable under the USDA's interpretation. *See Gilliam*, 2020 WL 5501220, at *6 (explaining that Pennsylvania proposed to issue all SNAP households an emergency allotment equal to 50% of the maximum monthly allotment for their household size).

§§ 2301(a), 134 Stat. at 187–88 (waiving SNAP work requirements under 7 U.S.C. § 2015(o)(2), subject to one exception, in an effort to provide "SNAP Flexibility for Low-Income Jobless Workers"), 2302(a)(2), 134 Stat. at 188 (authorizing the USDA to waive, under certain conditions, the FNA's reporting and application requirements).

In short, these three considerations cannot bear the weight of the USDA's interpretation.

E

The USDA further contends that Congress's subsequent passage of appropriations in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), demonstrates that it agreed with the USDA's interpretation of section 2302(a). The majority does not rely on this consideration, and for good reason. There is no evidence in the record, nor in the CARES Act, that Congress itself was aware of—still less *relied* on—that estimate in appropriating $15.81 billion for SNAP under the CARES Act. Indeed, the USDA does not claim that its estimate—much less any assumptions made in preparing any estimate—was included in a committee report or otherwise communicated to Congress.

F

In sum, Plaintiffs have established a likelihood of success on the merits of their claim, and the district court erred in concluding otherwise. The plain language of section 2302(a)(1) compels the conclusion that Congress did not intend to limit the emergency assistance available under that provision to the maximum amount that SNAP households may receive under non-emergency conditions.

## II

The district court did not reach the remainder of the *Winter* factors because it rested its decision on the first factor.  I would remand this case to the district court for "consideration of the remaining *Winter* factors in the first instance."  *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (citation omitted).

For these reasons, I respectfully dissent.